ACCEPTED
12-14-00254-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
3/9/2015 9:13:09 AM
CATHY LUSK
CLERK

NO. 12-14-00254-CV
TO THE COURT OF APPEALS FOR
THE TWELFTH DISTRICT OF TEXAS
AT TYLER, TEXAS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS

3/9/2015 9:13:09 AM

CATHY S. LUSK
Clerk

_____

NEURODIAGNOSTIC TEX, L.L.C.
Appellants,

v.

ROBERT "JOSH" PIERCE and SYNERGY IOM, L.L.C.
Appellees.

_____

**APPELLEE SYNERGY IOM, LLC'S OPENING BRIEF**

_____

Appeal from the 7th District Court, Smith County, Texas,
Honorable Kerry L. Russell, Presiding

_____

WHITAKER CHALK SWINDLE & SCHWARTZ PLLC
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102-4186
Phone: (817) 878-0500
Fax: (817) 878-0501

WILLIAM BRENT SHELLHORSE
Texas Bar No. 24008022
HUNTER T. MCLEAN
Texas Bar No. 00788026
PATRICK H. ROSE, IV
Texas Bar No. 24079244
WHITAKER CHALK SWINDLE
& SCHWARTZ PLLC
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102-4186
(817) 878-0500
(817) 878-0501 (Facsimile)

**IDENTITY OF COUNSEL AND PARTIES**

Appellant has accurately set forth the identity of the parties, with the exception of Synergy's counsel:

**Synergy's Trial Counsel:**
Hunter T. McLean
Patrick H. Rose, IV
William Brent Shellhorse
WHITAKER CHALK SWINDLE & SCHWARTZ PLLC
301 Commerce Street, Suite 3500
Fort Worth, TX 76102

**Synergy's Appellate Counsel:**
William Brent Shellhorse
Hunter T. McLean
Patrick H. Rose, IV
WHITAKER CHALK SWINDLE & SCHWARTZ PLLC
301 Commerce Street, Suite 3500
Fort Worth, TX 76102

## TABLE OF CONTENTS

IDENTITY OF COUNSEL AND PARTIES .................................................................ii

TABLE OF CONTENTS ....................................................................................iii

INDEX OF AUTHORITIES ...............................................................................vi

STATEMENT REGARDING ORAL ARGUMENT ........................................................ 1

I.  STATEMENT OF FACTS .............................................................................. 2

II. SUMMARY OF ARGUMENT .......................................................................... 5

III. ARGUMENT & AUTHORITIES ....................................................................... 6

    A. APPELLANT HAD ADEQUATE TIME FOR DISCOVERY (APPELLANT'S ISSUE #1) ....... 6

        1. Appellant Cannot NOW Complain of Scheduling Order ................................. 7

        2. Different Issues Raised On Appeal ........................................................ 7

        3. Motion and Brief Are Insufficient ........................................................ 8

        4. No Abuse of Discretion in Denying Appellant's Continuance ......................... 9

            (a).  Maximum Allowable Time Under Scheduling Order ........................... 9

            (b).  Rule 166a(i) Does Not apply to Traditional Summary Judgment ........... 9

            (c).  Appellant Did NOT Need Synergy's Revenue/Profit Information to Respond to Summary Judgment Challenges ..................................... 9

    B. ADEQUATE NOTICE OF SUMMARY JUDGMENT GROUNDS (APPELLANT'S ISSUE #2C) ............................................................... 13

        1. Appellant's Special Exceptions are Insufficient ....................................... 14

        2. Synergy's Motion Sufficiently Delineated Grounds ................................... 14

C. COURT PROPERLY CONSIDERED SYNERGY'S SUMMARY JUDGMENT
EVIDENCE (APPELLANT ISSUE #3) ............................................................ 15

   1. Trial Court Properly Considered Second Supplement
     (*i.e.* Appellant's Judicial Admissions) ................................................. 15

   2. Hearing Transcripts Were Properly Admitted ...................................... 19

D. SYNERGY COULD NOT INTERFERE WITH THE COVENANT BECAUSE
IT IS NOT ANCILLARY TO AN OTHERWISE ENFORCEABLE
AGREEMENT (APPELLANT'S ISSUE #4B) ................................................... 20

   1. Training ............................................................................................... 23

      (a). No Evidence that Training or Advancement of Funds for
          Training Was Worthy of Protection ..................................... 23

      (b). Training and Advancement of Funds for Training Was NOT
          An Interest Worthy of Protection ......................................... 24

   2. Covenant Not Designed to Enforce Pierce's Return
   Promise Regarding Training ................................................................. 27

      (a). No Evidence Covenant Was Designed to Enforce Pierce's Promise
          Regarding Training ............................................................... 27

      (b). Covenant NOT Designed to Enforce Pierce's
          Promise Regarding Training ................................................. 28

   3. Customer Information Not an Interest Worthy of Protection ............... 29

      (a). No Evidence that Customer Information Was Worth
          Of Protection or Reasonably Related to One ....................... 29

      (b). Customer Identities NOT Worthy of Protection ................... 34

      (c). Surgeon Identities/Preferences NOT an Interest Worthy of Protection. 35

      (d). Appellants' Pricing NOT an Interest Worthy of Protection .................. 36

      (e). Appellant Not Relieved From Establishing Ancillary Requirements ... 38

E. THE COVENANT'S RESTRAINTS ARE UNREASONABLE (APPELLANT'S ISSUE #4C). 40

    1. No Evidence that 5 Year Covenant Was Reasonable ...................................... 40

        (a). Advancement Does NOT Make 5 Years Reasonable ........................... 41

        (b). Long Employment Does NOT Equal Long Covenant .......................... 42

    2. Geographic Restraints Were Unreasonable ...................................... 43

    3. Scope of Activities from Which Pierce is Prohibited is Unreasonable ............ 46

G. TRIAL COURT NOT REQUIRED TO REFORM COVENANT (APPELLANT ISSUE #4E) .. 48

H. APPELLANT DID NOT PROVE ELEMENTS OF CLAIM (APPELLANT ISSUE #4D) ....... 52

    1. Damages Foreclosed by Statute ...................................... 52

    2. No Evidence of Lost Profits (*i.e.* "Recoverable Damages") ........................... 54

    3. No Evidence of Interference (Appellant Issue #6) ........................................... 55

PRAYER ...................................................................................................................... 58

CERTIFICATE OF COMPLIANCE .............................................................................. 59

CERTIFICATE OF SERVICE ....................................................................................... 59

**Cases**

*Acad. of Skills & Knowledge, Inc. v. Charter Sch., USA, Inc.,*
260 S.W.3d 529, 534 (Tex. App.—Tyler 2008, pet. denied) ................................. 38, 39

*Accord Amigo Broad., LP v. Spanish Broad. Sys., Inc.*,
521 F.3d 472, 493 (5th Cir. 2008) ................................................................... 56

*ACS Invs., Inc. v. McLaughlin,* 943 S.W.2d 426, 431 (Tex.1997) .................................... 56

*Aldous v. Bruss*, 405 S.W.3d 847, 857
(Tex. App.—Houston [14th Dist.] 2013, no pet.) ............................................... 14

*Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 649
(Tex. 2006) ...................................................................................... 22, 23, 26

*Allan J. Richardson & Assocs., Inc. v. Andrews*, 718 S.W.2d 833, 837
(Tex. App.—Houston [14th Dist.] 1986, no writ) ............................................... 31

*Allen v. United of Omaha Life Ins. Co.*, 236 S.W.3d 315, 326
(Tex. App.—Fort Worth 2007, pet. denied) ....................................................... 9

*Am. Fracmaster, Ltd. v. Richardson*, 71 S.W.3d 381
(Tex. App.—Tyler 2001, pet. granted, judgment vacated w.r.m.) ............................. 40

*Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W.2d 274, 276
(Tex. App.—Houston [1st Dist.] 1988) *as modified,* 771 S.W.2d 562
(Tex. App.—Houston [1st Dist.] 1989, no writ) ................................................. 31

*Arabesque Studios, Inc. v. Academy of Fine Arts Int'l*, 529 S.W.2d 564
(Tex. App.—Dallas 1975, no writ) ............................................................. 12, 13

*Atlas Copco Tools v. Air Power Tool & Hoist*, 131 S.W.3d 203, 209
(Tex. App.—Fort Worth 2004, pet. denied) .................................................... 54, 55

*Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 857 (Tex. App.—Houston
[14th Dist.] 2001, pet. denied) .................................................................... 56

*Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) ..................................... 14

*Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex. 1996) ................................... 16

*Benson v. Gaston*, 2014 Tex. App. LEXIS 2753, at *6 (Tex. App.—Tyler 2014, pet. denied)................................................................................................53

*Blake v. Lewis*, 886 S.W.2d 404, 409 (Tex. App.—Houston [1st Dist.] 1994, no writ).....8

*Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex.1993) ................................56

*Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 792
(Tex. App.—Houston [1st Dist.] 2001, no pet.) ...................................... 18, 44, 45, 46, 52

*Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 686 (Tex. 2002).............. 16

*Carter v. MacFadyen*, 93 S.W.3d 307, 311 (Tex. App.—Houston
[14th Dist.] 2002, pet. denied) ..............................................................................6

*Castano v. San Felipe Ag., Mfg., & Irrigation Co.*, 147 S.W.3d 444, 453
(Tex. App.—San Antonio 2004, no pet.)............................................................ 14

*Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625-26 (Tex. 1996) .........................53

*Cobb v. Caye Publ. Grp., Inc.,* 322 S.W.3d 780, 784-86
(Tex. App.—Fort Worth 2010, no pet.)....................................................... 44, 45

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923
(Tex. 2013) *reh'g denied* (Feb. 14, 2014) .................................................... 20

*Cook v. Nacogdoches Anesthesia Grp., L.L.P.,* 167 S.W.3d 476, 480
(Tex. App.—Tyler 2005, no pet.) ................................................................ 17

*Courtney v. Nibco, Inc.,* 152 S.W.3d 640, 644 (Tex. App.—Tyler 2004, no pet.) ........... 30

*Custom Drapery Co. v. Hardwick*, 531 S.W.2d 160, 165
(Tex. Civ. App.—Houston [1st Dist.] 1975, no writ)...................................... 24

*Dale v. Hoschar*, 2014 Tex. App. LEXIS 8816, *4
(Tex. App.—Dallas 2014, no pet.)............................................................. 43, 44

*Davis v. HydPro, Inc.*, 839 S.W.2d 137, 140 (Tex. App.—Eastland 1992, writ denied) .56

*Daytona Grp. of Tex., Inc. v. Smith*, 800 S.W.2d 285, 290
(Tex. App.—Corpus Christi 1990, writ denied) ....................................23, 26, 49, 50

*DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681-82 (Tex. 1990)............. 40, 48, 49, 50

*Emergicare Sys. Corp. v. Bourdon,* 942 S.W.2d 201, 204
(Tex. App.—Eastland 1997, no pet) ........................................................... 49

*Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 230-31
(Tex. App.—Texarkana 1998, no pet.)......................................18, 21, 24, 44, 45, 46, 52

*Flory v. Daimler Chrysler Corp.*, 2003 Tex. App. LEXIS 10235, at *7-*8
(Tex. App.—Tyler 2003, pet. denied) ...........................................................53

*Flynn Bros., Inc. v. First Med. Associates*, 715 S.W.2d at 785.........................................18

*Gallagher Healthcare Ins. Services v. Vogelsang,* 312 S.W.3d 640, 654
(Tex. App.—Houston [1st Dist.] 2009, pet. denied) .......................................40

*Gambling Paraphernalia Devices v. State*, No. 12-01-00161, 2002 Tex. App.
LEXIS 3613, *5 (Tex. App.—Tyler 2002, no pet.)............................................7

*Gomez v. Zamora*, 814 S.W.2d 114, 118 (Tex. App.—Corpus Christi 1991, no writ)….44

*Grace v. Orkin Exterminating Co.*, 255 S.W.2d 279, 285
(Tex. Civ. App.—Beaumont 1953, writ ref'd n.r.e.)..........................................24

*Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 n.1 (Tex. 1992)....................54, 55

*Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) ..............16

*Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000) .....................16

*Hospital Consultants, Inc. v. Potyka*, 531 S.W.2d 657, 662
(Tex. Civ. App.—San Antonio 1975, writ ref'd n.r.e.)......................................23

*IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W .3d 191, 197
(Tex. App. — Fort Worth 2005, no pet.)........................................................31

*In re Cauley*, 437 S.W.3d 650, 657 (Tex. App.—Tyler 2014, orig. proceeding) .......30, 33

*John Paul Mitchell Sys. v. Randalls Food Markets, Inc.*, 17 S.W.3d 721, 730
(Tex. App.—Austin 2000, pet. denied) ........................................................56

*John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 84-85
(Tex. App.—Houston [14th Dist.] 1996, writ denied)..........20, 40, 45, 46, 47, 48, 49, 50

*Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 207 (Tex. 2002) .........................15

*Johnston v. Am. Med. Int'l*, 36 S.W.3d 572, 576 (Tex. App.—Tyler 2000, pet. denied)..53

*Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 663, 665 (Tex. 1990), *superseded on other grounds by statute as stated in Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) *reh'g denied* (Feb. 14, 2014) .......................................................... 18, 20, 53

*Lazer Spot, Inc. v. Hiring Partners, Inc.*, 387 S.W.3d 40, 49 (Tex. App.—Texarkana 2012, pet. denied) ................................................. 18, 21, 24, 56

*Malooly Brothers, Inc. v. Napier*, 461 S.W.2d 119, 120 (Tex. 1970) ............................... 53

*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 849 (Tex. 2009) ................................................................... 21

*Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 768, 773 (Tex. 2011) ............... 22, 43

*Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989) ................................................... 16

*McClure v. Attebury*, 20 S.W.3d 722, 729 (Tex. App.—Amarillo 1999, no pet.) ............. 6

*McConathy v. McConathy*, 869 S.W.2d 341, 342 (Tex. 1994) ........................................ 20

*McCoy v. Rogers,* 240 S.W.3d 267, 272 (Tex. App.—Houston [1ˢᵗ Dist.] 2007, pet. denied) ..................................................................................................... 53

*Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 599 (Tex. App.—Amarillo 1995, no writ) ........................................................................ 21

*Morgan v. City of Alvin*, 175 S.W.3d 408, 420 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ............................................................. 8

*National Union Fire Ins. Co. v. Valdez*, 863 S.W.2d 458, 461 (Tex. 1993) ..................... 39

*NCH Corp. v. Share Corp.,* 757 F.2d 1540, 1543–1544 (5ᵗʰ Cir.1985) ..................... 18, 21

*Numed v. McNutt*, 724 S.W.2d 432, 435 (Tex. Civ. App.—Fort Worth 1987, no writ) ..................................................... 31, 37, 38

*Patel v. City of Everman*, 179 S.W.3d 1, 17 (Tex. App.—Tyler 2004, pet. denied) ........ 43

*Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387 (Tex. 1991)......................................... passim, 18, 20, 43, 44, 45, 46, 47, 52

*Philip H. Hunke, D.D.S. v. Wilcox*, 815 S.W.2d 855, 858 (Tex. App.—Corpus Christi 1991, writ denied) .......................................................... 36

*Powell Indus., Inc. v. Allen,* 985 S.W.2d 455, 456 (Tex. 1998).................................. 52, 55

ix

*Rest. Teams Intern., Inc. v. MG Sec. Corp.*, 95 S.W.3d 336, 339
(Tex. App.—Dallas 2002, no pet.)................................................................. 6

*Sentinel Integrity Solutions, Inc. v. Mistras Grp., Inc.,* 414 S.W.3d 911, 921
(Tex. App.—Houston [1st Dist.] 2013, pet. denied) ..................................... 49

*Sharma v. Vinmar Int'l, Ltd.,* 231 S.W.3d 405, 424
(Tex. App.—Houston [14th Dist.] 2007, no pet.)........................................... 34

*Simon v. Tudor Ins. Co.,* 2014 Tex. App. LEXIS 1321, 18-19
(Tex. App.—Dallas 2014, no pet.)................................................................. 8

*Sivley v. Sivley*, 972 S.W.2d 850, 861 (Tex. App.—Tyler 1998, no pet.)........................... 7

*SJW Prop. Commerce, Inc. v. Sw. Pinnacle Properties, Inc.*, 328 S.W.3d 121, 152
(Tex. App.—Corpus Christi 2010, pet. denied)............................................. 56

*Star-Telegram, Inc. v. Walker*, 834 S.W.2d 54, 57 (Tex. 1992) ................................. 34, 37

*Stone v. Griffin Communications & Sec. Sys., Inc.*, 53 S.W.3d 687, 696, no pet.),
*overruled on other grounds by Am. Fracmaster, Ltd. v. Richardson*, 71 S.W.3d 381
(Tex. App.—Tyler 2001, pet. granted, judgment vacated w.r.m.) ......................... 40, 41

*Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 761
(Tex. 1995).................................................................................. 39

*Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768, 844–45
(Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dismissed,*
485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988)....................................... 56

*Texas Div.-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994)......................... 33

*Travel Masters, Inc. v. Star Tours, Inc.,* 827 S.W.2d S.W.2d 830, 832-833
(Tex. 1991).................................................................................. 18, 21

*U.S. Risk Ins. Group, Inc. v. Woods*, 399 S.W.3d 295, 301
(Tex. App.—Dallas 2013, no pet.)............................................................. 47

*Weatherford Oil Tool Co. v. Campbell*,
161 Tex. 310, 340 S.W.2d 950, 951-52 (1960) ............................................... 44, 47

*Webb v. Hartman Newspapers, Inc.*, 793 S.W.2d 302, 303
(Tex. App.—Houston [14th Dist.] 1990, no writ) ..................................... 44, 45, 46, 52

*Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 660-61, 654, 660, 663-64

    (Tex. App.—Dallas 1992, no writ) .................................................. 21, 44, 45, 46, 52, 53

## Statutes

TEX. BUS. & COMM. CODE §§ 15.50-15.52 .......................................................... 6

TEX. BUS. & COMM. CODE § 15.05 .................................................................. 21

TEX. BUS. & COMM. CODE ANN. § 15.50 ............................................... 6, 21, 40

TEX. BUS. & COMM. CODE ANN. §§ 15.51(b), (c) .................................... 19, 21, 40, 49, 53

## Rules

TEX. R. APP. P. 33.1(a) ................................................................................. 7

TEX. R. CIV. P. 198.3 ............................................................................ 16, 18

TEX. R. CIV. P. 90 .................................................................................... 14

TEX. R. CIV. P. 91 .................................................................................... 14

**STATEMENT REGARDING ORAL ARGUMENT**

Appellee believes that the issues have been fully briefed and does not believe that oral argument will aid this Court. Appellee will participate in oral argument if Appellant's request for oral argument is granted.

Appellee Synergy IOM LLC ("Synergy") believes that Appellant Neurodiagnostic Tex. LLC's ("Appellant") brief fails to set forth all relevant facts; therefore, Synergy provides the following statement of facts. Synergy requests that this Court affirm the judgment and would respectfully show this Court as follows:

## I. STATEMENT OF FACTS

Synergy and Appellant are among a number of companies providing intraoperative neurophysiologic monitoring ("IOM") to hospitals. (CR 231). Appellant contracts with hospitals where other IOM companies simultaneously contract with that same hospital. (CR 231, 962).

While a surgeon decides whether to have IOM during a surgical procedure (CR 231-34, 821), Appellant does not contract with surgeons (CR 231-34) and does not consider surgeons to be its customers. (CR 231-34). The surgeon merely requests that the surgical facility have IOM available. (CR 231-34).

The surgical facility (*e.g.*, a hospital) contracts directly with the IOM provider (CR 231-32, 821, 856), and it is the hospital that schedules the IOM procedure and assigns cases to Appellant. (CR 235-37).[1] Appellant cannot provide services in a hospital unless it contracts with that hospital. (CR 231-34). Appellant characterizes itself in this process as a subcontractor to the hospital. (CR 266).

Appellee Josh Pierce ("Pierce") is a former employee of Appellant and is certified as an IOM technician. (CR 172). As an IOM technician, Pierce works in surgical operating rooms where he simply connects monitoring equipment to patients and makes

---

[1] Appellant does not know how it is selected to provide IOM services on a given case. (CR 235-37).

sure the equipment is working. (CR 172). Pierce does not interpret the IOM data gathered by the equipment. Pierce stays in the operating room monitoring the equipment while a neurologist remotely monitors and interprets the data throughout surgery. (CR 172). Pierce does not perform IOM outside the four walls of a surgical facility. (CR 172). And, Pierce does not use any confidential information in the performance of his duties. In fact, an IOM technicians are board certified such that their duties are standardized throughout the industry. (CR 183-84, 457).

While Appellant's employee, Pierce did *not* negotiate with hospitals and was *not* involved in meetings where negotiations occurred. (CR 173). He was *not* asked to solicit customers and did *not* solicit customers on behalf of Appellant. (CR 173). Pierce was never given Appellant's marketing materials and does not recall receiving any information from Appellant that Appellant indicated was proprietary or secret. (CR 173).

Pierce signed an employment agreement containing a covenant not to compete (the "Covenant"). (CR173, 176-90).[2] In the employment agreement, Appellant agreed to advance Pierce the costs for certification training; however, Appellant did so in exchange for: (*i*) Pierce's promise to work for 48 months after becoming board eligible; or (*ii*) repayment of $5,000.00, with interest. (CR183-186). Pierce is not prohibited from using or disclosing this training in any manner whatsoever. (CR 179-80).

The Covenant prohibits Pierce from, among other things, engaging in any business or activity which "directly" or "indirectly" competes with Appellant; there is also an "all

---

[2] The employment agreement is contained in the Appendix as Exhibit A, which is filed by Synergy contemporaneously herewith.

customers" non-solicitation provision. (CR 181-82). Although "directly" and "indirectly" are undefined, Appellant admits that an IOM tech working with surgeon with whom Appellant has not previously worked is neither directly nor indirectly competitive with Appellant. (CR 220-21).

Dr. Brent Alford ("Dr. Alford") is a surgeon. (CR 173). For a short period of time in 2012, Dr. Alford owned a monitoring company, and that company used Appellant as a subcontractor to provide monitoring services. (CR 209-10). Dr. Alford's monitoring company paid Appellant $150 per procedure, as a subcontractor performing monitoring services; however, this relationship ended at the conclusion of 2012. (CR 209-10).

Appellant also had historically provided IOM at one or more hospitals where Dr. Alford was the surgeon. (CR 173, 208). Pierce occasionally served as the technician on some of those surgeries. (CR 173).

Synergy was formed in 2012 and was owned partially by Dr. Alford. (CR 173, 208, 937). However, Dr. Alford is not employed by Synergy and does not manage Synergy. (CR 937).

By March 2013, Synergy was routinely handling all IOM for Dr. Alford's cases, with only minimal overflow being handled by Appellant. (CR 211, 208, 277-79). Appellant characterizes this minimal overflow as a "*backstop*" for the time or two when Synergy did not have enough IOM personnel to handle the work or did not have privileges at a hospital. (CR 251).

Pierce worked for Appellant for approximately eight years. (CR 172). He left in October 2013 and went to work as an IOM technician for Synergy. (CR 173, 987).

4

Since becoming a Synergy employee, Pierce has only worked with two surgeons and has *not* participated in any surgery where the surgeon was a surgeon that he had worked with while an employee of Appellant, this includes Dr. Alford. (CR 173, 958). Furthermore, Synergy assigned Pierce primarily to Victory Medical Center in Plano, a hospital that he did *not* work at while in Appellant's employ. (CR 934, 958, 964). Pierce also has *not* solicited surgeons, hospitals, or surgery centers to do business with Synergy. (CR 173-74).

## II. SUMMARY OF ARGUMENT

Appellant's only cause of action against Synergy is tortious interference with Pierce's Covenant. Appellant makes numerous dilatory challenges, including that the trial court abused its discretion by: (*i*) failing to grant a continuance; (*ii*) failing to grant special exceptions; and (*iii*) failing to strike summary judgment evidence. Appellant waived many of these complaints and the trial court did not abuse its discretion.

As to Appellants' merit-based challenges, Synergy cannot be liable for interfering with an unenforceable contract. The Covenant is invalid because: (*i*) Appellant did not have an interest worthy of protection; (*ii*) any consideration given to Pierce was not an interest worthy of protection or reasonably related to one; and (*iii*) as it relates to training, the Covenant was not designed to enforce Pierce's return promise regarding training.

The Covenant is also unenforceable because it contains restraints (geographic, duration, and activity) that are unreasonable. Assuming (*arguendo*) Appellant sought reformation, Appellant failed to establish reasonable, alternative restraints. Reformation was, therefore, properly denied.

5

Finally, Appellant lacks evidence supporting the elements of its causes of action. Appellant failed to present evidence of Synergy's interference. Appellant also has no evidence of damages and is additionally foreclosed from obtaining damages under the Covenant Not to Compete Act[3] (the "Act"). <u>Appellant also failed to challenge Synergy's damage-foreclosure ground.</u> The trial court's judgment should be affirmed.

## III. ARGUMENT & AUTHORITIES

### A. APPELLANT HAD ADEQUATE TIME FOR DISCOVERY (APPELLANT'S ISSUE #1)

Appellant contends that it had inadequate time to conduct discovery; thus, it argues the trial court abused its discretion by failing to grant a continuance.[4] (CR 1458). The trial court did not abuse its discretion by denying Appellant's continuance request.

Whether an adequate time for discovery has occurred is case specific and determined by factors such as the nature of the cause of action, the nature of the evidence necessary to controvert the no-evidence motion, and the length of time the case had been active in the trial court. *Rest. Teams Intern., Inc. v. MG Sec. Corp.*, 95 S.W.3d 336, 339 (Tex. App.—Dallas 2002, no pet.).

Some matters may require minimal or no discovery in order to respond to summary judgment. *McClure v. Attebury*, 20 S.W.3d 722, 729 (Tex. App.—Amarillo 1999, no pet.); *Rest. Teams,* 95 S.W.3d at 339. Requiring parties to conduct discovery when it will make no difference is a waste of time and expense. *Carter v. MacFadyen*, 93 S.W.3d 307, 311 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

---

[3] TEX. BUS.& COMM. CODE §§15.50-15.52.
[4] App. Br. p. 15.

6

## 1. **Appellant Cannot NOW Complain of Scheduling Order**

*Appellant complains to this Court* of the *expedited* nature of the scheduling order claiming that the order resulted in a condensed and the inadequate discovery period.[5] However, Appellant *did not complain to the trial court* of the scheduling order in any manner whatsoever. (CR 768-72). Appellant cannot complain of the scheduling order when it did not complain below. TEX. R. APP. P. 33.1(a); *Sivley v. Sivley*, 972 S.W.2d 850, 861 (Tex. App.—Tyler 1998, no pet.).

## 2. **Different Issues Raised On Appeal**

Appellant's brief is a substantial departure from its motion for continuance. Other than the mention of two depositions, both of which occurred, Appellant's motion for continuance stated *only* a *general* need for evidence of "lost profits" but failed to: (*i*) identify any specific discovery requests or evidence that it lacked; or (*ii*) how it was prevented from responding to the summary judgment motions by the lack of any evidence or Synergy's discovery responses. (CR 768-72).[6]

*On appeal*, Appellant recites a list of discovery requests to which Synergy objected. Neither the list nor these arguments were presented to the trial court.[7] The complaint on appeal must also be the same as that presented in the trial court. *Gambling Paraphernalia Devices v. State*, No. 12-01-00161, 2002 Tex. App. LEXIS 3613, *5 (Tex.

---

[5] Appellant's Br. p. 17.
[6] Appellant mentioned Dr. Alford's deposition *might* produce evidence of Synergy's intent to interfere, but Appellant does inform the Court why this is needed - Appellant presented text messages from Dr. Alford to argue Synergy's intent (CR 1022-23, 1064-67) and had already taken Pierce's deposition.
[7] This is in addition to the new complaint about the scheduling order.

7

App.—Tyler 2002, no pet.). Appellant has not raised the same complaint; thus, this Court should not consider Appellant's argument.

### 3. Motion and Brief Are Insufficient

As previously noted, other than the two above-mentioned depositions both of which actually occurred, Appellant's motion for continuance merely stated a need for evidence of "lost profits," without any specifics. General allegations in a motion for continuance are insufficient; the motion or the affidavit must state specific reasons for the request. *Morgan v. City of Alvin*, 175 S.W.3d 408, 420 (Tex. App.—Houston [1st Dist.] 2004, no pet.). Appellant was required, among other things, to identify for the trial court what was material and why. *Blake v. Lewis*, 886 S.W.2d 404, 409 (Tex. App.—Houston [1st Dist.] 1994, no writ). The trial court did not abuse its discretion in the face of such a deficient motion.

On appeal Appellant is required, among other things, to provide this Court with "substantive analysis explaining why denial of the motion[] for continuance . . . was improper" and "address how the additional time and discovery would have allowed [Appellant] to respond to the motions for summary judgment." *Simon v. Tudor Ins. Co.*, 2014 Tex. App. LEXIS 1321, 18-19 (Tex. App.—Dallas 2014, no pet.). Appellant's brief does neither.[8] Appellant has further waived this point on appeal by its deficient brief. *Id.*

---

[8] For example, there is nothing showing that Appellant learned anything relevant in Dr. Alford's or Dr. Craven's depositions that could have been used in responding to the summary judgment motions, had the trial court granted a continuance. Appellant also fails to address any of the written discovery that it complains of for the first time on appeal.

**4. No Abuse of Discretion in Denying Appellant's Continuance**

**(a). Maximum Allowable Time Under Scheduling Order**

Even if Appellant's continuance complaint is considered, it is without merit. The trial court entered a scheduling order imposing a May 12, 2014 deadline for the filing of motions seeking summary judgment. (CR 33-35). Synergy filed its motion on Friday, May 9, 2014. (CR 140). Appellant had all of the time allowable under the scheduling order.

**(b). Rule 166a(i) Does Not Apply to Traditional Summary Judgment**

Appellant's motion for continuance sought relief claiming an inadequate time for discovery under Texas Civil Procedure Rule 166a(i). The "adequate time for discovery" provision of Rule 166a(i) does *not* apply to traditional motions for summary judgment. *Allen v. United of Omaha Life Ins. Co.*, 236 S.W.3d 315, 326 (Tex. App.—Fort Worth 2007, pet. denied). Synergy raised several traditional summary judgment grounds in its motion, including that damages were foreclosed as a result of the unreasonable geographic restrictions. Thus, the trial court could not have abused its discretion in considering Synergy's traditional summary judgment grounds.

**(c). Appellant Did NOT Need Synergy's Revenue/Profit Information to Respond to Summary Judgment Challenges**

With regard to Synergy's no-evidence challenges, Appellant's motion for continuance stated that the depositions of Dr. Alford and Pierce's expert (Dr. Cravens) had been scheduled for June 10 and 13, respectively. (CR 769). These depositions occurred; however, Appellant provides no argument and fails to direct this Court to any

evidence that it uncovered in either deposition that Appellant did not have when it responded to the summary judgment motions. Thus, Appellant has not shown the trial court abused its discretion based on the assertions raised in the motion for continuance.

The written discovery responses that Appellant *currently* identifies as "lacking" are: (*i*) all hospitals in which Synergy has worked; (*ii*) contact information for every surgeon that Pierce has worked with and hospital he has worked in; (*iii*) all documents between Synergy and Dr. Alford regarding Appellant, Pierce, and hiring IOM techs; (*iv*) Synergy's ownership and corporate documents; (*v*) all documents regarding this case; (*vi*) Synergy's bills and receipts for IOM procedures where Pierce was the tech; and (*vii*) Synergy's profit and loss statements, account of income and expenses and its general ledger.[9]

Pierce only worked with two surgeons (CR 962) and Appellant was provided with a list of every procedure in which Pierce was involved, including identifying the date, time, hospital and doctor. (CR 118, 133-38, 949-54). Appellant attached this list as an exhibit to its summary judgment response. (CR 949-54). Thus, Appellant did not need a continuance for any information relating to the procedures in which Pierce was involved.

The remaining discovery identified as lacking in Appellant's brief is Synergy's revenue, profits, and other financial information (together "Synergy's revenues/profits").

---

[9] Much of Appellant's discovery is manifestly overly broad and not reasonably tailored to include only information regarding Pierce. Nor is there anything to show why the locations where Synergy operated was necessary for Appellant's summary judgment response. If Appellant had such a valuable relationship with surgeons, as it tries to convince this Court, why would Appellant need to be provided with contact information provided by Synergy. Finally, there is nothing showing why any of the other information was necessary to respond to Pierce's summary judgment Synergy's ownership and corporate documents and all documents regarding this case.

Appellant had all of the information to identify every procedure in which Pierce was involved and determine whether Appellant had been damaged by any of those procedures. ***Appellant did nothing to bring forward evidence of any actual loss or its own financial information to show a loss of any amount. Appellant attempts to distract this Court from its shortcomings arguing it needed Synergy's revenue/profits. For a number of reasons, it was unnecessary for Appellant to have Synergy's revenues/profits in order to respond to the summary judgment motions.***

Foremost, Appellant was absolutely barred by the Act from obtaining damages for any alleged violation of the Covenant because it contained unreasonable restraints.[10]  As a consequence, lost profits are immaterial to Appellant's summary judgment response. Therefore, a continuance was unnecessary to obtain Synergy's revenues/profits.

Second, ***Appellant testified that it had documents showing its actual economic damages, including lost profits. (CR 339-41, 349). It chose not to offer that evidence. Appellant cannot create a need for a continuance by refusing to come forward with its own documents.***

Next, ***if*** Synergy's revenues/profits were relevant to anything, it was only to the *quantum* of Appellant's alleged damages. ***Appellant must first, however, establish it suffered damages before there is a need to quantify. It could not establish this predicate fact.***

Pierce's leaving had nothing to do with any decline in Appellant's revenues from Dr. Alford's group. (CR 337-38). When asked — "*Do you have any evidence that Josh*

---

[10] Section III(H)(1), *infra*.

*had anything to do with Dr. Alford's decision to stop using Neurodiagnostics*," the answer was "*I don't know*." (CR372).

Except for occasions where it was short staffed, ***Appellant repeatedly admitted that it did not know whether it had lost any business following Pierce leaving***.  (CR 342-343, *see also* CR 332-33).  When asked:

> **Q.**   Since Josh — since his employment with Neurodiagnostics was terminated, from that time to the present are you able to identify a single surgical procedure that Neurodiagnostics lost as a result of him working for Synergy?
> **A.**   I don't know. [11]

(CR 372-73).  Appellant wholly failed to bring forward any evidence that it experienced any damages.  If Appellant did not lose business, Synergy's revenues/profits were neither material nor necessary to respond to Pierce's summary judgment motion.  Therefore, the trial court could not have abused its discretion in deny the request for a continuance.

Despite claiming to have its own evidence of damages, failing to establish it had suffered an injury, and the statutory bar to the recovery of damages, Appellant argues that Synergy's revenues/profits are relevant under *Arabesque Studios, Inc. v. Academy of Fine Arts Int'l*, 529 S.W.2d 564 (Tex. App.—Dallas 1975, no writ).  Appellant's reliance on *Arabesque* is misplaced.

In *Arabesque,* the departing employee admittedly took thirty-two students from his former employer and moved those students to the new employer's business.  *Id*. at 569.  Because the departing employee lured away the customers, the *Arabesque* Court held the

---

[11] Appellant had a list of every IOM procedure (including the doctor and facility) that Pierce performed while at Synergy. (CR 118, 133-38, 949-54).  Appellant had sufficient information by which to identify any lost procedures.

12

jury could infer the profits the new employer received would have, at least in part, accrued to old employer. *Id.* No similar evidence exists in this case.

Here, Appellant admits that months ***before*** Pierce left its employ, Appellant was doing little to no IOM work where Dr. Alford was the surgeon. (CR 208, 211, 277-78). Appellant proffered no evidence that Pierce's change in employment caused it any injury (CR 337-38, 342, 343, 372, 373, 332-33) and whatever revenue Appellant had historically received from procedures where Dr. Alford or his group was the surgeon had ceased long before Pierce became a Synergy employee. (CR 337).

Unlike *Arabesque*, Pierce stopped working for Appellant months ***after*** Appellant was no longer being assigned by hospitals to Dr. Alford's and his group's surgical cases. In other words, Pierce was <u>not</u> the pied piper luring Dr. Alford or his group away. *Arabesque* is inapposite and Synergy's revenues/profits were neither material nor necessary for Appellant to respond to Pierce's summary judgment motion. Therefore, the trial court did not abuse its discretion in denying Appellant's request for a continuance.

## B. ADEQUATE NOTICE OF SUMMARY JUDGMENT GROUNDS (APPELLANT'S ISSUE #2C)[12]

Appellant asserts Synergy's summary judgment motion failed to delineate between traditional summary judgment grounds and no-evidence summary judgment grounds. Based on this assertion, Appellant argues the trial court erred by failing to grant its special exceptions. (CR 1448).

---

[12] Appellant's issues 2a-2b are ***not*** directed solely to Synergy's motion.

A trial court has broad discretion in ruling on special exceptions. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007). A trial court's ruling will be reversed only if there has been an abuse of discretion. *Aldous v. Bruss*, 405 S.W.3d 847, 857 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The trial court did not abuse its discretion.

### 1. Appellant's Special Exceptions are Insufficient

Absent from Appellant's special exceptions and also absent from its briefing to this Court is any specific paragraph or ground that Appellant asserts is unclear or objectionable. (CR 812-14). Appellants' special exceptions are nothing more than a claim that Synergy's entire summary judgment motion is "general and confusing."

Special exceptions must "point out intelligibly and with particularity" the alleged defect or omission in the pleadings. TEX. R. CIV. P. 91. When special exceptions fail to specifically point out the defective allegations, they constitute a general demurrer and are prohibited. TEX. R. CIV. P. 90; *see also Castano v. San Felipe Ag., Mfg., & Irrigation Co.*, 147 S.W.3d 444, 453 (Tex. App.—San Antonio 2004, no pet.). Because Appellant failed to "point out intelligibly and with particularity" the complained-of defects, the trial court did not abuse its discretion in denying the special exceptions.

### 2. Synergy's Motion Sufficiently Delineated Grounds

Synergy's motion for summary judgment clearly delineated between the summary judgment grounds raised. In each instance where Synergy challenged a lack of evidence, Synergy stated there is "no evidence" and **underlined** the words "no evidence" to emphasize that Synergy was making a no-evidence challenge. This is shown in Paragraphs 29, 36, 37, 43, 50, 51, 55, 56, 59, 62, 72, 76, 88, 90, 97, 104, 105, 110, and

14

111 of Synergy's motion. (CR 149, 151-155, 158-59, 162, 164-67). In each instance, Synergy went on to identify what it was that Appellant had to prove and further identified what evidence Appellant lacked. This is exactly what is required of a no-evidence challenge. *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 207 (Tex. 2002).

Synergy's traditional summary judgment grounds, on the other hand, were supported by evidence and textually indicated a basis other than a lack of evidence. By way of example, Paragraphs 38-40 ("evidence conclusively establishes …" and "Appellant admits"); Paragraph 58 ("conclusory claims disproven by the facts); Paragraphs 63-66 (nowhere in section is there a mention of "no evidence"); Paragraphs 67-71 (same); Paragraph 87 "as a matter of law it is . . . ."). (CR 148, 153, 155-58, 161-62, 167-68). The trial court did not abuse its discretion by denying Appellant's special exceptions.

## C. COURT PROPERLY CONSIDERED SYNERGY'S SUMMARY JUDGMENT EVIDENCE (APPELLANT ISSUE #3)

Appellant's third point complains that the trial court erred by refusing to strike Synergy's summary judgment evidence offered *via* supplementation and erred by refusing to grant Appellant's objections to hearing excerpts tendered by Synergy. These complaints will be addressed in turn.

## 1. Trial Court Properly Considered Second Supplement (*i.e*. Appellant's Judicial Admissions)

Appellant argues the trial court erroneously granted Synergy leave to file its Second Motion to Supplement Summary Judgment (the "Second Supplement"). (CR 1453-54). Summary judgment evidence may be filed late, with leave of court.

*Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex. 1996). A ruling on a motion for leave to file a late summary judgment evidence is reviewed for an abuse of discretion. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 686 (Tex. 2002). The trial court did not abuse its discretion.

Appellant neglects to mention the "content" of the Second Supplement, which consists entirely of:

- Appellant's responses to requests for admissions, which Appellant served on Synergy after the May 12, 2014 deadline for summary judgment motions under the Scheduling Order (CR 763-67);[13]

- A request that the Court take judicial notice of Appellant's Motion for Reconsideration, which was filed on May 20, 2014[14] (CR 757); and

- A brief argument explaining why these judicial admissions were relevant to Synergy's pending summary judgment grounds (CR 756-62).

Appellant's responses to admissions are judicial admissions, as are its pleadings. *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) (statements in pleadings); *Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989) (responses to requests for admissions). A judicial admission conclusively establishes the admitted fact. TEX. R. CIV. P. 198.3. A judicial admission "not only relieves [an] adversary from making proof of the fact admitted but also bars the party himself from disputing it." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000).

---

[13] The Second Supplement with Appellant's admissions is contained in the Appendix as Exhibit B.
[14] The Motion for Reconsideration sought reconsideration of the trial court's decision not to hold Pierce in contempt. (CR 486-539) The reason for Synergy's supplementation was Appellant's admission that Pierce had not worked in all counties covered by the Covenant. (CR 487).

16

By the Second Supplement, Synergy requested leave to supplement the pending summary judgment motion with Appellant's judicial admissions, which were made after Synergy filed its motion. (CR 757).  Other than stating that the Second Supplement was filed only fourteen days prior to the summary judgment submission date, Appellant did not identify any surprise or prejudice that would result from admission of its judicial admissions. (CR 781-84).  In its briefing to this Court, Appellant *conclusorily* asserts that it was prejudiced by the trial court's consideration of the Second Supplement on only fourteen days' notice but fails to state how or why.[15]

Appellant's judicial admissions cannot be a surprise to Appellant.  Nor is allowing judicial admissions into evidence prejudicial because it is an undisputed fact.  In fact, the admission of such evidence furthers the purpose of summary judgment — elimination of patently unmeritorious claims and defenses. *Cook v. Nacogdoches Anesthesia Grp., L.L.P.,* 167 S.W.3d 476, 480 (Tex. App.—Tyler 2005, no pet.).  Therefore, the trial court did not abuse its discretion in considering Appellant's judicial admissions.

Appellant complains that Synergy added additional briefing by the Second Supplement, but fails to identify what is objectionable.  Synergy did not raise any new summary grounds in its Second Supplement. (CR 756-62).  Rather, Synergy showed the Court, by reference to sections, how Appellant's judicial admissions were relevant to the *pending* summary judgment motion grounds.

- In Section III(B)(4) of Synergy's Motion for Summary Judgment, Synergy raised and establishes that Appellant's purported customer list is neither secret nor an interest

---

[15] Appellant's Br. pp. 28-29.

worthy of protection. Appellant admits this fact by filing of public record a list of each surgeon and each hospital that Appellant claims Pierce worked with while an employee of Appellant. This list is attached to Appellant's Motion for Reconsideration. Such filing, even if not an admission, vitiates any right to protection; and

- In Section III(C) of Synergy's Motion for Summary Judgment, Synergy raises and establishes that Josh Pierce's covenant not to compete is not valid because it contains unreasonable restrictions.

Synergy then went on to state:

In APPELLANT'S RESPONSE TO SYNERGY IOM'S REQUEST FOR ADMISSIONS, Appellant judicially admits that Pierce **_never_** worked for Appellant in Ellis County, Hood County, Johnson County, Kaufman County, and Parker County.[16] This is five (5) of the eleven (11) counties covered by the covenant. In other words, almost ½ of the counties enumerated in the covenant are counties in which Pierce never worked for Appellant.

These admissions conclusively establish[17] that Pierce's covenant contains unreasonable restrictions. *Haass*, 818 S.W.2d at 387; *Evan's World Travel,* 978 S.W.2d at 232-33; *Butler,* 51 S.W.3d at 792.

As a consequence, the covenant is not valid and enforceable and cannot be the basis of a tortious interference claim. *Juliette Fowler Homes,* 793 S.W.2d at 665; *Travel Masters,* 827 S.W.2d at 833; *NCH Corp.,* 757 F.2d at 1543–1544; *Lazer Spot,* 387 S.W.3d at 49; *Flynn Bros., Inc. v. First Med. Associates*, 715 S.W.2d at 785. Therefore, Synergy is entitled to judgment on the tortious interference claim asserted by Appellant.

. . . .

In Section III(E) of Synergy's Motion for Summary Judgment, Synergy raises Neurodiagnostic's lack of damages as a summary judgment ground.

---

[16] *See* Responses 7-11.
[17] TEX. R. CIV. P. 198.3.

> APPELLANT'S RESPONSE TO SYNERGY IOM'S REQUEST FOR ADMISSIONS conclusively establishes that Pierce's covenant contains unreasonable restrictions.
>
> Assuming (*arguendo*) the other predicates as to formation of a valid non-compete and competent evidence of reasonableness, Appellant's best case scenario is that the Court reform the limitations contained in the covenant. *See* TEX. BUS. COMM. CODE §15.51(c).
>
> . . . .
>
> Appellant is, therefore, precluded from obtaining the very damages it now seeks from Synergy. Because Appellant is foreclosed, as a matter of law, from obtaining damages, the tortious interference claim fails as a matter of law.

(CR 759-61).

Because the Second Supplement only sought leave for the trial court to consider Appellant's judicial admissions and informed the trial court why such supplementation was appropriate, the trial court did not abuse its discretion by granting leave and considering Appellant's admissions.

## 2. <u>Hearing Transcripts Were Properly Admitted</u>

Synergy tendered excerpts from the temporary injunction hearing and the contempt hearing (Appendix Tabs 5 and 6 respectively). (CR 201-13, 215-23). Appellant contends these excerpts were unauthenticated.[18] Appellant further claims that it is unclear who was speaking on the cited pages; thus, consideration of such testimony was improper.[19]

---

[18] Appellant's Br. pp. 31-32.
[19] Appellant's Br. p. 31.

19

Equally available transcripts, such as these, do not require authentication *via* a reporter's certification or an affidavit. *See McConathy v. McConathy*, 869 S.W.2d 341, 342 (Tex. 1994) (stating "[a]ll parties have ready access to depositions taken in a cause, and thus excerpts submitted with a motion for summary judgment may be easily verified as to their accuracy. Authentication is not necessary and is not required under the present rules."). The same is true for these hearing excerpts. Besides, each of the excerpts included the reporter's certification. (CR 213, 223).

As to Appellant's complaint that it is unclear "***who***" is testifying on the cited pages, Appellant need only look to its copy of the transcripts to identify the speaker. *Id*. at 342. Moreover, the excerpts contained everything needed to independently determine who was testifying. Each excerpt included, among other things, a table of contents identifying "*who*" is testifying on the various pages. (CR 201-05, 215-18). The trial court, therefore, did not abuse it discretion in overruling Appellant's evidentiary objections.

## D. SYNERGY COULD NOT INTERFERE WITH THE COVENANT BECAUSE IT IS NOT ANCILLARY TO AN OTHERWISE ENFORCEABLE AGREEMENT (APPELLANT'S ISSUE #4B)

When, as here, a covenant not to compete is an unreasonable restraint of trade; it cannot form the basis of an action for tortious interference. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 663, 665 (Tex. 1990),[20] *superseded on other grounds by statute as stated in Coinmach Corp. v. Aspenwood Apartment Corp.*, 417

---

[20] Although some cases predate the 1989 adoption of the Act, courts should look to pre-Act cases for guidance in applying an interpreting the Act. *Haass*, 818 S.W.2d at 388; *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 84-85 (Tex. App.—Houston [14th Dist.] 1996, writ denied). This decision is highlighted and contained in the Appendix as Exhibit C.

S.W.3d 909, 923 (Tex. 2013) *reh'g denied* (Feb. 14, 2014); *Travel Masters, Inc. v. Star Tours, Inc.,* 827 S.W.2d S.W.2d 830, 833 (Tex. 1991);[21] *NCH Corp. v. Share Corp.,* 757 F.2d 1540, 1543–1544 (5th Cir.1985); *Lazer Spot, Inc. v. Hiring Partners, Inc.*, 387 S.W.3d 40, 49 (Tex. App.—Texarkana 2012, pet. denied).[22]  Here, the trial court correctly determined that the Covenant was an unenforceable restraint of trade and properly granted summary judgment to Synergy.

A covenant not to compete is presumed illegal.  TEX. BUS. & COMM. CODE §15.05.  The Act creates a safe harbor allowing enforcement; provided, the covenant strictly complies with the Act.  *Travel Masters,* 827 S.W.2d 832; *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 599 (Tex. App.—Amarillo 1995, no writ); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex. App.—Dallas 1992, no writ).  Appellant has the burden to establish compliance with the Act.  TEX. BUS. & COMM. CODE ANN. §15.51(b).

Two initial inquiries are made when assessing compliance with Act:  (*i*) is there an "otherwise enforceable agreement," and (*ii*) is the covenant "ancillary to or part of" that agreement at the time the otherwise enforceable agreement was made. TEX. BUS. & COMM. CODE ANN. § 15.50; *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 849 (Tex. 2009); *Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 230-31 (Tex. App.—Texarkana 1998, no pet.).

---

[21] This decision is highlighted and contained in the Appendix as Exhibit D.
[22] This decision is highlighted and contained in the Appendix as Exhibit E.

In order to be "ancillary" the:

    a. consideration given by the employer in the otherwise enforceable agreement must be reasonably related to an interest worthy of protection; and

    b. covenant must be designed to enforce the employee's return consideration (*e.g.*, a promise) in the otherwise enforceable agreement.

*See, e.g., Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 773 (Tex. 2011); *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 649 (Tex. 2006).

Synergy challenged Appellant's lack of evidence of confidential or proprietary information or any other interest worthy of protection (CR 147-60) because Pierce did not use confidential information in the performance of his duties and IOM technicians are board certified such that their duties are standardized throughout the industry. (CR 183-84, 457).  Appellant failed to bring forward competent evidence to satisfy its burden.

As discussed in more detail below, the only "consideration" that Appellant identified in discovery as having provided to Pierce as part of an "otherwise enforceable agreement" are:  (*i*) training; (*ii*) customer information, including surgeon preferences; (*iii*) pricing; and (*iv*) technique. (CR 241, 263, 272, 275-77).  Appellant would not identify or describe, even generally, any technique it believed to be a protectable (CR 275-77) or what was confidential as to the delivery of its service. (CR 368-69).  Appellant only *generically* identified the other categories, but provided no details or evidence.  This is due to the fact that this is standardized procedure throughout the industry.

## 1. Training

### (a). No Evidence that Training or Advancement of Funds for Training Was Worthy of Protection

Synergy specifically challenged that the training Pierce received or Appellant's advancement of funds for that training was an interest worthy of protection by a noncompete. (CR 291, 147-60). Without such proof, the provision of, or payment for, training was *not* ancillary to the Covenant.

Appellant responded by merely claiming that it had paid the cost of Pierce's certification training[23] (CR 822-23, 834, 835) and that such "training directly related to the type of work that [Pierce] did for [Appellant] and now does for Synergy." (CR 825-26, 836). Appellant's response would require this Court to hold that any training whatsoever, if it is job related, is automatically worthy of protection. This is incorrect for many reasons.

First, mere advancement of funds is not an interest worthy of protection. *Sheshunoff*, 209 S.W.3d at 650 (recognizing payment of money is not a protectable interest). Second, Appellant's contention that all work-related training is sufficient is incorrect. *See Daytona Grp. of Tex., Inc. v. Smith*, 800 S.W.2d 285, 290 (Tex. App.—Corpus Christi 1990, writ denied) (holding publicly available training is not a protectable interest); *Hospital Consultants, Inc. v. Potyka*, 531 S.W.2d 657, 662 (Tex. Civ. App.—San Antonio 1975, writ ref'd n.r.e.) (training given to emergency room physicians was

---

[23] It is a misstatement to say Appellant paid for training. Pierce re-paid for cost of training under the precise terms set forth in the employment agreement. (CR 183-86).

23

not a protectable interest because it belongs to the employee); *Evan's World Travel*, 978 S.W.2d at 231 (training given to employee was not worthy of protection).

Appellant's response failed to connect the dots by failing to provide evidence establishing whether Pierce's certification training was, in fact, an interest worthy of protection. There was nothing showing that what Pierce did or learned was different than what is done throughout the IOM industry. Appellant came forth with nothing identifying any curriculum, content, or information that Pierce learned in that training that was unique to Appellant, confidential, or that would be protectable for any reason whatsoever. Because Appellant failed to come forward with evidence that the training provided to Pierce was worthy of protection by a noncompetition agreement, Appellant failed to establish the agreement regarding training was ancillary to the Covenant.

### (b). Training and Advancement of Funds for Training Was NOT an Interest Worthy of Protection

In comparison, the training was conclusively shown not to be an interest worthy of protection. The mere fact "[t]hat a former employee was trained by the employer is not a ground for enforcing a restrictive covenant not to compete, even if the training was complex and extensive." *Custom Drapery Co. v. Hardwick*, 531 S.W.2d 160, 165 (Tex. Civ. App.—Houston [1ˢᵗ Dist.] 1975, no writ); *see Grace v. Orkin Exterminating Co.*, 255 S.W.2d 279, 285 (Tex. Civ. App.—Beaumont 1953, writ ref'd n.r.e.); *Lazer Spot,* 387 S.W.3d at 46. While Appellant suggests that there is some distinction between the cited cases and this case (CR 837), none exists. Just as in *Custom Drapery* and *Grace*,

Appellant's promise to train is not identified in the employment agreement as "*quid pro quo*" for the Covenant. (CR 176-90).

Synergy acknowledges that "*specialized*" training involving a company's proprietary information *may* be worthy of protection; however, the facts necessary to warrant protection do not exist in this case. This is board certification training that is taught, tested, and applied by all IOM technicians throughout the IOM industry. Appellant admits there is nothing confidential or proprietary about the training that Pierce received and it is available in the open market.

```
Q.   And I believe you answered a question
     that Mr. Hampton asked.   There's
     nothing about the training --
A.   No.
Q.   -- that's confidential?
A.   No.
Q.   It's all in the public domain?
A.   Correct.
Q.   It just costs you time and money, right?
A.   Correct.
```

(CR 263).

Indeed, Appellant unequivocally testified that it did not care about protecting the educational training that Pierce received.

```
Q.   Let me see if I can ask it again.   Your
     concern is that Mr. Pierce was trained
     and then worked in an environment where
     he gained certain specialized knowledge
     and expertise.
A.   Um-hum.

Q.   You've got to say yes or no.
A.   Yes.

Q.   Okay.   And then because of that, he
     should be bound by the covenant not to
```

25

> compete that he signed prior to being
> trained or receiving any knowledge,
> specialized knowledge.
>
> **A.** Not the education, not –
>
> **Q.** You don't care about the education part.
>
> **A.** Correct.

(CR 244). Because the training in this case is "in the public domain" (and is admittedly not an interest Appellant even seeks to protect) it is not an interest worthy of protection. *See, e.g., Daytona Grp.,* 800 S.W.2d at 290. Consequently, the training Pierce received cannot support the Covenant.

Appellant's advancement of monies does not transform training, which does not warrant protection, into a protectable interest. *Sheshunoff*, 209 S.W.3d at 650 (recognizing payment of money is not a protectable interest). More importantly, Appellant's advancement of funds for training has been fully repaid, *precisely* as contemplated in the employment agreement. Appellant allowed Pierce to repay the advanced funds by working for 48 months after becoming board eligible. (CR 183-86). Pierce became board eligible in 2006 and worked for Appellant for more than 48 months after that time. (CR 843,[24] 173). Appellant was fully repaid its advancement of training costs, precisely as it had agreed. (CR 183-86). Pierce, therefore, effectively paid for his own training.

Appellant also argues that Pierce received and Appellant paid for continuing education and on-the-job training (CR 823, 843, 857); however, the employment agreement does not mention continuing education or on-the-job training. (CR 183-84).

---

[24] Also judicially admitted Appellant's Br. p. 51.

The employment agreement only refers to training to "become board eligible," to "become registered as an REPT," and to "become registered as a CNIM," there is no mention of any continuing education or training after "eligibility" or "registration." (CR 183-86). There are also no facts identifying or detailing what was encompassed by this "on-the-job-training" and whether it was worthy of protection. (CR 823, 843, 857). Therefore, regardless whether Pierce received or Appellant paid for continuing education, this was not part of an otherwise enforceable agreement ancillary to the Covenant at the time it was made. Because the evidence conclusively establishes that Pierce's training was not an interest worthy of protection and further establishes that Pierce repaid the cost of that training as provided for in the employment agreement, the agreement regarding training was *not* ancillary to the Covenant.

## 2. Covenant Not Designed to Enforce Pierce's Return Promise Regarding Training

### (a). No Evidence Covenant Was Designed to Enforce Pierce's Promise Regarding Training

Appellant has no evidence showing that the Covenant was designed to enforce any promise by Pierce related to training. (CR 149). When challenged on this precise issue, Appellant responded:

> The noncompete *may* have been designed, at least in part, to make Pierce live up to his agreement to repay Appellant for training expenses if he left employment with Appellant within 5 years.

(emphasis added) (CR 838).

27

Appellant provides no evidentiary citation to support its assertion of a possible nexus and *fails to even unambiguously claim such a nexus exits*. Appellant instead argues that other proprietary information existed to support the Covenant but failed to identify that information (discussed below). Because Appellant failed to come forward with evidence that the Covenant was designed to enforce Pierce's consideration regarding training, Appellant failed to establish the agreement regarding training was ancillary to the Covenant.

### (b). Covenant NOT Designed to Enforce Pierce's Promise Regarding Training

In actuality, the evidence conclusively established the Covenant was *not* designed to enforce Pierce's consideration regarding training. Appellant agreed to provide for Pierce's training in exchange for either: (*i*) Pierce's promise to work for a stated period of time; or (*ii*) payment of $5,000, with interest. (CR 183-86).

Other than repayment under the stated terms, Pierce made no other promise in the employment agreement related to training. By way of example, there is no prohibition on Pierce's use or disclosure of whatever knowledge, education, or techniques he learned through training. (CR 179-80).[25]

Moreover, the repayment obligation establishes that Pierce's five-year Covenant was not intended as an enforcement mechanism to insure repayment. For example, repayment is: (*i*) immediately due and payable "***in cash upon the date of termination***" of Pierce's employment; (*ii*) the unpaid debt accrues eight percent (8%) interest; (*iii*)

---

[25] There can be no agreement as to the alleged ongoing training because it was never mentioned.

Appellant is entitled to an award of attorney's fees and costs to collect any unpaid debt; (*iv*) applied in specific order. (CR 184-85). While the terms expressly cover how the repayment obligation is to be repaid, there is no mention of the Covenant. The Covenant was not designed to enforce either Pierce's promise to "work off" or repay the cost of his training. Therefore, the agreement regarding training was *not* ancillary to the Covenant.

### 3. Customer Information Not an Interest Worthy of Protection

As noted previously, Appellant argued that proprietary information, other than training, supported the Covenant. When asked to identify the confidential information provided to Pierce in any detail, Appellant refused to answer most questions (CR 272-77, 246-47, 311, 368-69) and would only *generically* state that its customer list, surgeon preferences, and pricing structure were proprietary. (CR 241, 263, 272, 275-77).[26] Appellant never identified any allegedly confidential information with any specificity.

### (a). No Evidence that Customer Information Was Worthy of Protection or Reasonably Related to One

With regard to all allegedly confidential customer information, Synergy specifically challenged that there was *no evidence* that: (*i*) such information is *Appellant's* trade secret; (*ii*) such information is entitled to protection (in other words an interest worthy of protection); (*iii*) such information was disclosed to Pierce by Appellant, as opposed to by the hospital or surgeon; or (*iv*) that Pierce took any such information with him, other than by way of his general knowledge and skill. (CR 151).

---

[26] Appellant suggests that Pierce *may* have some of its business forms, but admitted these forms were neither confidential nor secret and were created from reference books (CR 264-65).

29

In its summary judgment response, Appellant provided nothing demonstrating that surgeon preferences was its confidential information, that it had provided Pierce with this information, or that the information was an interest worthy of protection. (CR 835-37). In fact, Appellant's summary judgment response failed to mention surgeon preferences. Thus, Appellant failed to produce a scintilla of evidence that surgeon preferences was an interest it was entitled to protect or one even worthy of protection.

As to pricing, Appellant's response indicates that "methods of pricing" are mentioned in the employment agreement (CR 835, 840) and Boldery's affidavit states Appellant's pricing was confidential (CR 857); however, Appellant falls short of any *competent* evidence showing that any pricing information given to Pierce was confidential or worthy of protection by a noncompete covenant. There are no facts, including "how" or "why" any pricing information in this case should be protected by a covenant not to compete. (CR 857-59). Appellant's conclusory statement and subjective beliefs are not evidence. *In re Cauley*, 437 S.W.3d 650, 657 (Tex. App.—Tyler 2014, orig. proceeding); *Courtney v. Nibco, Inc.,* 152 S.W.3d 640, 644 (Tex. App.—Tyler 2004, no pet.). Thus, Appellant failed to produce a scintilla of evidence that its pricing was an interest worthy of protection.

Appellant also argues that its customer list/identities are worthy of protection because customer information has been recognized by courts as protectable. Appellant relies on a bevy of cases where a temporary injunction issued to protect customer lists/identities/information; however, issuance of a temporary injunction does not mean

the information was, in fact, a trade secret. *See, e.g., IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W .3d 191, 197 (Tex. App. — Fort Worth 2005, no pet.).

Appellant's argument presupposes anything falling within the category of customer information is worthy of protection. (CR 840). The mere fact that courts have issued temporary injunctions to protect information falling within the *category* of customer information does not relieve Appellant from establishing that its customer information is confidential and worthy of protection *in this particular case*. Protection does not automatically attach to such things as a customer list. *Numed v. McNutt*, 724 S.W.2d 432, 435 (Tex. Civ. App.—Fort Worth 1987, no writ); *Allan J. Richardson & Assocs., Inc. v. Andrews*, 718 S.W.2d 833, 837 (Tex. App.—Houston [14th Dist.] 1986, no writ).

To rise to a level of an interest worthy of protection, the information must be more than merely of a kind and character encompassed by the definition. It must be information that is not publicly available or readily ascertainable by independent investigation. *Numed*, 724 S.W.2d at 435; *Allan J. Richardson & Assocs.,* 718 S.W.2d at 837. A customer list must have a substantial element of secrecy for protection. *Numed*, 724 S.W.2d at 435; *Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W.2d 274, 276 (Tex. App.—Houston [1st Dist.] 1988) *as modified,* 771 S.W.2d 562 (Tex. App.—Houston [1st Dist.] 1989, no writ).

Appellant does nothing more than make conclusory statements as to status of its customer information. There is no evidence of exactly "what" is confidential/protectable, much less "how" or "why" any information in this case is protectable. (CR 857-59).

31

Appellant wholly failed to come forward with evidence that any of its customer information (lists, identities, or anything else) was worthy of protection. In fact, it refused to do so. When Appellant's founder, sole owner, and corporate representative, was asked about the alleged confidentiality of customer information, Ms. Boldery would not disclose "what" exactly was confidential or "why" such information was confidential.

```
Q.   Is there anything confidential about the identity of
     the hospitals or surgical facilities that I might want
     to contact in order to market my new business?
     Certainly you're not claiming that, are you?
A.   I believe that there is.

Q.   So, you think there's something confidential about the
     fact that there are surgeries that occur at Harris
     Hospital, Cook's Hospital, Baylor All Saints, HEB,
     Huguley?
A.   Yes.

Q.    Okay.  What about the physicians that might perform,
     say a neurosurgeon?  Is there anything confidential
     about the identity of the physicians that are
     neurosurgeons at certain hospitals?
A.   Yes.

Q.    (By Mr. McLean) What?
A.    It's confidential.

     . . . .

Q.   So are you claiming that the identity of the
     physicians that might use IOM at USMD Fort Worth is
     confidential?
A.   No.

Q.   Okay.   And are you claiming that the contact
     information for how to contact their offices is
     confidential?
A.   No.

Q.   Because that's published too.  So, what is it other
     than physician preferences -- I'm not – I understand
     you've said that, like if they like hams for
```

32

Christmas, but what is it about identifying a list of
potential physician customers that is confidential to
Neurodiagnostics?

A. It's confidential.

Q. What is?
A. The information is confidential.

Q. So you're not even going to tell me what it is?
A. (Witness shakes head.)

Q. All right.
A. No.

(CR 272-77, 246-47).

Appellant's assertion that its information falls within a recognized category of

potentially protectable information coupled with its bare conclusions that its customer

information is confidential, thus implicitly suggesting worthy of protection, is insufficient

to overcome a no-evidence challenge. *Texas Div.-Tranter, Inc. v. Carrozza*, 876 S.W.2d

312, 314 (Tex. 1994) (conclusory statements unsupported by facts are insufficient to raise

a fact issue to prevent the granting of summary judgment); *In re Cauley*, 437 S.W.3d at

657 (same).

Because Appellant failed to come forward with evidence demonstrating "what"

and "why" surgeon preferences, its customer list/identities, or other customer information

constituted an interest worthy of protection in this case, Appellant failed to raise a

genuine issue of fact. Appellant, therefore, failed to meet its burden of establishing

compliance with the "ancillary" requirements for an enforceable covenant.

### (b). Customer Identities NOT Worthy of Protection

To the extent Appellant alleges there was some undisclosed "confidentiality" regarding client identities or other customer information, this was conclusively disproven by the facts. First, Appellant filed pleadings identifying the hospitals where Pierce worked and the surgeons with whom Pierce worked. (CR 860-61, 497-98). Once filed, the information is public record and prevents the identity of these hospitals and surgeons from being an interest worthy of protection. *See Star-Telegram, Inc. v. Walker*, 834 S.W.2d 54, 57 (Tex. 1992) (filing documents destroys confidentiality/secrecy).

Second, as to the surgeons, Appellant does not have a contract with any surgeon (CR 231-34) and Appellant does not even consider the surgeon to be its client (CR 231-34). The identity and contact information of non-clients cannot be an interest worthy of protection.

Finally, the identity of the surgeons and the hospitals where they practice is publicly available and readily ascertainable.[27] Appellant admits surgeon and hospital identities are not confidential and available on the doctor's and hospital's websites. (CR 272-77, 246-47). It is axiomatic that the hospitals know whether they have contracted with Appellant. Likewise, the hospital knows the surgeons to whom the hospital has assigned Appellant as the IOM provider. (CR 235-37). If Appellant's IOM technician is present in surgery, the fact Appellant contracts with that hospital is also known by the surgeon(s) and surgical staff involved in the procedure. The identity of the hospitals and

---

[27] A defendant can be liable for misappropriation for ***actually*** taking protectable information, even though that information may be readily ascertainable through legitimate means. *See, e.g., Sharma v. Vinmar Int'l, Ltd.,* 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.). However, there is no evidence Pierce took anything.

34

surgeons is also known to the surgical patients, as well as third-party payors who pay Appellant directly for its services (CR 266-69).

Additionally, the identity of the surgeons and hospitals was already known to Dr. Alford and others because Appellant has subcontracted its IOM services to others. (CR 209-10). Such information was also known to Appellant's competitors who have contracts with the same hospitals and provide monitoring for the same surgeons. (CR 241-43, 234).

Appellant has no protectable interest in this public and readily available information. Nor does Appellant have a right to prevent dissemination of the identity of the hospitals with which it contracts or the identity of surgeons with whom it is assigned to work. (CR 234,[28] 268-69,[29] 209-10[30]). Appellant came forward with nothing to show an obligation on the part of any surgeon, hospital, or third party payor to maintain the identity of these surgeons and hospitals confidential. Consequently, there is nothing preventing Synergy, a hospital, surgeon, or anyone else that knew this information from disclosing or using such information. These facts conclusively establish that identity of hospitals and surgeons were not an interest worthy of protection.

**(c). Surgeon Identities/Preferences NOT an Interest Worthy of Protection**

Synergy also established that *any* information about a surgeon is not worthy of protection. Here, it is the hospitals that assign cases to Appellant and its competitors. (CR 235). *Assuming*, as Appellant suggests, the surgeon requests that a hospital assign a

---

[28] Admitting no contracts with doctors.
[29] Admitting that it does not have contracts, or many contracts, with third-party providers.
[30] Admitting contract with Synergy ended in December 2012.

specific IOM company to handle a procedure, the surgeon is merely a referral source.[31] Professional referral sources *are not* legitimate proprietary interests that may be protected by a covenant not to compete. *See Philip H. Hunke, D.D.S. v. Wilcox*, 815 S.W.2d 855, 858 (Tex. App.—Corpus Christi 1991, writ denied) (holding the fact "flow of new patients would be diluted whenever a [competitor] is introduced into the group of local professionals" does not "form a legitimate proprietary interest which may be protected by a covenant"). Therefore, the identities and other information regarding surgeons are not interests worthy of protection.

Additionally, Dr. Alford is free to disclose to Appellant's competitors or anyone else for that matter, what he likes and dislikes a monitoring technician do to in surgery. The same is true for any other surgeon. Any surgeon can freely disclose to Synergy, Appellant, nurses, or any stranger on the street his/her preferences for monitoring and testing during a procedure. Accordingly, a surgeon's preferences are not an interest of Appellant's that is worthy of protection *via* a covenant.

### (d). Appellants' Pricing NOT an Interest Worthy of Protection

The final category of information that Appellant claims worthy of protection is its pricing information; the evidence established otherwise. Appellant admitted that its pricing has been the same for more than a decade. (CR 270-71). There is nothing secret about Appellant's pricing, especially after twelve (12) years.

---

[31] Neither Pierce nor any of Appellant's IOM technicians are assigned to any specific doctor or hospital. (CR 363). Appellant assigned its IOM technicians on an "as available" basis. Thus, Pierce was not the continual point of contact or even the primary contact between Appellant and any surgeon or hospital.

36

First, Appellant's so-called confidential pricing is dictated to it by others. In many instances Appellant's pricing was set by the hospitals or a third-party payor. (CR 209). Appellant has also been asked to reduce its rates so as to remain competitive with other IOM providers. (CR 241-43, 238).

Second, Appellant has also publicly disclosed the amount it receives ($150) by filing invoices with the trial court. (CR 209-10). This public disclosure prevents the information from being an interest worthy of protection. *See Star-Telegram,* 834 S.W.2d at 57.

Third, its pricing is also contained in its contracts with the hospitals (CR 234), is contained in invoices Appellant sends out (CR 195-99), and is known to the hospitals and third-party payors who set the prices and pay the invoices. (CR 266-67). Dr. Alford's former monitoring company, was also aware of Appellant's pricing. (CR 209-10). Appellant cannot establish that any hospital, third-party payor, Dr. Alford, or anyone else has an obligation to maintain Appellant's pricing confidential.

The Fort Worth Court of Appeals has addressed the protectability of information when it is available to a much lesser degree than Appellant's pricing information. In *Numed* the court held:

> *Here, the facts do not justify conferring the status of trade secret on the data Numed claims requires protection. The evidence reflects much of the information Numed wishes to protect is not secret. Instead, it is contained in the contracts distributed to Numed's customers, which in turn may be discovered by anyone.*

*Numed,* 724 S.W.2d at 435.

37

Appellant's pricing information has been repeatedly disclosed for twelve (12) years, without restriction, and can be readily obtained from any number of sources. Accordingly, Appellant's pricing information is unworthy of protection. *Numed*, 724 S.W.2d at 435. Because Appellant's pricing information is not worthy of protection, it cannot have a valid enforceable covenant not to compete based thereon.

**(e). Appellant Not Relieved From Establishing Ancillary Requirements**

Appellant argues that it was relieved of establishing the "specific details of [its] confidential and proprietary information" because it had "sought and received protection from the [trial court] regarding these details."[32] *Assuming* this to be correct, Appellant was not faced with a discovery request, it was faced with a no-evidence summary judgment.

A no-evidence motion for summary judgment ***must be granted*** if: (*i*) the moving party asserts that there is no evidence of one or more specified elements of a claim or defense on which the adverse party would have the burden of proof at trial; and (*ii*) the respondent produces no summary judgment evidence raising a genuine issue of material fact on those elements. *See, e.g., Acad. of Skills & Knowledge, Inc. v. Charter Sch., USA, Inc.,* 260 S.W.3d 529, 534 (Tex. App.—Tyler 2008, pet. denied).

Appellant certainly has the option of not coming forward with evidence in support its claims, it just cannot refuse to come forward with evidence and also maintain claims for affirmative relief. As stated by the Texas Supreme Court:

---

[32] Appellant's Br. pp. 45-48.

> A plaintiff cannot use one hand to seek affirmative relief in court and with the other lower an iron curtain of silence against otherwise pertinent and proper questions which may have a bearing upon his right to maintain his action.

*National Union Fire Ins. Co. v. Valdez*, 863 S.W.2d 458, 461 (Tex. 1993).

> *Assuming* Appellant has a right to protect the information:

> [it] cannot eat [its] cake and have it too. The defendant also has certain rights, one of which is to defend [the] lawsuit and to develop an affirmative defense which may well destroy the plaintiff's right to maintain his action.

*Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 761 (Tex. 1995).

Appellant argues it only needed to show that it had information falling into *categories* of information where other courts had found those categories protectable.[33] To put this in perspective, Appellant claims it does not have to identify the information it claims was supposedly given to Pierce in support of the Covenant or why such information was worthy of protection. The mere fact Appellant claims its information falls within a *category* of information is insufficient to raise a fact issue.[34]

In the face of a no-evidence summary judgment, Appellant elected not to come forward with information necessary to raise a fact issue on its claims. Because Appellant was unwilling to provide anything more than *ipse dixit* statements regarding a protectable interest, Appellant failed to meet its burden of proof under Texas Business Commerce Code Section 15.51 and required the trial court to grant Synergy judgment. *Acad. of Skills & Knowledge,* 260 S.W.3d at 534.

---

[33] Appellant's Br. pp. 45-48.
[34] Section III(D)(3)(a), *supra*.

39

## E. THE COVENANT'S RESTRAINTS ARE UNREASONABLE
## (APPELLANT ISSUE #4C)

Assuming (*arguendo*) some protectable interest is found to exist, the Covenant is, nonetheless, unenforceable because it is broader than necessary to protect Appellant's interests. A covenant is enforceable only to the extent that it contains restraints as to time, geographic area, and scope, which are no greater than necessary to protect good will or other business interests of the employer. TEX. BUS. & COMM. CODE §15.50; *Gallagher Healthcare Ins. Services v. Vogelsang,* 312 S.W.3d 640, 654 (Tex. App.—Houston [1ˢᵗ Dist.] 2009, pet. denied); *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston [14ᵗʰ Dist.] 1996, writ denied).

Restraints are unreasonable if they are broader than necessary to protect the legitimate interests of the employer. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681-82 (Tex. 1990); *Stroman*, 923 S.W.2d at 84-85. Appellant bears the burden to establish the reasonableness of each restraint. TEX. BUS. & COMM. CODE ANN. §15.51(b).

### 1. No Evidence that 5 Year Covenant Was Reasonable

Synergy challenged the lack of evidence establishing that a five (5) year restraint was a reasonable in this case. (CR 162). Appellant could not articulate any basis for a 5-year restraint. (CR 355-59).

Appellant cites *Stone v. Griffin Communications & Sec. Sys., Inc.*, 53 S.W.3d 687, 696, no pet.), *overruled on other grounds by Am. Fracmaster, Ltd. v. Richardson*, 71 S.W.3d 381 (Tex. App.—Tyler 2001, pet. granted, judgment vacated w.r.m.), for the proposition that a 5-year restraint is *per se* reasonable. Appellant misreads *Stone*. *Stone*

40

recognizes that a 5-year restraint is not *per se* unreasonable, it does not hold that a 5-year restraint is *per se* reasonable. *Stone* went on to hold that a 5-year restraint reasonable because the evidence **in that particular case** established that it would take 5 years for the protectable information to become outdated.[35]

Unlike *Stone*, Appellant offers no evidence that whatever information Pierce allegedly received will not become outdated for at least five (5) years. Here, there is no evidence that any protectable information (*assuming it exists*) will not be outdated at the end of the month or that it is not already outdated. Appellant's reliance on *Stone* is misplaced.

### (a). Advancement Does NOT Make 5 Years Reasonable

To justify the duration of the Covenant, Appellant returns to its advancement of $5,000 for Pierce's training claiming this makes the 5-year restraint is reasonable.[36] Because, the training is not an interest worthy of protection,[37] it is self-evident that a 5-year restraint is broader than necessary to protect that training.

Appellant's assertion is also devoid of authority and provides no logical nexus between the training/funds and the 5-year restraint. Appellant could have summarily stated any duration was reasonable, just as it has done with stating 5 years is a reasonable period. There is simply no nexus between the advance or its amount and the imposition of a 5-year noncompete.

---

[35] Appellant's Br. p. 49.
[36] Appellant's Br. p. 51.
[37] Section III(D)(1)-(2), *supra*.

Examination of the repayment arrangement also establishes that a 5-year covenant is unreasonable. If Pierce did not repay the loan *via* the workout, he was obligated to *immediately* reimburse Appellant $5,000.00, with interest. (CR 183-86). In other words, if Pierce quit 90 days after becoming board certified he would have had to *immediately* repay Appellant the entire sum. The Covenant was in no way tied to his promise to repay the advancement of training costs. For example, if Pierce had to repay the advancement the Covenant is not tied to his final payment. With regard to the workout period, it was 48 months, not 60 months. Moreover, the mere fact Pierce elected to "work off" the debt in *lieu* of a cash repayment does not justify an additional five (5) year prohibition after the debt has been satisfied.

### (b). Long Employment Does NOT Equal Long Covenant

Finally, Appellant argues Pierce was employed for more than 5 years and received "on the job training" and continuing education during his entire employment. (CR 823, 843, 857). Essentially, Appellant's argument is that because Pierce remained employed for a long time, he should be restricted for a long time. The term of the employment was limited to just 90 days. (CR 176). Otherwise, Pierce's employment was at-will. Appellant offers no authority for its *tit-for-tat* argument and provides no evidence that 5 years is a reasonable restraint based on the duration of Pierce's employment.

With regard to Appellant's claim of ongoing training, neither the "on-the-job-training" nor the continuing education is mentioned in the employment agreement. (CR 183-84). And, there are no facts identifying or detailing what this ongoing training consisted of. (CR 823, 843, 857). Even if this training occurred at the tail end of Pierce's

employment, this supposed ongoing training could have been publicly available or the information out-of-date within a week. There is simply no evidence that whatever the ongoing training Pierce *might* have received makes a 5-year restraint reasonable. Therefore, accepting (*arguendo*) Appellant's claim that ongoing training occurred, this does *not* raise a fact issue whether a 5-year restraint is reasonable. Because Appellant failed to present any evidence of that a 5-year restraint is reasonable, Synergy is entitled to judgment that the duration of the covenant is unreasonable and, therefore, unenforceable and incapable of supporting a tortious interference claim.[38] *Patel v. City of Everman*, 179 S.W.3d 1, 17 (Tex. App.—Tyler 2004, pet. denied).

### 2. **Geographic Restraints Were Unreasonable**

Separate from the 5-year restraint, the geographic restrictions are patently unreasonable. (CR 181-82).[39] A covenant not to compete is unenforceable when the

---

[38] Section III(D), *supra*.

[39] Appellant suggests that a no-solicitation provision in the employment agreement is enforceable and provides an alternative to the 11-county covenant. The no-solicitation provision is equally flawed. Without question, the no-solicitation provision is subject to the Act. *Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011). As a consequence, the absence of an otherwise enforceable agreement to which the no-solicitation clause is ancillary is fatal to the enforcement of the no-solicitation provision.

The no-solicitation provision applies to only current and future customers. Appellant admits surgeons are not its customers. Moreover, whatever the relationship between Dr. Alford and his group and Appellant, the evidence establishes that was a prior relationship, not a current or future one.

Additionally, the no-solicitation provision contains no time period whatsoever. (CR 182). It is an absolute bar to any contact with customers, regardless of activity. (CR 182). And, it applies to all of Appellant's customers, not just the ones with whom Pierce worked. (CR 182). Each of these failings makes the no-solicitation provision unenforceable. *Dale v. Hoschar*, 2014 Tex. App. LEXIS 8816, *4 (Tex. App.—Dallas 2014, no pet.) (covenant with an indefinite duration is unenforceable as a matter of law); *Haass*, 818 S.W.2d at 387-88 (activities have to be ones in which promisor engaged and cannot "prohibit[] an employee from working with clients that did not exist at the time employee left or with whom employee had no contact.").

43

restraint includes areas that the employee did not work for the former employer. *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387 (Tex. 1991) (holding "the restrictive covenant must bear some relation to the activities of the employee. It must not restrain his activities into a territory into which his former work has not taken him . . . ."); *Cobb v. Caye Publ. Grp., Inc.,* 322 S.W.3d 780, 784-86 (Tex. App.—Fort Worth 2010, no pet.) (holding reformation limited to areas where former employee actually worked); *Evan's World Travel,* 978 S.W.2d at 232-33 (holding noncompete enforceable only as to the one county that employee had worked in for former employer); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 792 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (reforming covenant to only counties in which the employee had conducted his duties); *Zep Mfg.*, 824 S.W.2d at 660-61 (holding a covenant unenforceable because it prohibited an employee from working anywhere, regardless of whether he had serviced the area during his employment); *Webb v. Hartman Newspapers, Inc*., 793 S.W.2d 302, 303 (Tex. App.—Houston [14th Dist.] 1990, no writ) (restricting geographical area of a noncompete covenant between a newspaper publisher and former employee to the distribution area of the newspaper for which the employee had worked).

---

There is also a diversion of business provision, which applies to all "existing and future business." In addition to a lack of an ancillary agreement, it is not limited to business with which Pierce was involved (*Haass*, 818 S.W.2d at 387-88) and is too indefinite to be enforced based on restrictive language of "existing or future business." *See, e.g., Weatherford Oil Tool Co. v. Campbell*, 161 Tex. 310, 340 S.W.2d 950, 951-52 (1960) (geographic scope described as "any area where Weatherford Oil Tool Company, Inc., may be operating or carrying on business" undeterminable and subject to change; therefore unenforceable); *Gomez v. Zamora*, 814 S.W.2d 114, 118 (Tex. App.—Corpus Christi 1991, no writ) (holding restrictive language of "existing marketing area" and a "future marketing area of the employer begun during employment" to indefinite to be enforced); *Hoschar*, 2014 Tex. App. LEXIS 8816, at *7.

The Covenant restrains Pierce from engaging in activities in eleven counties; however, Appellant did not perform any services in at least one of those counties (CR 259) and Pierce never worked for Appellant in five of those counties. (CR 764-65). Appellant's document shows that Pierce actually did not work in six of the eleven counties. (CR 860). The Covenant's geographic restraints are, therefore, unreasonable as matter of law. *Haass*, 818 S.W.2d at 387; *Evan's World Travel,* 978 S.W.2d at 232-33; *Butler,* 51 S.W.3d at 792; *Zep Mfg.*, 824 S.W.2d at 660-61; *Webb.* 793 S.W.2d at 303.

Appellant makes the bare assertion that the "geographic restriction at issue here is limited to the territory in which the employee worked while in the employment of NeuroTex."[40] Appellant *cites no evidence to support this assertion because none exists*.

Appellant next asserts that the geographic restraints are reasonable because "[i]n 2005, when the Employment Agreement was entered into by the parties, Appellant had either worked in or had prospective business in the counties included within the covenant not to compete." (CR 845)[41] Appellant's assertion misses the mark.

Whether Appellant had or might have intended to do business in a geographical locale is not the test for determining the reasonableness of Pierce's Covenant.[42] *Cobb,* 322 S.W.3d at 784-86; *Haass*, 818 S.W.2d at 387; *Butler,* 51 S.W.3d at 792; *Evan's World Travel,* 978 S.W.2d at 232-33; *Stroman*, 923 S.W.2d at 85; *Zep Mfg.*, 824 S.W.2d at 660-61; *Webb.* 793 S.W.2d at 303. The reasonableness of the restraints is not measured by where Appellant performed services, but where Pierce provided services for

---

[40] Appellant's Br. p. 54.
[41] Appellant's Br. p. 54.
[42] There is nothing establishing that Appellant's historical or *prospective* service areas were known to or discussed with Pierce at the time the Covenant was signed.

Appellant. *Haass*, 818 S.W.2d at 387; *Butler,* 51 S.W.3d at 792; *Evan's World Travel,* 978 S.W.2d at 232-33; *Stroman*, 923 S.W.2d at 85; *Zep Mfg.*, 824 S.W.2d at 660-61; *Webb.* 793 S.W.2d at 303.  Because the 11-county restraint was conclusively established to be unreasonable, it is unenforceable and incapable of being the basis of a tortious interference claim.[43]

### 3. Scope of Activities from Which Pierce is Prohibited is Unreasonable

The Covenant is also unenforceable because it unreasonably restrains Pierce's future activities.  A restrictive covenant must bear some relation to the activities of the employee at his former employer and must not restrain his activities in a field into which his former work has not taken him.  *See, e.g., Haass*, 818 S.W.2d at 387.

The Covenant reads: "*Employee shall not, directly or indirectly, become* <u>*engaged in any business or activity*</u> *…, which directly or indirectly competes with the Company's business owned or operated by Company or any of Company's subsidiaries, partners, associates, or affiliates . . . .*"  (emphasis added) (CR 182).  On its face, the Covenant prohibits Pierce from working as a janitor or in any other capacity for anyone that Appellant might consider to be its competitor.

The true breadth of this restraint is not even presently determinable.  According to Appellant, Pierce might or might not be prohibited from activities depending on what Appellant decides to do in in the ***future***.

---

[43] Section III(D), *supra*.

```
Q.    But  you  did  testify  that  the  noncompete  would
restrict   him   as   written   from   performing   clinical
testing  services  performed  outside  the  operating  room,
correct?
A.    Well,  it  just  encompass  company  business.    There
was  a  time  when  clinical  testing  was  a  big  part  of  the
business.
Q.    So  is  that  a  yes?
A.    I'm  not  certain.    How's  that?    I'm  not  certain,
because  the  nature  of  the  business  changes  from  time
to  time.    There  could  be  a  time  in  the  future  where
clinical  testing  is  a  big  part  of  the  business.
```

(CR 1001).

As written, the restraint is overly broad because it is based on Appellant's changing business, not Pierce's limited duties provided to Appellant. (CR 173-74). *See, e.g., Weatherford Oil,* 340 S.W.2d at 951-52 (restraint described as "any area where Weatherford Oil Tool Company, Inc., may be operating or carrying on business" undeterminable and subject to change; therefore unenforceable). Such restrictions are effectively industry-wide exclusions from the enumerated counties. *Id; Stroman*, 923 S.W.2d at 85; *see Haass*, 818 S.W.2d at 387; *U.S. Risk Ins. Group, Inc. v. Woods*, 399 S.W.3d 295, 301 (Tex. App.—Dallas 2013, no pet.).

In addition, the restraints apply to hospitals and surgeons with whom Appellant has no contract or never had contact (CR 256-58). According to Appellant:

```
I  believe  that  any  competition  is  in  violation  of  the
contract   because   there's   always   the   potential   for
[NeuroTex]  to  obtain  a  physician  that  either  is  not
utilizing  the  monitoring  and  might  and  a  hospital  that
has  a  company  that  can't  make  it,  won't  make  it,  isn't
there  yet.    There  always  the  potential,  always.
```

(CR 256; *see also* 257-58).

However, Appellant cannot provide services to a hospital without a contract and privileges at that hospital. (CR 233). Further, ***Appellant admits that performance of IOM for a surgeon with whom Appellant has not previously worked is neither directly nor indirectly competitive with it.*** (CR 220-21). Moreover, whatever the relationship between Dr. Alford and his group and Appellant, the evidence establishes that it was not a current relationship, but a former relationship. Despite the absence of a competitive threat and despite Appellant's inability to even service certain facilities, the Covenant prohibits and Appellant seeks to forbid Pierce from providing any services in his field to surgeons, with whom Appellant has no relationship, and to hospitals that Appellant cannot service.

Without question, the Covenant, as written, forbids activities that are unreasonable and greater than necessary to protect any interest that Appellant might have. *DeSantis*, 793 S.W.2d at 681-82; *Stroman*, 923 S.W.2d at 84-85. Accordingly, Synergy is entitled to judgment that the Covenant is unenforceable and incapable of being the subject of a tortious interference claim.[44]

### G. TRIAL COURT NOT REQUIRED TO REFORM COVENANT (APPELLANT ISSUE #4E)

Appellant next complains that the trial court did not reform the Covenant. Appellant did not affirmatively seek reformation. Neither Appellant's first amended petition nor its second amended petition requested reformation. (CR 48-58, 455-66).

---

[44] Section III(D), *supra*.

Appellant consistently maintained throughout the litigation that the Covenant was enforceable as written. As an alternative allegation in its summary judgment response, Appellant raised for the first time that reformation of the geographic scope to Pierce's actual counties of employment was acceptable. (CR 846). This is insufficient and is a waiver of any right to reformation. *Sentinel Integrity Solutions, Inc. v. Mistras Grp., Inc.,* 414 S.W.3d 911, 921 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *see Emergicare Sys. Corp. v. Bourdon,* 942 S.W.2d 201, 204 (Tex. App.—Eastland 1997, no pet); *Daytona Grp.,* 800 S.W.2d at 290.[45]

*Assuming* a request for reformation is implied, the trial court did not err in failing to reform the Covenant. First, reformation is only proper where the covenant is necessary to protect a legitimate business interest. *Daytona Grp.,* 800 S.W.2d at 290. Because the Covenant was not necessary to protect any legitimate business interest of Appellant,[46] the Covenant could not be reformed. *See id.*

Second, when, as here, a covenant involves the promisor's rendition of personal services, the burden is on Appellant to establish that the covenant meets the requirements of the Act. TEX. BUS. & COMM. CODE ANN. § 15.51(b); *see Stroman*, 923 S.W.2d at 85. Appellant also has the burden to establish what, if any, reformation of the Covenant would be reasonable and necessary to protect its legitimate business interest(s). *DeSantis*, 793 S.W.2d at 685; *Stroman*, 923 S.W.2d at 85. Unless such a showing is

---

[45] There is no injunctive relief sought against Synergy.
[46] Section III(D), *supra*.

made, the covenant cannot be reformed. *DeSantis*, 793 S.W.2d at 685; *Stroman*, 923 S.W.2d at 85; *Daytona Grp.*, 800 S.W.2d at 290.

Appellant offered no alternative duration to the 5-year restraint and provided no evidence as to the reasonableness of any alternative duration. Appellant also offered no alternative and no evidence to establish any lesser degree of activity that reasonably should be restrained.

Appellant's conditional and reluctant acceptance to have the trial court enforce the Covenant in only those counties where Pierce worked during his employment falls far short of establishing that a county-wide restraint is reasonable. An insurmountable gap exists between the evidence in the record and the evidence that a county-wide restraint is reasonable. For example, the evidence establishes that: (*i*) Pierce's duties were limited to that of an IOM technician and IOM only occurs in a surgical facility (CR 172); (*ii*) the hospital, not the surgeon, is Appellant's client (CR 231-37); and (*iii*) Appellant cannot work in a surgical facility without contracting with that surgical facility. (CR 231-34). Other than a desire to eliminate any possible competition,[47] Appellant offered nothing to explain why Pierce's former work, which only occurs within the 4 walls of a surgical facility, justified a county-wide restraint. Appellant's admission that Pierce could work in Tarrant and Dallas counties under the right set of circumstances (CR 1603) further erodes any foundation for a county-wide restraint.

---

[47] (CR 256; *see also* 257-58).

As another example of this insurmountable gap, Appellant filed a list of hospitals and surgeons that Pierce worked with over the tenure of his of employment (CR 860), but nothing indicates the frequency or time period that he worked with any physician or in any facility. In contrast, the evidence shows that Pierce worked at some hospitals only once during his employment with Appellant. (CR 921). Appellant fails to identify anything showing what Pierce learned or could have learned during a single procedure or even a few procedures that would allow the trial court to determine a reasonable duration or geographic restraint for reforming the Covenant.

As to the time periods involved, the record only allows for speculation wholly insufficient to reform the Covenant. If the last time Pierce worked in a listed facility or with a listed physician was 2006, there is no evidence showing the necessity of restraining Pierce from working with that surgeon or in that facility *beginning* in 2013, when he left Appellant's employ, or for five years thereafter.[48]

Here, for example, Pierce had worked in USMD hospital in Fort Worth while an employee of Appellant, but had not worked in that hospital for possibly up to five years before leaving Appellant's employ. (CR 962). Given the fact the record is devoid of the time periods during which Pierce worked at the enumerated facility and surgeons (CR 860), Appellant failed to provide sufficient evidence of alternative, reasonable duration or geographic restraints. Therefore, the trial court did not err by failing to reform the Covenant.

---

[48] The same could be said for the most of the years thereafter.

## H. APPELLANT DID NOT PROVE ELEMENTS OF CLAIM (APPELLANT ISSUE #4D)

### 1. Damages Foreclosed By Statute

Appellant erroneously argues that damages are unnecessary and further argues that Synergy failed to challenge Appellant's request for injunctive relief; therefore, Appellant asserts its claim should survive.[49]  Appellant did not seek injunctive relief against Synergy. (CR 56-57, 463, 465-66).[50]  Appellant's only cause of action against Synergy is for alleged tortious interference with Pierce's Covenant. (CR 54-55; 460-62).  Damages are a necessary element of Appellant's tortious interference claim. *See Powell Indus., Inc. v. Allen,* 985 S.W.2d 455, 456 (Tex. 1998).

Assuming (*arguendo*) that the Covenant was otherwise valid, Appellant judicially admitted (CR 756-62; 167-68) that Pierce never worked for Appellant in five of the eleven of the counties covered by Pierce's Covenant.[51] (CR 764-65).  Appellant also admitted that it had never provided services in at least one of the counties in which Pierce was prohibiting from working. (CR 259).  Therefore, even if the Covenant were otherwise enforceable, it would have to be reformed. *Haass*, 818 S.W.2d at 387; *Evan's World Travel,* 978 S.W.2d at 232-33; *Butler,* 51 S.W.3d at 792; *Zep Mfg.*, 824 S.W.2d at 660-61; *Webb*, 793 S.W.2d at 303.

---

[49] Appellant's Br. p. 60.
[50] Further, Appellant sought and received return of the injunction bond. (CR 1527-29).
[51] This is not to say that a county-wide restriction is reasonable (assuming a protectable interest exists), because IOM is a hospital-based practice that occurs within a surgical center.

Reformation precludes damages and forecloses Appellant's tortious interference claim. TEX. BUS. & COMM. CODE § 15.51(c); *Juliette Fowler Homes at* 663; *Zep Mfg.,* 824 S.W.2d at 661, 663-64.[52]

Appellant wholly fails to address the Act's foreclosure of damages in this case. (CR 167-168; 760-61) and did not assign a general point of error as provided for in *Malooly Brothers, Inc. v. Napier*, 461 S.W.2d 119, 120 (Tex. 1970). Even if it had, that is not the end of Appellant's burden. In circumstances such as these, where a trial court has potentially granted summary judgment on multiple elements of a claim, Appellant must present arguments and supporting authority regarding each of the elements challenged by the motion for summary judgment. *McCoy v. Rogers,* 240 S.W.3d 267, 272 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). Appellant fails to raise or brief the foreclosure-of-damages ground raised by Synergy. When, as here, a summary judgment ground would support the grant of summary judgment, a court of appeals may affirm regardless of whether the trial court specified the grounds on which it relied. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625-26 (Tex. 1996); *Flory v. Daimler Chrysler Corp.*, 2003 Tex. App. LEXIS 10235, at *7-*8 (Tex. App.—Tyler 2003, pet. denied). Furthermore, the granting of summary judgment *must* be affirmed where it may have been based on a ground not specifically challenged by the appellant and where there is no general assignment of error. *Malooly,* 461 S.W.2d at 120; *Benson v. Gaston*, 2014 Tex. App. LEXIS 2753, at *6 (Tex. App.—Tyler 2014, pet. denied); *Flory,* 2003 Tex. App. LEXIS 10235, at *7-*8; *Johnston v. Am. Med. Int'l*, 36 S.W.3d 572, 576 (Tex. App.—

---

[52] Appellant's challenges to the reasonableness of the restraints are dealt with in Section III(E)(2), *supra*.

Tyler 2000, pet. denied). Because Appellant did not challenge the damage-foreclosure ground advanced by Synergy and the trial court could have granted summary judgment on that ground, this Court must affirm summary judgment in favor of Synergy.

## 2. No Evidence of Lost Profits (*i.e.* "Recoverable Damages")

Appellant argues that the record contains evidence of its damages because Boldery testified that Appellant had historical, annual revenues of approximately $400,000 from IOM procedures where Alford and his group were the attending surgeons.[53] (CR 858).

In addition to not addressing Synergy's damage-foreclosure ground, Boldery's affidavit statement is merely an assertion of revenues, not evidence of recoverable damages (*i.e.*, lost profits). *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 n.1 (Tex. 1992); *Atlas Copco Tools v. Air Power Tool & Hoist*, 131 S.W.3d 203, 209 (Tex. App.—Fort Worth 2004, pet. denied). Evidence of lost revenue that does not include expenses lacks probative value and constitutes no evidence. *Id.*[54]

Appellant admits it does not know how much of that alleged revenue is profit (CR 336-37) and that Appellant did not actually collect $400,000 in annual revenues from procedures performed by Alford or his group in 2013 or 2012. (CR337). In fact, Appellant could not state whether it had collected that much in 2011. (CR 337). In other words, going back 3 years before Pierce left Appellant's employ, Appellant cannot provide evidence of its $400,000 revenue allegation.

---

[53] Appellant's Br. pp. 10, 59-60; *see also* (CR 825, 852, 858).
[54] Appellant's argument also ignores the admission that the relationship giving rise to this historical revenue ended **before** Pierce left Appellant's employee. (CR 208, 211, 277-78).

Texas law unequivocally requires lost profits to be calculated by measuring lost net profits, not lost gross profits. *See Atlas*, 131 S.W.3d at 209 (citing *Holt Atherton,* 835 S.W.2d at 83 n.1). Net profits are "what remains in the conduct of business after deducting from its total receipts all of the expenses incurred in carrying on the business." *Atlas,* 131 S.W.3d at 209. Evidence of lost revenue that does not include expenses lacks probative value and constitutes no evidence. *Id.* Boldery's affidavit statement is merely an assertion of revenues, not evidence of damages.

### 3. No Evidence of Interference (Appellant Issue #6)

Appellant also argues it raised fact issues precluding summary judgment on the element of interference. With regard to interference, Appellant must establish that Synergy <u>intentionally interfered</u> with Pierce's Covenant. *See Powell Indus.,* 985 S.W.2d at 456 (listing of elements for tortious interference). It failed to raise a genuine issue of fact of this element.

Appellant argues that Synergy, *via* Alford, knew of Pierce's Covenant prior to Synergy hiring Pierce. When asked to identify Synergy's wrongful actions, Appellant testified:

> **Q.** Okay. What is Neurodiagnostics claiming that Synergy has done wrong as it relates to the employment agreement that is Exhibit 4?
> **A.** They maintained his employment even though Eric sent a letter informing him of the employment agreement.
> **Q.** Anything else?
> **A.** That sums it up.

(CR 252-53).

Appellant reasons, ***albeit incorrectly***, this creates a fact issue of interference. Simply hiring an employee or inducing an at-will employee to leave his/her employment is insufficient to constitute interference. *See, e.g., Lazer Spot,* 387 S.W.3d at 50. Said another way, a defendant cannot be liable for inducing a party to do what that party has a right to do under a contract. *ACS Invs., Inc. v. McLaughlin,* 943 S.W.2d 426, 431 (Tex.1997); *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 857 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

A tortious interference defendant must be more than a willing participant in a breach; the defendant must *knowingly induce* a contracting party to breach its obligations. *See Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex.1993); *John Paul Mitchell Sys. v. Randalls Food Markets, Inc.*, 17 S.W.3d 721, 730 (Tex. App.—Austin 2000, pet. denied). Merely entering into a contract with a party with knowledge of that party's contractual obligations to someone else is not the same as inducing a breach. *John Paul Mitchell Sys.,* 17 S.W.3d at 731; *SJW Prop. Commerce, Inc. v. Sw. Pinnacle Properties, Inc.*, 328 S.W.3d 121, 152 (Tex. App.—Corpus Christi 2010, pet. denied); *Baty,* 63 S.W.3d at 861; *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 140 (Tex. App.—Eastland 1992, writ denied); *Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768, 844–45 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dismissed,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988); *Accord Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 493 (5th Cir. 2008); *see also Reyna,* 865 S.W.2d at 927.

Appellant has no proof that Synergy *interfered* with Pierce's covenant not to compete or any other provision of his employment contract. Appellant erroneously claims

that there is no dispute that Pierce breached the Covenant.[55]  This is incorrect.  As set forth above, the Covenant is invalid and unenforceable; therefore, it could not be breached.

Further, Pierce primarily worked at Victory Medical Center in Plano, a hospital that he never worked in while an employee of Appellant (CR 934, 958, 964) with surgeons with whom he had not previously worked. (CR 173, 962).[56]  This is not competitive with Appellant by its own admission. (CR 220-21).  Appellant's contention of an undisputed breach, and therefore interference, is incorrect.

Further, the evidence showed no interference. The plain language of the Covenant prohibits Pierce from activities in the enumerated counties, where the activities are directly or indirectly competitive with Plaintiff. (CR 220-21).   The evidence conclusively shows that:

- Pierce has not worked with surgeon that he worked with while he was employed by Plaintiff (CR 172-73);

- Pierce has worked at Victory Medical Center, a surgical facility that he did not work at while in Appellant's employ (CR 934, 958, 964);

- Pierce has not solicited surgeons, whether he previously worked with or not, to do business with Synergy (CR 173-74);

---

[55] Appellant's Br. p. 57.

[56] As a Synergy employee, Pierce worked at USMD hospital on a few occasions, where Dr. Tinley was the surgeon (CR 957, 961-62).  Pierce had not previously worked with Dr. Tinley (CR 497-98, 961-62). Moreover, Appellant confesses that there is no breach related to working at USMD because there was no damage.

> **Q**.      Well, we know based on the Reptrax report that you produced that Josh performed IOM monitoring services for Dr. Tinley at USWD Fort Worth. Those are the ones reflected on that Reptrax report.
> **A**.      um-humm, correct.
>
> **Q**.      Are you claiming that those are procedures that Neurodiagnostics lost?
> **A**.      No.  (CR 373).

- Pierce has not solicited hospitals or surgery centers to do business with Synergy (CR 173-74) ; and

- Pierce has not contracted or been involved in contracting with hospitals or surgery centers while an employee of Synergy (CR 173-74).

There is no interference under these facts because Appellant admits that when an intraoperative monitoring of a surgery occurs with a surgeon that Plaintiff has not worked with, such is neither directly or indirectly competitive with Plaintiff. (CR 220-21). For these reasons, Appellant cannot prevail on its tortious interference claim. Consequently, Synergy is entitled to judgment on the tortious interference claim.

## PRAYER

Appellee Synergy IOM, LLC requests that this Court uphold the trial's judgment in all respect and that judgment in favor of Appellee be affirmed.

Respectfully submitted,

WHITAKER CHALK SWINDLE & SCHWARTZ PLLC

*/s/ Brent Shellhorse*
William Brent Shellhorse
State Bar No. 24008022
Hunter McLean
State Bar No. 00788026
Patrick H. Rose, IV
State Bar No. 24079244
301 Commerce Street, Ste. 3500
Fort Worth, Texas 76102
(817) 878-0523
(817) 878-0501 (Facsimile)

**ATTORNEYS FOR APPELLEE SYNERGY IOM, LLC**

## CERTIFICATE OF COMPLIANCE

Relying on the word count function in the word processing software used to produce this document (MS Word), I certify that the sections covered by T.R.A.P. 9.4(i)(1) contain 14,812 words.

*/s/ Brent Shellhorse*
Brent Shellhorse


## CERTIFICATE OF SERVICE

This is to certify that on March 9, 2015, a true and correct copy of the foregoing APPELLEE SYNERGY IOM, LLC'S OPENING BRIEF with attached APPENDIX was delivered to opposing counsel, listed below, in accordance with the Texas Rules of Civil Procedure.

*/s/ Brent Shellhorse*
Brent Shellhorse

# APPENDIX TABLE OF CONTENTS

Employment Agreement — Exhibit A

Synergy's Second Motion to Supplement to
Summary Judgment Evidence — Exhibit B

*Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,*
793 S.W.2d 660, 663, 665 (Tex. 1990) — Exhibit C

*Travel Masters, Inc. v. Star Tours, Inc.,* 827 S.W.2d S.W.2d 830,
832-833 (Tex. 1991) — Exhibit D

*Lazer Spot, Inc. v. Hiring Partners, Inc.*, 387 S.W.3d 40, 49
(Tex. App.—Texarkana 2012, pet. denied) — Exhibit E

# EXHIBIT A

# EMPLOYMENT AGREEMENT

This Agreement is made to be effective the 1st day of November, 2005, between Neurodiagnostic Tex, Ltd., a Texas limited partnership, having its principal place of business at 1322 Old Creek Drive, Tyler, Smith County, Texas 75703, hereinafter referred to as the "Company", and Robert "Josh" Pierce, hereinafter referred to as the "Employee."

## I. TERM

The Company agrees to employ the Employee, and the Employee hereby accepts employment with the Company for a period of ninety (90) days, beginning on the date hereof. Following the initial ninety-(90) day period (the "Initial Period"), Company agrees to employ Employee for a period of thirty (30) days with such periods being automatically renewable on a monthly calendar basis (the "Continuing Period"), unless Company or Employee gives notice of non-renewal. Notwithstanding the foregoing, Company shall retain the right to terminate this Agreement for cause at an earlier time as set forth in this Agreement. This Agreement may be terminated by either party by giving fourteen (14) days written notice of an intention to not renew the employment for the following calendar month.

## II. EMPLOYEE'S DUTIES

Employee shall work primarily in Tarrant County, Texas and surrounding counties, but may be assigned to places as the Company may from time to time direct. The Employee shall perform such duties as Company shall from time to time direct, however,

EMPLOYMENT AGREEMENT – Page 1



EXHIBIT
2

it is the intention of the parties hereto that the primary duty of Employee shall be to provide intraoperative testing / monitoring (IOM) services for the Company, but may include clinical testing services performed outside the operating room.

## III. TIME

The Employee shall devote Employee's entire time and attention to the business of the Company while employed by Company. As a condition precedent for employment with Company, Employee shall have no other employment without the Company's express written consent. It is specifically acknowledged by both Employee and Company that the duties to be performed by Employee are of such a nature that the number of hours to be worked each week cannot be literally foreseen or predicted. Employee agrees to work that number of hours per week which will accomplish the results sought by both parties herein.

## IV. COMPENSATION

As compensation for employment services rendered under this Agreement, Employee shall be entitled to receive a salary at the rate of Thirty-three Thousand and NO/100 Dollars ($33,000.00) per year, payable in bi-weekly equal installments.

## V. SATISFACTORY PERFORMANCE OF DUTIES

The employment of the Employee shall continue only as long as the services rendered by the Employee are satisfactory to the Company, regardless of any other provision contained in this Agreement. The Company shall be the sole judge as to whether the services of the Employee are satisfactory. In the event Company determines

the services of Employee are unsatisfactory, employment may be terminated by giving Employee a fourteen (14) day notice of such termination ("Notice Period") and by paying Employee to the end of the Notice Period.

## VI. TERMINATION FOR CAUSE

Company may terminate Employee at any time for cause. Cause shall be defined to include, but is not limited to, any acts of dishonesty, theft, or involvement in any illegal activity, whether or not such involvement results in criminal prosecution. Further, cause shall be defined to include tardiness, absence from work, failure to follow the instructions or policies of Company, or any other act or action for which Company would be reasonably expected to take disciplinary actions or terminate an employee. In the event of termination for cause, the Employee shall be entitled to compensation earned by Employee prior to the date of termination as provided for in this Agreement computed pro rata up to and including that date. The Employee shall be entitled to no further compensation as of the date of termination.

## VII. NON-COMPETITION AGREEMENT

Employee acknowledges that Company is agreeing to spend financial resources to train Employee pursuant to the Training Agreement below and share proprietary and confidential information with Employee so that Employee will be capable of satisfying Employee's duties under this Agreement. Further, Company agrees to provide Employee with a fourteen (14) day notice of termination of Employment, unless Employee is

terminated for cause as described earlier in this Agreement, in the event Employee's employment is terminated as described earlier in this Agreement.

1.    Non-Disclosure Agreement

Employee and Company agree that, in the course of Employee's employment with Company, Employee will acquire confidential customer and patient related information that could damage Company if this information were to come into the possession of Company's competitors. For this reason, and for the protection of the Company's patients, Employee will not, except as authorized in writing by Company, during or at any time after the expiration or termination of this Agreement, directly or indirectly, use, communicate, divulge, furnish to, or convey to any other person, firm, or corporation, any of the trade secrets, financial information, project plans, or other proprietary or confidential information of Company or any of Company's subsidiaries, partners, associates, or affiliates, obtained by Employee during the term of this Agreement. The information Employee agrees not to disclose includes, but is not limited to, the following:

a.    Identity and information regarding any past, present or prospective customer or patient of Company;

b.    Any financial information of any of Company's business;

c.    Any list of Company's employees, whether permanent or temporary; and

d.    Any results of any studies or investigations by Company or Employee conducted during the term of this Agreement.

Further, Employee agrees that all procedures and techniques used by Company or other concepts created by Company for use in Company's business, whether actually used

or not, shall be deemed to be works made for hire. Employee agrees to assign, and shall assign to Company, its successors, assigns or nominees all right, title and interest Employee may otherwise have in such copyrightable works. In the event that Employee incorporates or otherwise uses Employee's copyrighted, copyrightable material, or trademark material in the performance of Employee's duties for Company, which procedure or technique was not first produced or composed by Employee in the performance of said duties, to the extent Employee has the right to do so, Employee hereby grants, and shall grant to Company, a royalty-free, nonexclusive and irrevocable license to reproduce, translate, publish, use and dispose of such procedures and techniques, and to authorize others to do so in the conduct of any of Company's businesses.

2. Proprietary Information of Former Employers

Employee represents that Employee has not misappropriated proprietary or confidential information from any former employer, which includes all confidential information of any former employer, that is, information not generally known to the public or to the former employer's competition in the industry. Examples of such information being customer lists, customer files, personnel files, computer records, financial and marketing data, potential customers or projects, the former employer's marketing tactics and strategy, the former employer's scheduling and cost budgeting techniques, and the former employer's bidding techniques. Employee further represents

that Employee's employment with Company is not in violation of any non-competition agreement.

### 3. Indemnification of Company

Employee agrees to indemnify and hold Company harmless from any dispute arising out of any agreements or employment of Employee with any former employer of Employee. Employee agrees to pay all attorneys' fees and costs incurred by Company arising out of such disputes, whether or not such disputes result in litigation, arbitration, or some other means of dispute resolution. Employee agrees to pay all attorneys' fees and costs incurred by Company arising out of such disputes, whether or not such disputes arise out of meritless or frivolous claims. Employee agrees that all settlement decisions regarding such claims shall be made at Company's sole discretion.

### 4. Covenant Not to Compete

Employee agrees that the covenants and restrictions set forth below are intended only as a reasonable protection of the Company. For a period of five (5) years after the expiration or termination of this Agreement, Employee shall not, either directly or indirectly, become engaged in any business or activity in the Texas counties surrounding the Dallas / Fort Worth Metroplex, which are Collin, Dallas, Denton, Ellis, Hood, Johnson, Kaufman, Parker, Rockwall, Tarrant, and Wise counties located in the State of Texas, which directly or indirectly competes with the Company's business owned or operated by Company or any of Company's subsidiaries, partners, associates, or affiliates,

unless approved by Company in writing before Employee's acceptance of such employment or opportunity.

Employee shall not have any contact with any of Company's current customers or contacts or solicit potential customers if such potential customers are or were identified through leads developed during the course of Employee's rendering of services and duties under this Agreement.

Employee shall not, either during the term of this Agreement or for a period of two (2) years thereafter, divert or attempt to divert any existing or future business of Company. Employee shall not, either during the term of this Agreement or for a period of two (2) years thereafter, either directly or indirectly, for himself or any third party, solicit, induce, recruit, or cause another person in the employ of any business owned or operated by Company to terminate his/her employment for the purpose of joining, associating or becoming employed with any business which is either in competition with Company or that conducts or performs intraoperative testing / monitoring (IOM) services.

If the foregoing covenant is not enforceable to the fullest extent provided, it shall remain enforceable to the extent provided by law. Any breach hereof may be remedied by any right or remedy available to Company, including, without limitation, the right to obtain from a court of competent jurisdiction an order of specific performance or injunctive relief without the necessity of the posting of any bond or other security.

5.    Soliciting Employees After Termination of Employment

Page 182

For a period of two (2) years immediately following the termination of the Employee's employment with the Company, the Employee shall not, either directly or indirectly, solicit or offer employment to any then current employee or sub-contractor of Company, or employ any former employee of Company for a period of one (1) year from the date of termination of employment with Company.

6.    Notification of Future Employers

For a period of five (5) years immediately following the termination of this Agreement and Employee's employment with Company, Employee will inform each new Company, prior to accepting employment, of the existence and details of this Agreement, and provide the Company with a copy of this Agreement.

7.    Representations of Employee

Employee represents that Employee's experience and capabilities are such that the restrictions contained herein will not prevent Employee from obtaining employment or otherwise earning a living at the same general economic benefit as reasonably required by Employee and that Employee has, prior to the execution of this Agreement, reviewed this Agreement thoroughly with Employee's legal counsel, if needed or desired.

## VIII. TRAINING AGREEMENT

As part of this Agreement, Company and Employee agree that Company is prepared to expend large sums of money and invest considerable amounts of time to train, educate and qualify Employee to (1) either become board eligible in preparation of the evoked potential and intraoperative monitoring boards or to become board eligible to

provide evoked potential testing / intraoperative monitoring (IOM) services, (2) to become registered as an REPT, and (3) to become registered as a CNIM. Employee acknowledges that he has already become boarded in EEG. Employee and Company agree that the cost of the training to be provided to Employee is Five Thousand and NO/100 Dollars ($5,000.00). In consideration of the covenants and agreements contained herein, Employee and Company agree to the following:

1.    Company's Advancement of Training

       -    Company will advance the cost of training to train, educate and qualify Employee to (1) either become board eligible in preparation of the evoked potential and intraoperative monitoring boards or to become board eligible to provide evoked potential testing / intraoperative monitoring (IOM) services, (2) to become registered as an REPT, and (3) to become registered as a CNIM, all of which shall hereinafter be referred to as "Training."

2.    Service Period

       Company will be unable to realize the full value of the Training provided to Employee under this Training Agreement unless Employee successfully completes the Training described above and continues to provide services for the Company for a reasonable period of time. Therefore, if Employee resigns, otherwise voluntarily terminates employment with Company, or is discharged for cause pursuant to Section VI at any time during the Training period or within forty-eight (48) months of full time employment following Employee's board eligibility date ("Service Period"), Employee

will repay Company the sum of Five Thousand and NO/100 Dollars ($5,000.00), with interest at the rate of eight (8) percent per annum from the date of termination of employment with Company, in cash upon the date of termination.

3.     **Effect of Employee's Failure to Repay Training Costs**

Should Employee fail to make payment as described above, Company is entitled to costs, attorney fees and related expenses incurred related to Company's collection of the outstanding balance, together with interest thereon, to the extent permitted by applicable law.  Payments under this Training Agreement will be applied first to the payment of expenses of Company, such as attorney's fees and costs of collection, if any.  The balance of the payments will be applied to the principal amount.

4.     **Effect of Termination of Company's Business or Death of Employee**

Company will absorb the cost of the Training provided under this Training Agreement if its business is terminated while Employee is actively employed by Company or if Employee dies before the completion of the Service Period.

5.     **Existing Terms and Conditions of Employment**

Except as expressly provided herein, this Training Agreement does not alter any of the existing terms and conditions of Employee's employment with Company, either during the period of Training or any subsequent period of employment with Company. The existence of any claim that Employee may have against Company based upon any agreement with Company or upon Employee's employment with Company shall not serve as a defense to Company's enforcement of this Training Agreement.

EMPLOYMENT AGREEMENT – Page 10

**6.    Change of Employee's Address**

If Employee's employment with Company is terminated for any reason before the expiration of the Service Period, Employee agrees to promptly notify Company in writing with all address changes for Employee.

**7.    Acceleration of Unpaid Balance**

If Employee's employment with Company is terminated and Company elects to assert its rights to repayment of the Training costs as provided above, Company may elect to accelerate the unpaid balance of the principal and all accrued interest and declare the same payable at once without notice or demand.

**8.    "At Will" Employment Status**

This Training Agreement shall not be interpreted as a promise by Company to employ Employee for any length of time. This Training Agreement shall not be interpreted as a change of Employee's status from an "at will" employee.

## IX. MISCELLANEOUS PROVISIONS

**1.    Dispute Resolution**

The parties agree that it is in their best interest to resolve any dispute without litigation. Therefore, any party who has a dispute under this Agreement must notify the other party in writing of the nature of the dispute and the damages which the party is seeking. Either party has a right to make reasonable requests for documentation to support the facts which are alleged by a party. If the parties cannot resolve the dispute within thirty (30) days after the date of the written document notifying the party of a

dispute is received by such party, then the dispute shall be referred to a mutually agreeable mediator. If the parties cannot agree to a mediator, then either party may file a lawsuit. Once the lawsuit is filed, the parties agree that the party that filed the lawsuit shall *immediately* request that the Court appoint a mediator and the parties shall attempt to resolve the dispute through the court appointed mediator. In such a dispute, the prevailing party shall be entitled to reasonable attorney's fees and courts costs of litigation, including appellate and collection costs. The cost for mediation shall be divided equally between the parties.

2.    Entire Agreement

This Agreement and its exhibits, if any, supersedes all other previous agreements with respect to the performance of duties or payment of compensation outlined in this Agreement, either oral or in writing, between the parties to this Agreement and contains the entire understanding of the parties and all of the covenants and agreements between the parties.

3.    Amendment

No change or modification of this Agreement shall be valid unless the modification is in writing and signed by Employee and Company. Each party shall be given written notice of any amendment of any section of this Agreement.

4.    Execution

This Agreement shall become effective as to each party when executed by such party or its representative, but no party shall be entitled to claim a benefit under this Agreement unless such party or its representative has executed this Agreement.

## 5. Assignability and Benefit

This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors, assigns, heirs, and legal representatives, provided, however, that this Agreement, being in the nature of one for personal services, may not be performed by any person other than Employee, unless otherwise approved by Company in writing, and the responsibilities of Employee cannot be assigned by Employee. It is expressly agreed that the rights arising from the terms and provisions of this Agreement shall be assignable by the Company to any person, corporation, partnership, company, firm, or other entity which succeeds to the business of the Company, whether by incorporation, merger, stock purchase, dissolution or liquidation of Company, purchase or transfer of the assets of Company, or otherwise.

## 6. Remedies Cumulative

All specific remedies provided for in this Agreement shall be cumulative and not exclusive of each other or of any other remedies available in law or equity.

## 7. Governing Law and Venue

This Agreement shall be construed in accordance with the laws of the State of Texas, entirely independent of the forum in which this Agreement or any part of it may

come up for construction, interpretation, or enforcement. Venue for any judicial proceeding under this Agreement shall be in Smith County, Texas.

8.    Waiver

Any failure, forbearance or delay on the part of either the Employee or Company to exercise any remedy or right under this Agreement shall not operate as a waiver. The failure of either party to require performance of any of the terms, covenants, or provisions of this Agreement by the other party shall not constitute a waiver of any of the rights under this Agreement.

9.    Attorney's Fees and Costs

If any action at law or in equity is necessary to enforce or interpret any of the rights and obligations under this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which the prevailing party may be entitled.

10.    Headings

The headings used for the various provisions of this Agreement have been included only to make it easier to locate the subject matter covered by each provision and are not to be used in construing this Agreement or in ascertaining the intentions for this Agreement.

11.    Severability

In the event any one or more of the provisions contained in this Agreement shall be determined by a court to be invalid or unenforceable in any respect, the determination

shall not affect any other provision, and this Agreement shall be enforced as if the invalid provision did not exist.

Executed at Tyler, Smith County, Texas on the date below.

COMPANY                                      EMPLOYEE

Neurodiagnostic Tex, Ltd., a Texas          Robert "Josh" Pierce
limited partnership

_____            _____
Cathy Boldery                               Robert Pierce
Manager of Neuropartners, LLC
General Partner

Date: ___12-13-05___                        Date: ___12/13/05___

# EXHIBIT B

| | | |
|---|---|---|
| NEURODIAGNOSTIC TEX, L.L.C. | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | 7TH JUDICIAL DISTRICT |
| | § | |
| ROBERT "JOSH" PIERCE and | § | |
| SYNERGY IOM, LLC | § | |
| | § | |
| Defendants. | § | SMITH COUNTY, TEXAS |

## SYNERGY'S SECOND MOTION TO SUPPLEMENT SUMMARY JUDGMENT

TO THE HONORABLE JUDGE:

NOW COMES Defendant Synergy IOM LLC ("**Synergy**") and files this Second Motion to Supplement Summary Judgment Evidence (the "**Motion**"). In support hereof, Synergy would respectfully show the Court as follows:

### I. BACKGROUND

1. Pursuant to the Scheduling Order, the deadline to file Motions for Summary Judgment in this lawsuit is May 12, 2014.

2. Synergy filed its Motion for Summary Judgment on May 9, 2014.

3. Attached to Synergy's Motion for Summary Judgment is an Appendix of evidence in support of Synergy's Motion for Summary Judgment (the "**Appendix**"). Synergy previously sought leave to Supplement Exhibit 1 of the Appendix to substitute and include a new affidavit of Robert "Josh" Pierce to correct a procedural defect in the original affidavit.

4. Synergy makes this second request to supplement the summary judgment record based on recent filings by Plaintiff NEURODIAGNOSTIC TEX, L.L.C.

Page 756

("Neurodiagnostic" or "Plaintiff") and Plaintiff's recent service of discovery responses, both of which are relevant to the summary judgment grounds already raised by Synergy.

5. **SYNERGY REQUESTS LEAVE TO SUPPLEMENT THE SUMMARY JUDGMENT EVIDENCE WITH PLAINTIFF'S RESPONSES TO SYNERGY IOM'S REQUEST FOR ADMISSIONS, WHICH ARE ATTACHED TO THIS MOTION AS EXHIBIT "8" AND REQUESTING THE COURT TO TAKE JUDICIAL NOTICE OF PLAINTIFF'S MOTION FOR RECONSIDERATION.**

6. **SYNERGY REQUESTS A JUNE 12, 2014 SUBMISSION DATE FOR THIS LEAVE TO SUPPLEMENT SUMMARY JUDGMENT EVIDENCE SO THAT IT BE INCLUDED WITH ITS PREVIOUSLY FILED MOTION FOR SUMMARY EVIDENCE.**

7. A request for admission once admitted, deemed or otherwise, is a judicial admission. *Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989). An admission conclusively establishes the admitted fact. Tex. R. Civ. P. 198.3. A judicial admission "not only relieves [an] adversary from making proof of the fact admitted but also bars the party himself from disputing it.'" *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000).

8. Allowing Synergy to supplement its motion with Plaintiff's judicial admissions is not a surprise to Plaintiff. Similarly, judicial notice of Plaintiff's own pleadings cannot be a surprise to Plaintiff. Nor does the admission of such evidence prejudice Plaintiff because Plaintiff is barred from disputing judicial admissions.

9. This Motion is not sought for the purpose of delay or prejudice.

## II. ARGUMENTS & EVIDENCE BEING SUPPLEMENTED

### A. COVENANT NOT TO COMPETE IS NOT A CONTRACT SUBJECT TO INTERFERENCE

10. The elements of Plaintiff's tortious interference cause of action against Synergy require that Plaintiff prove: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss. *See Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998).

11. All contracts are not subject to interference. The first element requires that the contract must be a valid contract. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 665 (Tex.1990), *superseded on other grounds by statute as stated in Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013), reh'g denied (Feb. 14, 2014); *Seelbach v. Clubb*, 7 S.W.3d 749, 757 (Tex. App.—Texarkana 1999, pet. denied); *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 123 (Tex. App.—El Paso 1997, pet. denied).

12. An illegal contract, such as covenant not to compete that is an unreasonable restraint of trade, is illegal and unenforceable on grounds of public policy and cannot form the basis of an action for tortious interference. *Juliette Fowler Homes*, 793 S.W.2d at 665; *Travel Masters, Inc. v. Star Tours, Inc.*, 827 S.W.2d 830, 833 (Tex.1991), *superseded by statute on other grounds as stated in Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 653 n.5 (Tex.2006); *NCH Corp. v. Share Corp.*, 757 F.2d 1540, 1543–1544 (5th Cir.1985); *Lazer Spot, Inc. v. Hiring Partners, Inc.*, 387 S.W.3d 40, 49 (Tex. App.—Texarkana 2012,

pet. denied); *Flynn Bros., Inc. v. First Med. Associates*, 715 S.W.2d 782, 785 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

13. In Section III(B)(4) of Synergy's Motion for Summary Judgment, Synergy raised and establishes that Plaintiff's purported customer list is neither secret nor an interest worthy of protection. Plaintiff admits this fact by filing of public record a list of each surgeon and each hospital that Plaintiff claims Pierce worked with while an employee of Plaintiff. This list is attached to Plaintiff's Motion for Reconsideration. Such filing, even if not an admission, vitiates any right to protection.

14. In Section III(C) of Synergy's Motion for Summary Judgment, Synergy raises and establishes that Josh Pierce's covenant not to compete is not valid because it contains unreasonable restrictions.

15. Synergy specifically asserts that the geographic restrictions are unreasonable because the restrictions sought to cover counties in which Pierce had never worked for Neurodiagnostic. *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387 (Tex. 1991) (holding "the restrictive covenant must bear some relation to the activities of the employee. It must not restrain his activities into a territory into which his former work has not taken him . . . ."); *Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 232-33 (Tex. App.—Texarkana 1998, no pet.) (holding that when employee worked only in Harrison County, Texas. The restraint from doing business anywhere in the state of Texas is clearly an unreasonable restriction); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 792 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (reforming covenant to include only counties in which the employee conducted his duties).

16. In PLAINTIFF'S RESPONSE TO SYNERGY IOM'S REQUEST FOR ADMISSIONS, Plaintiff judicially admits that Pierce never worked for Plaintiff in Ellis County, Hood County, Johnson County, Kaufman County, and Parker County.[1] This is five (5) of the eleven (11) counties covered by the covenant. In other words, almost ½ of the counties enumerated in the covenant are counties in which Pierce never worked for Plaintiff.

17. These admissions conclusively establish[2] that Pierce's covenant contains unreasonable restrictions. *Haass*, 818 S.W.2d at 387; *Evan's World Travel*, 978 S.W.2d at 232-33; *Butler*, 51 S.W.3d at 792.

18. As a consequence, the covenant is not valid and enforceable and cannot be the basis of a tortious interference claim. *Juliette Fowler Homes*, 793 S.W.2d at 665; *Travel Masters*, 827 S.W.2d at 833; *NCH Corp.*, 757 F.2d at 1543-1544; *Lazer Spot*, 387 S.W.3d at 49; *Flynn Bros., Inc. v. First Med. Associates*, 715 S.W.2d at 785. Therefore, Synergy is entitled to judgment on the tortious interference claim asserted by Plaintiff.

### B. Unreasonable Restrictions Preclude Damages

19. As part of its tortious interference claim, Plaintiff must also establish that it suffered damages. *See Powell Indus.*, 985 S.W.2d at 456 (listing of elements for tortious interference). In Section III(E) of Synergy's Motion for Summary Judgment, Synergy raises Neurodiagnostic's lack of damages as a summary judgment ground.

---

[1] See Responses 7-11.
[2] TEX. R. CIV. P. 198.3.

SYNERGY SECOND MOTION TO SUPPLEMENT
#133723

20. PLAINTIFF'S RESPONSE TO SYNERGY IOM'S REQUEST FOR ADMISSIONS conclusively establishes that Pierce's covenant contains unreasonable restrictions.

21. Assuming (*arguendo*) the other predicates as to formation of a valid non-compete and competent evidence of reasonableness, Plaintiff's best case scenario is that the Court reform the limitations contained in the covenant. *See* TEX. BUS. COMM. CODE §15.51(c).

22. However, reformation automatically and irrevocably precludes Plaintiff from recovering damages that might have occurred prior to the reformation. TEX. BUS. & COM. CODE ANN. §15.51(c); *Butler*, 51 S.W.3d at 796; *Perez v. Texas Disposal Systems, Inc.*, 53 S.W.3d 480, 482-83 (Tex. App.—San Antonio 2001), *reversed on other grounds*, 80 S.W.3d (2002); *see also Haass*, 818 S.W.2d at 388 (noting that Section 15.51(c) expressly provides a court may not award damages to the promisee and relief shall be limited to injunctive relief). These are the very same damages that Plaintiff must establish to prevail on its claims.

23. Plaintiff is, therefore, precluded from obtaining the very damages it now seeks from Synergy. Because Plaintiff is foreclosed, as a matter of law, from obtaining damages, the tortious interference claim fails as a matter of law.

## PRAYER

Synergy requests that this honorable Court grant it leave to supplement its Motion for Summary Judgment, as set forth above, and also supplement the summary judgment record by allowing Synergy to file and this Court consider PLAINTIFF'S RESPONSES TO SYNERGY IOM'S REQUEST FOR ADMISSIONS, which are attached to this motion as Exhibit "8" and judicial notice of the Court's file, including Plaintiff's Motion for Reconsideration.

Respectfully submitted,

WHITAKER CHALK SWINDLE
AND SCHWARTZ PLLC

By: /s/ Brent Shellhorse
      Hunter T. McLean
      State Bar No. 00788026
      hmclean@whitakerchalk.com
      William Brent Shellhorse
      State Bar No. 24008022
      bshellhorse@whitakerchalk.com
      Patrick H. Rose, IV
      State Bar No. 24079244
      prose@whitakerchalk.com
      3500 DR Horton Tower
      301 Commerce Street
      Fort Worth, Texas 76102
      (817) 878-0500
      (817) 878-0501 (Facsimile)
      ATTORNEYS FOR
      SYNERGY IOM, LLC

## CERTIFICATE OF SERVICE

This is to certify that on the undersigned date, a true and correct copy of the foregoing SECOND MOTION TO SUPPLEMENT MOTION FOR SUMMARY JUDGMENT was sent to all parties in accordance with Texas Rule of Civil Procedure 21a on May 29, 2014.

/s/ Brent Shellhorse
W. Brent Shellhorse

| | | |
|---|---|---|
| NEURODIAGNOSTIC TEX, L.L.C.,<br>Plaintiff, | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | 7ᵗʰ JUDICIAL DISTRICT |
| | § | |
| ROBERT "JOSH" PIERCE and<br>SYNERGY IOM, LLC,<br>Defendant. | § | SMITH COUNTY, TEXAS |

## PLAINTIFF'S RESPONSE TO SYNERGY IOM'S
## REQUEST FOR ADMISSIONS

TO:   DEFENDANT, Synergy IOM, LLC, by and through its attorney of record, Patrick Rose and Hunter McLean, Whitaker Chalk Swindle & Schwartz, PLLC, 301 Commerce Street, Suite 3500, Fort Worth, Texas 76102.

COMES NOW Plaintiff, Neurodiagnostic Tex, LLC, Pursuant to Rule 198 of the Texas

Rules of Civil Procedure, and submits its Response to Defendant Synergy IOM, LLC's Request for

Admissions to Plaintiff in the above-styled and numbered cause as follows:

### INSTRUCTIONS AND DEFINITIONS:

Plaintiff OBJECTS to Defendant's Definitions and Instructions in their entirety to the extent they attempt to impose any obligations on Plaintiff outside the Texas Rules of Civil Procedure. Plaintiff responds to these Requests in accordance with the Texas Rules of Civil Procedure

### REQUESTS FOR ADMISSIONS

#### REQUEST FOR ADMISSION NO. 1:

Admit that in connection with his employment with Neurodiagnostic, Pierce was not responsible for soliciting customers for Neurodiagnosic.

#### RESPONSE:

Denied.

#### REQUEST FOR ADMISSION NO. 2:

Admit that in connection with his employment with Neurodiagnostic, Pierce did not solicit customers for Neurodiangosic.

**EXHIBIT**
**8**

**RESPONSE:**

Denied.

**REQUEST FOR ADMISSION NO. 3:**

Admit that Pierce has not provided Monitoring Services to any current customer of Neurodiagnostic since Pierce's employment with Neurodiagnostic terminated.

**RESPONSE:**

Denied.

**REQUEST FOR ADMISSION NO. 4:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurodiagnostic in Collin County while employed by Neurodiagnostic.

**RESPONSE:**

Denied.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurodiagnostic in Dallas County while employed by Neurodiagnostic.

**RESPONSE:**

Denied.

**REQUEST FOR ADMISSION NO. 6:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurodiagnostic in Denton County while employed by Neurodiagnostic.

**RESPONSE:**

Denied.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurodiagnostic in Ellis County while employed by Neurodiagnostic.

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 8:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurdiagnostic in Hood County while employed by Neurodiagnostic.

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 9:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurdiagnostic in Johnson County while employed by Neurodiagnostic.

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 10:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurdiagnostic in Kaufman County while employed by Neurodiagnostic.

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurdiagnostic in Parker County while employed by Neurodiagnostic.

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurdiagnostic in Rockwall County while employed by Neurodiagnostic.

**RESPONSE:**
Denied.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurdiagnostic in Tarrant County while employed by Neurodiagnostic.

**RESPONSE:**

Denied.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Pierce did not provide Monitoring Services to any physician or hospital on behalf of Neurdiagnostic in Wise County while employed by Neurodiagnostic.

**RESPONSE:**

Denied.

**REQUEST FOR ADMISSION NO. 15:**

Admit that since Pierce's employment with Neurodiagnostic was terminated, that Neurdiagnostic has been able to provide intraoperative monitoring technicians for all surgical procedures where physicians or hospitals requested that Neurodiagnostic provide such services.

**RESPONSE:**

Denied.

Respectfully submitted,

WIGINGTON & DANKESREITER, L.L.P.

Eric F. Dankesreiter
State Bar No. 00796434
efd@texasbuslaw.com
Debra S. Crafton
State Bar No. 24050458
dcrafton@texasbuslaw.com
Rob Wright
State Bar No. 24034184
rwright@texasbuslaw.com
3010 Broadmoor Lane
Flower Mound, Texas 75022
(972) 691-3677
(972) 691-5688 – facsimile

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been sent Carter Hampton, Hampton & Associates, Flat Iron Building, 4th Floor, 1000 Houston Street, Fort Worth, Texas 76102, and Patrick Ross and Hunter McLean, Whitaker Chalk Swindle & Schwartz, PLLC, 301 Commerce Street, Suite 3500, Fort Worth, Texas 76102, via email on this ___ day of May, 2014.

_____
Counselor

F:\DOCUMENT\CLIENTS\JA Bridge, Carter\JA Newspaper.001 F\Our Discovery\Response to Synergy's First Request for Admissions.doc

PLAINTIFF'S RESPONSE TO SYNERGY IOM'S REQUEST FOR ADMISSIONS                    PAGE 5 OF 5

# EXHIBIT C

# *Juliette Fowler Homes, Inc. v. Welch Assocs.*

Supreme Court of Texas

June 6, 1990, Delivered

No. C-7805

**Reporter**

793 S.W.2d 660; 1990 Tex. LEXIS 77; 33 Tex. Sup. J. 530

JULIETTE FOWLER HOMES, INC. ET AL. Petitioners, v. WELCH ASSOCIATES, INC. Respondent

**Subsequent History:** [**1] Rehearing Overruled September 12, 1990.

**Prior History:** From Dallas County, Eleventh District.

## Core Terms

noncompetition, termination, tortious interference, covenant, unenforceable, compete, fund-raising, notice, damages, contractual relationship, tortiously, interfered, public policy, no evidence, cancellation, contracts, grounds, argues, unreasonable restraint, enforceability, injunction, campaign, court of appeals, monetary damages, actual damage, inducing, parties, hired, terms

## Case Summary

### Procedural Posture

Petitioners appealed from a decision of the Dallas County Court, Eleventh District (Texas), which held in favor of respondent in an action alleging that one petitioner breached a noncompetition agreement with respondent and tortiously interfered with another noncompetition agreement.

### Overview

Petitioners, separate organizations involved in fund-raising, each entered into contracts which included noncompetition agreements with respondent. Each petitioner eventually terminated the contracts. Subsequent to the termination of the contracts, second petitioner's president was hired by another organization to supervise the fund-raising campaign of first petitioner. Respondent brought suit against petitioners, alleging violation of the noncompetition agreement, and tortious interference with a noncompetition agreement. The court found the noncompetition agreement between second petitioner and respondent to be unenforceable, because it contained no limitations concerning geographical area or scope of activity. As a result, there could be no tortious interference with the contract. Second petitioner, who was found to have validly ended its contract with respondent, did not tortiously interfere with the agreement between first petitioner and respondent, because mere inducement of a party to terminate contractual relations did not constitute tortious interference in Texas.

### Outcome

The judgment in favor of respondents was reversed, because the noncompetition agreement contained no limitations as to geography or scope of activity, and unenforceability of a noncompetition clause was a valid defense to the claim of petitioner's tortious interference.

## LexisNexis® Headnotes

Contracts Law > Types of Contracts > Covenants

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN1* A covenant not to compete is in restraint of trade and unenforceable on grounds of public policy unless it is reasonable. A covenant not to compete is not a reasonable restraint of trade unless it meets each of three criteria: (1) the covenant not to compete must be ancillary to an otherwise valid transaction or relationship; (2) the restraint created by the covenant not to compete must not be greater than necessary to protect the promisee's legitimate interest; and (3) the promisee's need for the protection afforded by the covenant not to compete must not be outweighed by either the hardship to the promisor or any injury likely to the public. Whether a covenant not to compete is a reasonable restraint of trade is a question of law for the court.

Contracts Law > Types of Contracts > Covenants

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN2* In determining whether the restraint created by a covenant not to compete is greater than necessary to protect the promisee's legitimate interest, the court's primary focus is whether the covenant not to compete incorporates reasonable limitations concerning time, geographical area and scope of activity which do not impose a greater restraint than is necessary to protect the promisee's interest.

Civil Procedure > Remedies > Injunctions > Permanent Injunctions

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN3* An action for damages resulting from competition occurring before a reasonable territory and period have been prescribed by a court of competent jurisdiction must stand or fall on the contract as written. If the agreement is not enforceable in accordance with its terms because either the time or the area stipulated therein is unreasonable, the employer may obtain injunctive relief but will not be awarded a money recovery for anything the employee may have done prior to a judicial declaration of the rights and obligations arising from the contract.

Torts > ... > Commercial Interference > Contracts > General Overview

Torts > ... > Contracts > Intentional Interference > Elements

*HN4* In Texas, the elements of a cause of action for tortious interference with contractual relations are (1) there was a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiffs damage, and (4) actual damage or loss occurred.

Contracts Law > Procedural Matters > Statute of Frauds > General Overview

Contracts Law > Types of Contracts > Covenants

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

Real Property Law > Brokers > Brokerage Agreements

Real Property Law > Purchase & Sale > Contracts of Sale > Formalities

Torts > ... > Commercial Interference > Contracts > General Overview

*HN5* Covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference.

Contracts Law > Standards of Performance > Discharge & Termination

*HN6* When a contract provides expressly that it is subject to termination upon notice, the general

rule is that each party to the contract has the legal right to cancel the contract.

> Contracts Law > Standards of Performance > Discharge & Termination

> Torts > Business Torts > Commercial Interference > General Overview

> Torts > ... > Commercial Interference > Contracts > General Overview

*HN7* Until a contract is terminated, it is valid and subsisting, and third persons are not free to tortiously interfere with it. It would be inconsistent to leave contracts that are terminable upon notice unprotected from tortious interference while protecting relations that are more or less complete or definitive.

> Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

> Torts > ... > Commercial Interference > Contracts > General Overview

*HN8* In reviewing a no evidence point, the court considers only the evidence and inferences tending to support the jury verdict and disregard all evidence to the contrary. If there is any evidence of probative value to support the jury's finding that defendants tortiously interfered with a contract, the court must overrule the no evidence point.

> Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN9* No evidence points of error must and may only be sustained when the record discloses: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; and (4) the evidence established conclusively the opposite of the vital fact.

> Contracts Law > Standards of Performance > Discharge & Termination

> Torts > ... > Commercial Interference > Contracts > General Overview

*HN10* Merely inducing one of the parties to exercise his right to terminate contractual relations after giving the required notice does not necessarily constitute tortious interference with contract under Texas law.

> Civil Procedure > Remedies > Damages > General Overview

> Civil Procedure > Remedies > Damages > Punitive Damages

> Contracts Law > ... > Damages > Types of Damages > Punitive Damages

> Torts > Remedies > Damages > General Overview

> Torts > ... > Types of Damages > Punitive Damages > General Overview

*HN11* Recovery of actual damages is a prerequisite to the receipt of exemplary damages.

**Counsel:** Bryant, Jr., Mr. Corbet F. Carrington, Coleman, Sloman & Blumenthal, Dallas, Texas, DeHay, Jr., Mr. J. Carlisle, and Blanchard Dallas, Texas, Cook, Mr. Kevin J., DeHay & Blanchard, Dallas, Texas, for petitioners.

Zukowski, Mr. John M. Campbell, Athey, Zukowski & Bresenhan, Houston, Texas, for respondent.

**Judges:** Jack Hightower, Justice.

**Opinion by:** HIGHTOWER

## Opinion

[*661] OPINION

HIGHTOWER, Justice.

This breach of contract and tortious interference with contractual relations case involves issues concerning the enforceability of a covenant not to compete. The trial court rendered judgment in

favor of Welch Associates Inc. and against Juliette Fowler Homes, Inc. et al. The court of appeals affirmed the judgment of the trial court. [1] We reverse the judgment of the court of appeals and render judgment that Welch Associates, Inc. take nothing.

[**2] Juliette Fowler Homes, Inc. (Fowler) is a charitable nonprofit organization, an affiliate of the Disciples of Christ Church. In 1981, Fowler entered into a fund-raising contract (Fowler-Welch contract) with Welch Associates, Inc. (Welch), whereby Welch agreed to conduct a fund-raising campaign for the benefit of Fowler. Welch contracted with John W. Butler Companies, Inc. (Butler Companies), to help execute the Fowler fund-raising campaign. The contract between Welch and Butler Companies (Butler Companies-Welch contract) contained a covenant not to compete which bound Butler Companies to not "enter into any form of contract for services" with any of Welch's clients for a period of two years after the conclusion of the Butler Companies-Welch contract. Eventually, Fowler became dissatisfied with Welch's fund-raising results, and Welch and Butler Companies became dissatisfied with one another's performance. Pursuant to the express notice provisions, Fowler terminated its contract with Welch. Butler Companies also terminated its contract with Welch. Subsequently, John Butler, the president [2] of Butler Companies, was hired by the National Benevolent Association (NBA), one of whose

agencies [**3] is Fowler. John Butler was assigned to work directly with Fowler, and supervise Fowler's fund-raising campaign.

Welch filed this action against Fowler, alleging breach of the Fowler-Welch contract, and further alleging tortious interference with the noncompetition clause [3] in the contract between Welch and Butler Companies by inducing John Butler to accept the Director of Development position with NBA. Welch also named John Butler and Butler Companies as defendants, seeking damages for breach of the noncompetition clause of the Butler Companies-Welch contract and for tortious interference with Welch's contractual relations with Fowler.

[**4] The jury found that John Butler breached the noncompetition clause of Butler Companies' contract with Welch and that John Butler and Butler Companies tortiously interfered with Welch's contractual relationship with Fowler. Furthermore, the jury found that Fowler tortiously interfered with Welch's contractual relationship with Butler Companies. A judgment for damages was rendered in favor of Welch against Fowler, John Butler and Butler Companies, jointly and severally. In addition, John Butler was enjoined from certain [*662] activities for one year from the date of the judgment. [4]

[**5] *BREACH OF THE BUTLER COMPANIES-WELCH NONCOMPETITION*

---

[1] The court of appeals' opinion was originally unpublished but has been ordered published by this court.

[2] As far as we can determine from the record, John Butler was the only "employee" of Butler Companies.

[3] The terms "covenant not to compete" and "noncompetition clause" are used interchangeably in this opinion.

[4] The judgment inexplicably enjoined John Butler as follows:

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that a permanent injunction be granted enjoining John W. Butler for a period of one year from the date of this Judgment [April 2, 1987] from contacting any individual or entity, who resides in the United States, the identity of whom or which was first disclosed by WAI [Welch] to John W. Butler during the term of the management contract between Welch Associates, Inc., and the John W. Butler Companies, Inc., for the purpose of soliciting funds.

Since more than one year has passed from the date of judgment, the injunction has expired by its own terms and it is not necessary for this court to address its validity. See *Parr v. Stockwell,* 159 Tex. 440, 322 S.W.2d 615 (1959). Furthermore,

*CLAUSE*

The jury found that John Butler breached the noncompetition clause of the Butler Companies-Welch contract by accepting the Director of Development position with NBA. Among other things, judgment for actual damages was rendered for Welch and against John Butler based upon his breach of the noncompetition clause. John Butler argues that the noncompetition clause of the Butler Companies-Welch contract is unenforceable as written and that Welch may not recover monetary damages for breach of an unenforceable noncompetition clause. Welch does not allege that Butler Companies violated the noncompetition clause by contracting with Welch's clients; rather, Welch argues that John Butler and Butler Companies are liable for breach of contract because John Butler violated the noncompetition clause in the Butler Companies-Welch contract by accepting a position with NBA. Since the noncompetition clause is unenforceable as written, we agree that Welch may not recover monetary damages for John Butler's breach of the Butler Companies-Welch contract.

The noncompetition clause in the Butler Companies-Welch contract provides:

The **[\*\*6]** employees of the John W. Butler Companies, Inc., upon acceptance of this contract, agreed that no disclosure of any confidential information will be given to any third party at any time; and further, that during the life of this contract, and for a period of two (2) years after conclusion of this contract, The John W. Butler Companies, Inc., will not enter into any form of contract for services, directly or indirectly, with any client of Welch Associates, Inc., past or present, including Juliette Fowler Homes, Inc., any agencies of the National Benevolent Association, St. Louis, Missouri, without the expressed written consent of Welch Associates, Inc.

*HN1* A covenant not to compete is in restraint of trade and unenforceable on grounds of public policy unless it is reasonable. *[DeSantis v. Wackenhut Corp., 793 S.W.2d 670 (Tex. 1990)](#)*; *[Frankiewicz v. National Comp Assoc., 633 S.W.2d 505, 507 (Tex. 1982)](#)*. A covenant not to compete is not a reasonable restraint of trade unless it meets each of three criteria: (1) the covenant not to compete must be ancillary to an otherwise valid transaction or relationship; (2) the restraint created by the covenant not to compete must not be greater **[\*\*7]** than necessary to protect the promisee's legitimate interest; and (3) the promisee's need for the protection afforded by the covenant not to compete must not be outweighed by either the hardship to the promisor or any injury likely to the public. *DeSantis v. Wackenhut Corp.,* S.W.2d at . Whether a covenant not to compete is a reasonable restraint of trade is a question of law for the court. *DeSantis v. Wackenhut Corp.,* S.W.2d at ; *[Hershaw v. Kroenecke, 656 S.W.2d 416, 418 (Tex. 1983)](#)*.

In determining the enforceability of the noncompetition clause in the Butler Companies-Welch contract, we need only consider the second criteria: the restraint created by the covenant not to compete **[\*663]** must not be greater than necessary to protect the promisee's legitimate interest. *HN2* Under the second criteria, our primary focus is whether the covenant not to compete incorporates reasonable limitations concerning time, geographical area and scope of activity which do not impose a greater restraint than is necessary to protect the promisee's interest. *DeSantis v. Wackenhut Corp.,* S.W.2d at . As written, the noncompetition clause in the Butler **[\*\*8]** Companies-Welch contract contains no

---

in the court of appeals, Welch conceded that "the injunction fashioned by the [Trial] Court is not on point with either the restrictive covenant found in the Butler [Companies-Welch] Contract or the evidence offered at trial."

==limitations concerning geographical area or scope of activity. Butler Companies and its employees [5] are prohibited from entering into any form of contract for services or employment in any capacity or position, directly or indirectly, with any past or present clients of Welch wherever they may be located. This prohibition is absolute, unequivocal and unreasonable. Accordingly, we hold that the noncompetition clause in the Butler Companies-Welch contract as written is an unreasonable restraint of trade and unenforceable on grounds of public policy.==

John Butler argues that since the noncompetition clause of the Butler Companies-Welch **[**9]** contract is unenforceable as written, Welch may not recover monetary damages for breach of an unenforceable noncompetition clause. We agree.

An action for damages may not be predicated upon the breach of an unenforceable noncompetition clause. *Weatherford Oil Tool Co. v. Campbell, 161 Tex. 310, 340 S.W.2d 950, 952-953 (1960)*; *Frankiewicz v. National Comp Assoc., 633 S.W.2d at 507-508*. For purposes of an action for damages, the enforceability of the covenant not to compete will be determined as written and may not be modified to render it reasonable and enforceable. *Weatherford Oil Tool Co. v. Campbell, 340 S.W.2d at 952-953*; *Frankiewicz v. National Comp Assoc., 633 S.W.2d at 507-508*. As this court discussed in *Weatherford Oil Tool Co. v. Campbell:*

> If the agreement is not reasonably limited as to either time or space, the parties are not definitely apprised of their respective rights and duties until a court of equity has

carved out an area or a period that is reasonable under the circumstances. It is one thing for the court to do this as an incident to the granting of injunctive relief which operates prospectively and an entirely different matter to **[**10]** reform the contract for the purpose of giving the employer a cause of action for damages. In the latter situation the defendant would be required to respond in damages for what he had done at a time when there was no way of determining, except possibly by an action for declaratory judgment, where or for how long he was legally obligated to refrain from competing.

* * * * *

> We hold that *HN3* an action for damages resulting from competition occurring before a reasonable territory and period have been prescribed by a court of competent jurisdiction must stand or fall on the contract as written. If the agreement is not enforceable in accordance with its terms because either the time or the area stipulated therein is unreasonable, the employer may obtain injunctive relief but will not be awarded a money recovery for anything the employee may have done prior to a judicial declaration of the rights and obligations arising from the contract.

*340 S.W.2d at 952-953*. Since the noncompetition clause of the Butler Companies-Welch contract is unenforceable as written, we hold that Welch may not recover monetary damages for John Butler's breach of the noncompetition clause by accepting

---

[5] Since it is not necessary to the disposition of this cause, we do not address (1) whether Welch could enforce the noncompetition clause in the Butler Companies-Welch contract against John Butler simply because he is an employee of Butler Companies or (2) whether John Butler is individually liable for the breach of the Butler Companies-Welch contract.

[**11]   a position with NBA. [6]

[**12]   [*664] *TORTIOUS INTERFERENCE WITH THE BUTLER COMPANIES-WELCH CONTRACT*

Welch obtained favorable jury findings regarding its claim that Fowler tortiously interfered with Welch's contractual relationship with Butler Companies. Fowler argues that a judgment cannot be based upon tortious interference with the Butler Companies-Welch contract because the contractual provision that was violated -- the noncompetition clause -- is unenforceable. Fowler argues that the noncompetition clause in the Butler Companies-Welch contract as written is an unreasonable restraint of trade and unenforceable on grounds of public policy. Therefore, Fowler's actions "inducing" John Butler to accept the Director of Development position with NBA cannot support a judgment for tortious interference. This argument presents the narrow issue of whether the unenforceability of the noncompetition clause in the Butler Companies-Welch contract is a defense to Welch's action against Fowler for tortious interference with contractual relations. Under the facts of this case, we hold that the unenforceability of the noncompetition clause is a defense to Welch's tortious interference claim against Fowler.

*HN4* In Texas, [**13] the elements of a cause of action for tortious interference with contractual relations are (1) there was a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiffs damage, and (4) actual damage or loss occurred. *Armendariz v. Mora, 553 S.W.2d 400, 404* (Tex. Civ. App. -- El Paso 1977, writ ref'd n.r.e.); *see also Hi-Line Elec. Co. v. Dowco Elec. Prod., 765 F.2d 1359, 1362 (5th Cir. 1985).* [7]

The first element requires the [**14] existence of a valid contract. *Steinmetz & Assoc.*, *Inc. v. Crow, 700 S.W.2d 276, 277 n.1* (Tex. App. -- San Antonio 1985, writ ref'd n.r.e.). However, even an unenforceable contract may serve as the basis for a tortious interference claim if the contract is not void. *Clements v. Withers, 437 S.W.2d 818, 821 (Tex. 1969).* In other words, mere unenforceability of a contract is not a defense to an action for tortious interference with its performance. *Id.*

*Clements* concerned an action for tortious interference with a real estate listing agreement

---

[6]   While this cause was pending before this court, the Legislature added sections 15.50 and 15.51 to the Texas Business and Commerce Code concerning covenants not to compete. TEX. BUS. & COM. CODE ANN. §§ 15.50, 15.51 (Vernon Supp. 1990). The legislature made these sections applicable "to a covenant entered into before, on, or after the effective date of this Act." Act of June 16, 1989, ch. 1193, § 1, 1989 Tex. Gen. Laws 4852 (effective Aug. 28, 1989). *See DeSantis v. Wackenhut Corp.,*   S.W.2d at  . We need not determine in this case whether sections 15.50 and 15.51 apply retroactively to affect litigation concerning the rights of parties to a covenant not to compete which commenced before the statute was enacted. *See DeSantis v. Wackenhut Corp.,*   S.W.2d at   ; *Martin v. Credit Protection Ass'n, 793 S.W.2d 667 (Tex. 1990).* Under section 15.50(2), "a covenant not to compete is enforceable to the extent that it . . . contains reasonable limitations as to time, geographical area, and scope of activity to be restrained that do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." TEX. BUS. & COM. CODE ANN. § 15.50(2) (Vernon Supp. 1990). Under section 15.51(c), if the covenant not to compete "does not meet the criteria specified by Subdivision (2) of Section 15.50, the court, at the request of this promisee, shall reform the covenant to the extent necessary to cause the covenant to meet the criteria specified by Subdivision (2) of Section 15.50 and enforce the covenant as reformed, except that the court may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be limited to injunctive relief." TEX. BUS. & COM. CODE ANN. § 15.51(c) (Vernon Supp. 1990). Thus, sections 15.50(2) and 15.51(c) would not require a result in this case different from the one we reach today. *See DeSantis v. Wackenhut Corp.,*   S.W.2d at   ; *Martin v. Credit Protection Ass'n,*   S.W.2d at   .

[7]   At one time the lack of justification or excuse was viewed as an element of the plaintiffs right of recovery. *Sakowitz, Inc. v. Steck, 669 S.W.2d 105, 107 (Tex. 1984).* Recently, however, this court overruled *Sakowitz* and its progeny holding that "the privilege of legal justification or excuse in the interference of contractual relations is an affirmative defense upon which the defendant has the burden of proof." *Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989).*

that was unenforceable between the contracting parties under the statute of frauds. *Id. at 820*. In *Clements,* we expressly noted that the contract [*665] was not void or illegal, neither was there any public policy opposing its performance. *Id. at 821*. We now hold that **HN5** covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference. *See NCH Corp. v. Share Corp., 757 F.2d 1540, 1543-1544 (5th Cir. 1985)*; *Hi-Line Elec. Co. v. Dowco Elec. Prod., 765 F.2d at 1362*.

As we have noted above, [**15] the noncompetition clause in the Butler Companies-Welch contract as written is an unreasonable restraint of trade and unenforceable on grounds of public policy. We hold, therefore, that the unenforceability of the noncompetition clause in the Butler Companies-Welch contract is a valid defense to Welch's tortious interference claim against Fowler.

### BREACH OF THE FOWLER-WELCH CONTRACT

Fowler argues that the court of appeals erred in affirming the trial court's judgment "if based upon a claim of breach of contract," since the fund-raising contract was properly terminated. We address this point because the trial court's judgment against Fowler did not specify whether it was based upon Welch's tortious interference or breach of contract claim against Fowler.

The fund-raising contract involved in this case was a negotiated, arm's length agreement between Fowler and Welch. Paragraph 14, the termination provision, specified how the termination notice should be given and how payment should be calculated in the event of termination. [8] Welch does not contest that written notice of termination was properly given, rather it claims that termination was wrongful because there was no good faith [**16] reason for termination.

At trial, the jury specifically found that Fowler and Welch mutually intended and agreed that the fund-raising contract could be terminated for any reason. **HN6** When a contract provides expressly that it is subject to termination upon notice, the general rule is that each party to the contract has the legal right to cancel the [**17] contract. *Kingsbery v. Phillips Petroleum Co., 315 S.W.2d 561, 576* (Tex. Civ. App. -- Austin 1958, writ ref'd n.r.e.). In this case, the parties bargained for the flexibility of terminating the contract upon tender of the requisite notice. Neither party should be denied the benefit of its bargain. We hold that Fowler properly terminated the fund-raising contract pursuant to its express terms; therefore, Welch's breach of contract claim against Fowler must fail.

### TORTIOUS INTERFERENCE WITH THE FOWLER-WELCH CONTRACT

At trial, the jury found that John Butler and Butler Companies tortiously interfered with the contractual relationship between Fowler and Welch. John Butler and Butler Companies argue that since Fowler properly terminated the fund-raising contract with Welch pursuant to the contract's express notice provisions, judgment

---

[8]  Paragraph 14, the termination provision, states:

> This agreement may be cancelled by either party with the cancellation to be effective sixty days after the mailing or personal delivery of a written notice of cancellation; in the event of a cancellation, the professional fee will be prorated to the date of cancellation according to the fee payment schedule on the effective date of cancellation, based upon the rate of payment to WAI in effect for the particular month in which the termination is effective, and the remaining unpaid fees established by the schedule herein will not be due or owing by Juliette Fowler Homes, Inc., to Welch Associates, Inc.

could not be rendered against John Butler or Butler Companies for tortious interference with the Fowler-Welch contract. Welch argues that Texas law protects against tortious interference with valid existing contracts and prospective business relationships, and that an existing contract which is terminable upon notice should be given similar protection.

 [**18] Texas law protects existing and prospective contracts from interference. *Sterner v. Marathon Oil Co., 767 S.W.2d 686, 689* [*666] *(Tex. 1989)*; *C F & I Steel Corp. v. Pete Sublett & Co., 623 S.W.2d 709, 715* (Tex. Civ. App. -- Houston [1st Dist.], 1981, writ ref'd n.r.e.); *Harshberger v. Reliable-Aire, Inc., 619 S.W.2d 478, 481* (Tex. Civ. App. -- Corpus Christi 1981, writ dism'd w.o.j.). In *Sterner v. Marathon Oil Co., 767 S.W.2d at 689*, this court held that the terminable-at-will status of a contract was no defense to an action for tortious interference with its performance. *HN7* Until a contract is terminated, it is valid and subsisting, and third persons are not free to tortiously interfere with it. *Id*; *see RESTATEMENT (SECOND) OF TORTS § 766 comment g* (1979). It would be inconsistent to leave contracts that are terminable upon notice unprotected from tortious interference while protecting relations that are more or less "complete" or "definitive" (i.e., contracts with fixed terms, terminable-at-will contracts and prospective business relations). *See Champion v. Wright, 740 S.W.2d 848, 854* (Tex. App. -- San Antonio 1987, writ denied); *Deauville* [**19] *Corp. v. Federated Dept. Stores, Inc., 756 F.2d 1183, 1195 (5th Cir. 1985)*. We hold that the terminable upon notice status of the Fowler-Welch contract is not a defense to an action for tortious interference with its performance.

John Butler and Butler Companies argue that there is no evidence that they tortiously interfered

with the Fowler-Welch contract. After a thorough review of the record, we agree.

*HN8* In reviewing a no evidence point, we consider only the evidence and inferences tending to support the jury verdict and disregard all evidence to the contrary. *Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965)*. If there is any evidence of probative value to support the jury's finding that John Butler and Butler Companies tortiously interfered with the Fowler-Welch contract, we must overrule the no evidence point. [9] *In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661-662 (1951)*.

 [**20]   In 1983, Fowler became increasingly dissatisfied with the direction and results of Welch's fund-raising efforts. John Butler was also dissatisfied with Welch and the operation of the fund-raising campaign. In mid-1983, Ed Dowell, Fowler's Executive Director, allegedly stated that it would be good for Fowler if the current NBA Director of Development was no longer there and John Butler could be moved into that position. Mr. Dowell allegedly expressed his desire that John Butler assume total responsibility for the development of Fowler including the fund-raising campaign. Mr. Dowell and John Butler had worked together on the fund-raising campaign almost since its inception.

In September 1983, the NBA Director of Development was terminated. Subsequently, Fowler appointed a Search Committee to find a successor. In December 1983, Mr. Dowell contacted John Butler concerning the Director of Development position; however, John Butler was not particularly interested. In January 1984, the members of the Search Committee decided that they wanted John Butler to be the Director of Development. Mr. Warren Moray, the Chairman of the Fowler Board, indicated that he would

---

[9]   *HN9* No evidence points of error must and may only be sustained when the record discloses: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; and (4) the evidence established conclusively the opposite of the vital fact. Calvert, "*No Evidence*" and "*Insufficient Evidence*" *Points of Error,* 38 TEX. L. REV. 361, 362-363 (1960).

contact John Butler to [**21] see if he was interested in the position. Although he was not initially interested, John Butler decided to discuss the position. In February 1984, John Butler informed Welch that he was interested in the Director of Development position and had decided to pursue this employment opportunity. In April 1984, Fowler hired John Butler and terminated the Fowler-Welch contract. The decision to hire John Butler as Director of Development was not dependent upon the termination of the Fowler-Welch contract and the termination of the Fowler-Welch contract was not dependent upon John Butler's hiring.

Even if John Butler had induced Fowler to terminate the Fowler-Welch contract, [*667] *HN10* merely inducing one of the parties to exercise his right to terminate contractual relations after giving the required notice does not necessarily constitute tortious interference with contract under Texas law. *C.E. Services*, *Inc. v. Control Data Corp., 759 F.2d 1241, 1248* (5th Cir.), *cert denied,* 474 U.S. 1037, 106 S. Ct. 604, 88 L. Ed. 2d 583 (1985); *Kingsbery v. Phillips Petroleum Co., 315 S.W.2d at 576*. Furthermore, even if Fowler's termination of the Fowler-Welch contract was an "outgrowth" [**22] of John Butler's hiring, this would not constitute any evidence that John Butler or Butler Companies either induced Fowler to terminate the contract or tortiously interfered with the contract.

Since we have determined that there is no evidence that John Butler or Butler Companies tortiously interfered with the Fowler-Welch contract, Welch is not entitled to an award of actual damages. *HN11* Recovery of actual damages is a prerequisite to the receipt of exemplary damages. *Doubleday & Co.*, *Inc. v. Rogers, 674 S.W.2d 751, 753-754 (Tex. 1984)*. Consequently, Welch is not entitled to recover exemplary damages.

*CONCLUSION*

We conclude, therefore, that the noncompetition agreement in the Butler Companies-Welch contract as written is an unreasonable restraint of trade and unenforceable on grounds of public policy Furthermore, since the noncompetition clause of the Butler Companies-Welch contract is unenforceable as written, Welch may not recover monetary damages for John Butler's breach of the noncompetition clause by accepting a position with NBA. Since the noncompetition clause of the Butler Companies-Welch contract as written is an unreasonable restraint of trade and unenforceable [**23] on grounds of public policy, it cannot serve as the basis for a tortious interference claim against Fowler.

Since Fowler terminated its contract with Welch pursuant to the express notice provisions of the contract, Fowler cannot be held liable for breach of the Fowler-Welch contract. Moreover, we hold that there is no evidence that John Butler or Butler Companies tortiously interfered with the Fowler-Welch contract. Since Welch is not entitled to an award of actual damages, it is not entitled to recover exemplary damages. We hereby reverse the judgment of the court of appeals and render judgment that Welch take nothing.

# EXHIBIT D

## *Travel Masters, Inc. v. Star Tours, Inc.*

Supreme Court of Texas

December 18, 1991, Delivered

No. D-0962

### Reporter

827 S.W.2d 830; 1991 Tex. LEXIS 158; 35 Tex. Sup. J. 254; 7 I.E.R. Cas. (BNA) 60

TRAVEL MASTERS, INC. ET AL., PETITIONERS v. STAR TOURS, INC., RESPONDENT

**Prior History:** [**1] ON APPLICATION FOR WRIT OF ERROR TO THE COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

### Core Terms

covenant, compete, Travel, enforceable agreement, unenforceable, tortious interference, court of appeals, matter of law, employment-at-will, illegality, ancillary

### Case Summary

#### Procedural Posture

Petitioners sought review from a decision of the Court of Appeals for the Fifth District of Texas, which reversed the decision of the trial court and held that a covenant not to compete was enforceable as a matter of law.

#### Overview

Respondent sued petitioners, seeking injunctive relief and damages for the breach of a covenant not to compete and for tortious interference with a contractual relationship. The lower court reversed and remanded the covenant not to compete claim against petitioner daughter, holding that the covenant not to compete was enforceable as a

matter of law. The lower court affirmed the judgment against the other petitioners. On appeal, the court held that the covenant not to compete was unenforceable as a matter of law because it was not ancillary to an otherwise enforceable agreement. Because employment-at-will was not binding upon either the employee or the employer and was not an otherwise enforceable agreement, a covenant not to compete executed either at the inception of or during an employment-at-will relationship could not be ancillary to an otherwise enforceable agreement and was unenforceable as a matter of law. Further, the court held that respondent could not recover damages from petitioner father or petitioner company for the tortious interference of the covenant. The court rendered judgment that respondent take nothing against petitioners.

#### Outcome

The court reversed the judgment of the lower court and rendered judgment that respondent take nothing against petitioners. The covenant not to compete was unenforceable as a matter of law because it was not ancillary to an otherwise enforceable agreement.

### LexisNexis® Headnotes

Business & Corporate Law > Distributorships & Franchises > Causes of Action > Covenants not to Compete

Contracts Law > Types of Contracts > Covenants

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN1* A covenant not to compete is in restraint of trade and unenforceable on grounds of public policy unless it is reasonable. Whether a covenant not to compete is a reasonable restraint of trade is a question of law for the court. Among other things, an enforceable covenant not to compete must be ancillary to an otherwise enforceable agreement.

Business & Corporate Law > Distributorships & Franchises > Causes of Action > Covenants not to Compete

Contracts Law > Types of Contracts > Covenants

Labor & Employment Law > Employment Relationships > General Overview

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Labor & Employment Law > Employment Relationships > At Will Employment > Duration of Employment

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN2* An "employment-at-will" relationship is not binding upon either the employee or the employer. Either may terminate the relationship at any time. Thus, an employment-at-will relationship, although valid, is not an otherwise enforceable agreement. Because employment-at-will is not binding upon either the employee or the employer and is not an otherwise enforceable agreement, a covenant not to compete executed either at the inception of or during an employment-at-will relationship cannot be ancillary to an otherwise enforceable agreement and is unenforceable as a matter of law.

Business & Corporate Law > Distributorships & Franchises > Causes of Action > Covenants not to Compete

Contracts Law > Types of Contracts > Covenants

*HN3* Covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference.

**Counsel:** FOR PETITIONER Mr. Tom S. McCorkle, McCorkle & Westerburg, P. C., 500 Katy Bldg., Dallas, TX 75202

FOR RESPONDENTS Mr. Randy Roberts, Scoggins, O'Connor & Blanscet, 14180 Dallas Parkway, Suite 800, Dallas, TX 75240. Mr. Bradley S. Freedberg, Scoggins, O'Connor & Blanscet, 14180 Dallas Parkway, Suite 800, Dallas, TX 75240. Mr. Randy Roberts, Scoggins, O'Connor & Blanscet, 14180 Dallas Parkway, Suite 800, Dallas, TX 75240

**Judges:** HIGHTOWER

**Opinion by:** JACK HIGHTOWER

## Opinion

[*831] *OPINION*

In this covenant not to compete case, Star Tours, Inc. sued Travel Masters, Inc., Donna Goldsmith and Walter Goldsmith seeking, among other things, injunctive relief and damages from Donna Goldsmith for the breach of a covenant not to compete and from Travel Masters and Walter Goldsmith for the tortious interference with a contractual relationship. The trial court rendered judgment in favor of Donna Goldsmith concerning the covenant not to compete claim and against Travel Masters and Walter Goldsmith concerning the tortious interference with the covenant not to compete. The court of appeals reversed [**2] and remanded the covenant not to compete claim against Donna Goldsmith, holding that the covenant not to compete was enforceable as a matter of law. The court affirmed the judgment against Travel Masters and Walter Goldsmith.

S.W.2d . We reverse the judgment of the court of appeals and render judgment that Star Tours take nothing against Travel Masters, Donna Goldsmith and Walter Goldsmith.

Donna Goldsmith, an experienced travel agent, was hired by Star Tours with the intent to eventually make her office manager. As a condition of her employment, Donna executed an ″Employee Non-Competition Agreement″ which consisted entirely of a covenant not to compete. The agreement provided:

WHEREAS, Employee, in consideration of the agreements herein contained and the compensation to be paid her, expressly agrees that she will not, for a period of twenty-four (24) months after termination of her employment hereunder for any reason whatsoever, directly or indirectly as Employer, Employee, stockholder, principal agent Employee or in any other individual representative capacity whatsoever, solicit, serve or cater to or engage in, assist, be interested in or connected with any other **[**3]** person, firm or corporation in the same or similar business of Employer soliciting, serving or catering to any of the customers served by her or by any other employee of Employer during the term of her employment. Additionally, Employee shall not disclose to any other persons, firms or entities in the same or similar business as Employer, the names, customers of Employer nor disclose any information of any kind pertaining to the terms of any agreements between Employer and its customers.

Although Donna signed the ″Employee Non-Competition Agreement″ prohibiting **[*832]** her competition with Star Tours for two years, she was an employee-at-will and was subject to termination at any time for any reason.

Several years after beginning her employment with Star Tours, Donna and her parents incorporated Travel Masters, a competing travel agency. Donna eventually left Star Tours and joined Travel Masters as its president. Star Tours attempted to enforce the covenant not to compete against Donna and Travel Masters and ultimately sought, and obtained, a temporary injunction restraining Donna and Travel Masters from soliciting specified Star Tours customers. [1]

**[**4]** Star Tours thereafter added Donna's father, Walter, as a defendant and sought damages from him and Travel Masters for tortious interference with a contractual relationship and from Donna for breach of the covenant not to compete. On Donna's motion, the trial court granted a directed verdict in her favor because the covenant not to compete was unenforceable. However, the tortious interference claims against Walter and Travel Masters were submitted to a jury. The jury found that Walter and Travel Masters wrongfully and maliciously induced a breach of the covenant not to compete and awarded Star Tours actual and exemplary damages. The court of appeals reversed and remanded the covenant not to compete claim against Donna, holding that the covenant not to compete was enforceable as a matter of law. The court affirmed the judgment against Travel Masters and Walter.

I.

Donna argues that the covenant not to compete is unenforceable as a matter of law because it was not ancillary to an otherwise enforceable agreement. We agree.

*HN1* A covenant not to compete is in restraint of trade and unenforceable on grounds of public policy unless it is reasonable. *Martin v. Credit Protection Ass'n,* **[**5]** *Inc., 793 S.W.2d 667, 668 (Tex. 1990)*; *Desantis v. Wackenhut Corp., 793 S.W.2d 670, 681 (Tex. 1990)*. Whether a covenant not to compete is a reasonable restraint of trade is

---

[1]  Travel Masters and Donna appealed the temporary injunction; the court of appeals affirmed the trial court. This court dismissed the application for writ of error for want ofjurisdiction. 742 S.W.2d 837 Tex. App.--Dallas 1987, writ dism'd w.o.j.).

a question of law for the court. *Martin, 793 S.W.2d at 668-69*. Among other things, an enforceable covenant not to compete must be ancillary to an otherwise enforceable agreement. *Martin, 793 S.W.2d at 669*. See *Tex. Bus. & Com. Code § 15.50*.

In *Martin,* we examined an "employment agreement" consisting entirely of a covenant not to compete. The "employment agreement" was executed three years after Martin became an employee-at-will and Martin faced termination if he refused to execute the agreement. *Martin, 793 S.W.2d at 669*. We held that the covenant not to compete was not ancillary to an otherwise enforceable agreement as a matter of law because neither the "employment agreement" nor the employment-at-will relationship was an otherwise enforceable agreement. *Id. at 669-70*. In this case, the "employment agreement" consisted entirely of a covenant not to compete; it did not contain any terms or provisions usually associated with an employment contract. Donna was required to **[**6]** sign the covenant not to compete as a condition of employment. The only difference between this case and *Martin* is that Donna executed the covenant not to compete contemporaneously with the inception of her employment while the *Martin* covenant was executed three years after Martin began employment.

In both cases, however, the employment relationship was "at-will". ² *HN2* An "employment-at-will" relationship is not binding upon either the employee or the employer. Either may terminate the relationship **[*833]** at any time. *Id. at 669*. Thus, an employment-at-will relationship, although valid, is not an otherwise enforceable agreement. *Id. at 669-70*. See *Sterner v. Marathon Oil Co., 767 S.W.2d 686, 689 (Tex. 1989)*. Because employment-at-will is not binding upon either the employee or the employer and is not an otherwise enforceable agreement, we conclude that a covenant not to compete executed either at the inception of or during an employment-at-will relationship cannot be ancillary to an otherwise enforceable agreement and is unenforceable as a matter of law. Since Donna's covenant not to compete is not ancillary to an otherwise enforceable agreement, we hold **[**7]** that the covenant not to compete is an unreasonable restraint of trade and unenforceable on grounds of public policy.

II.

Travel Masters and Walter argue that since the covenant not to compete was unenforceable, it cannot form the basis of an action for tortious interference. We agree.

Star Tours alleged that Walter and Travel Masters willfully and intentionally induced Donna to breach the covenant not to compete. *HN3* Covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference. *Juliette Fowler Homes v. Welch Asso., 793 S.W.2d 660, 665 (Tex. 1990)*. Since the covenant not to compete is an unreasonable restraint **[**8]** of trade and unenforceable on grounds of public policy, we hold that Star Tours cannot recover damages from Walter ³ or Travel Masters for the tortious interference of the covenant not to compete.

**[**9]** We reverse the judgment of the court of

---

² During oral argument, Star Tours asserted that Donna Goldsmith was not an employee-at-will because she was paid on a monthly basis. However, the mere fact that Donna was paid on a monthly basis by Star Tours, without any other evidence, does not prove she was other than an employee-at-will.

³ The court of appeals held that Walter waived his affirmative defense of illegality of the covenant Dot to compete by failing to specifically plead that defense. Although Walter did not plead illegality, Donna and Travel Masters did plead the affirmative defense of illegality of the covenant not to compete. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be tread in all respects as if they had been raised by the pleadings." *Gulf & Basco Co. v. Buchanan,* 707 S.W.2d 655, 657 Tex.

appeals and render judgment that Star Tours take nothing against Travel Masters, Donna Goldsmith and Walter Goldsmith.

JACK HIGHTOWER, JUSTICE

---

App. -- Houston [1st Dist.] 1986, writ ref'd n.r.e.) (affirmative defense of ambiguity of contract); Tex. R. Civ. P. 67. The question of the illegality of the covenant not to compete was clearly before the court. Consequently, in the absence of an objection, the illegality of the covenant not to compete concerning Walter was tried by implied consent.

# EXHIBIT E

# *Lazer Spot, Inc. v. Hiring Partners, Inc.*

Court of Appeals of Texas, Sixth District, Texarkana

September 16, 2012, Submitted; October 18, 2012, Decided

No. 06-12-00044-CV

**Reporter**

387 S.W.3d 40; 2012 Tex. App. LEXIS 8780

LAZER SPOT, INC., Appellant v. HIRING PARTNERS, INC., Appellee

**Subsequent History:** Rehearing overruled by *Lazer Spot, Inc. v. Hiring Partners, Inc., 2012 Tex. App. LEXIS 8932 (Tex. App. Texarkana, Oct. 30, 2012)*

Petition for review denied by *Hiring v. Lazer Spot, 2013 Tex. LEXIS 253 (Tex., Mar. 29, 2013)*

**Prior History:** [**1] On Appeal from the 6th Judicial District Court, Lamar County, Texas. Trial Court No. 79914.

## Core Terms

Spot, employees, tortious interference, covenant, Hiring, at-will, contracts, unenforceable, noncompetition, non competition agreement, terminate, goodwill, compete, enforceable, employment contract, induce, contends, services, confidential information, summary judgment, pet, trial court, contractual, interfered, training, dock, summary judgment motion, attorney's fees, matter of law, temporary

## Case Summary

### Procedural Posture

Appellant company sought review of the decision of the 6th Judicial District Court, Lamar County (Texas), which granted summary judgment in favor of appellee employer in the employer's action alleging that the company had tortiously interfered with contracts between the employer and some of its employees.

### Overview

The employer and the company filed competing motions for summary judgment in a suit brought by the employer. The employer had alleged that the company had tortiously interfered with contracts between the employer and some of its employees. The trial court awarded summary judgment to the employer, but the appellate court reversed, finding no basic for the summary judgment granted in favor of the employer. Judgment was further rendered in favor of the company. Because the restrictive covenants were not supported by consideration independent of the simple act of hiring under an at-will agreement, they were not ancillary to or part of an otherwise enforceable agreement under *Tex. Bus. & Com. Code Ann. § 15.50* (2011). Because a claim of tortious interference could not be premised merely on the hiring of an at-will employee, without more, summary judgment was improperly granted on the claim of tortious interference with contractual relations; the employees were within their rights to terminate employment with the employer at any time.

### Outcome

The judgment was reversed and judgment was rendered in favor of the company.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > Cross Motions

*HN1* When both sides move for summary judgment and the trial court grants one motion and denies the other, reviewing courts consider both sides' summary-judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN2* The Covenants Not to Compete Act governs the enforceability of noncompetition agreements, *Tex. Bus. & Com. Code Ann. §§ 15.50-15.52* (2011). The enforceability of a covenant not to compete is a question of law. Appellate courts review the trial court's determinations of questions of law on a de novo basis.

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN3* See *Tex. Bus. & Com. Code Ann. § 15.50(a)* (2011).

Contracts Law > Standards of Performance > Illusory Promises

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN4* The requirement of an ″otherwise enforceable agreement″ set out in *Tex. Bus. & Com. Code Ann. § 15.50(a)* (2011) is satisfied when the covenant is part of an agreement which contains mutual, nonillusory promises. An ″otherwise enforceable″ agreement can emanate from at-will employment so long as the consideration for any promise is not illusory. A noncompetition agreement must be supported by consideration to be enforceable. Consideration for a noncompetition that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus.

Contracts Law > Formation of Contracts > Consideration > Sufficient Consideration

Contracts Law > Standards of Performance > Illusory Promises

Labor & Employment Law > ... > At Will Employment > Exceptions > Implied Contracts

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN6* Where the nature of the employment requires the employer to furnish the employee with confidential information, the employer impliedly promises to provide that information and that implied promise is sufficient consideration to support a covenant not to compete. Where an employer in an at-will employment agreement agrees to provide confidential information or other consideration to an employee, a reciprocal promise by the employee not to use the confidential information in competition with the employer may not be immediately enforceable because the employer's promise is illusory because he could terminate the employee before any confidential information is shared. But, once the employer fulfills the promise to divulge the confidential information, the contract becomes enforceable and may support a covenant not to compete. Thus, a covenant not to compete is not

unenforceable solely because the employer's promise is executory when made.

> Contracts Law > Formation of Contracts > Consideration > General Overview

> Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN5* Employment agreements consisting entirely of a covenant not to compete are unenforceable because the covenant must be supported by valuable consideration.

> Contracts Law > Formation of Contracts > Consideration > General Overview

> Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN7* While goodwill is a protectable interest, goodwill does not encompass guidelines that prevent the business from ceasing to exist (although some goodwill is generally necessary for that aim). Consideration is required to support a noncompetition agreement. "Goodwill" is defined as the advantage or benefits which is acquired by an establishment beyond the mere value of the capital stock, funds or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant and habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

> Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN8* General skills and knowledge developed through course of employment are not the type of interest which justifies protection under a restrictive covenant.

> Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

> Torts > ... > Contracts > Intentional Interference > Defenses

*HN9* Those covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference Thus, unenforceability of a noncompetition covenant is a valid defense to a claim of tortious interference.

> Torts > ... > Contracts > Intentional Interference > Elements

*HN10* Even an unenforceable contract may serve as the basis for a tortious interference claim if the contract is not void, and mere unenforceability of a contract is not a defense to an action for tortious interference with its performance. A tortious interference claim may not be grounded on a contract that was void or illegal, or where there is any public policy opposing its performance.

> Torts > ... > Business Relationships > Intentional Interference > Elements

*HN11* To establish liability for interference with a prospective contractual or business relation, the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful.

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

> Torts > ... > Contracts > Intentional Interference > Defenses

> Torts > ... > Contracts > Intentional Interference > Elements

*HN12* A party seeking to establish tortious interference with a contract must prove four elements: (1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and

intentional act proximately caused damage; and (4) that actual damage or loss occurred. A defendant may defeat a tortious interference claim on summary judgment by disproving one element of the claim as a matter of law. To establish a willful and intentional act of interference, there must be evidence that the defendant was more than a willing participant. The defendant must have knowingly induced one of the contracting parties to breach its obligations under a contract.

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Torts > Business Torts > Commercial Interference > General Overview

Torts > ... > Commercial Interference > Contracts > General Overview

**HN13** Outside of the realm of allegedly defamatory statements made by third parties that result in termination of at-will employment (where inducement is apparently tortious because it is accomplished via defamation), other actionable interference appears to hinge on violation of a contractual provision, other than the at-will provision.

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Torts > Business Torts > Commercial Interference > General Overview

**HN14** A claim of tortious interference cannot be premised merely on the hiring of an at-will employee, without more.

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

**HN15** See *Tex. Bus. & Com. Code Ann. § 15.51(c)* (2011).

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

**HN16** *Tex. Bus. & Com. Code Ann. § 15.51(c)* (2011) permits the promisor to recover costs and reasonable attorney's fees, in certain circumstances.

**Counsel:** Hon. Michael V. Abcarian, Fisher & Phillips, LLP, Dallas, TX.

Hon. Larry M. Lesh, Law Office of Larry M. Lesh, Richardson, TX.

Hon. Paul M. Lanagan, Fisher & Phillips, LLP, Dallas, TX.

Hon. Philip B. Smith Jr., Attorney at Law, Paris, TX.

**Judges:** Before Morriss, C.J., Carter and Moseley, JJ. Opinion by Justice Moseley.

**Opinion by:** Bailey C. Moseley

## Opinion

[**\*43**] The Judgment of the Trial Court in the referenced proceeding on appeal from Lamar county was this date **REVERSED**, and the judgment here **RENDERED**, in conformity with the written Opinion of this Court of even date.

A true copy of this Court's Opinion and Judgment is enclosed.

Respectfully yours,

Opinion by Justice Moseley

OPINION

Hiring Partners, Inc. (HPI) and Lazer Spot, Inc. (Lazer Spot) filed competing motions for summary

judgment in a suit brought by HPI. HPI's suit alleged that Lazer Spot had tortiously interfered with contracts between HPI and some of its employees. The trial court awarded summary judgment to HPI. Because we find no basis for the summary judgment granted in favor of HPI and because Lazer Spot was entitled to summary judgment as a matter of law, we reverse the [**2] judgment of the trial court and render judgment in favor of Lazer Spot.

## I. Background and Procedural Posture

HPI is in the business of recruiting workers for its clients for the performance of services required by those clients. HPI requires each of its employees to execute written employment contracts with HPI. While the form of these contracts vary somewhat, they each specifically state that the employees are at-will employees. In addition, each employment contract contains a ninety-day clause, which prohibits the employee from seeking "employment on a temporary, contract or permanent basis at any company where introduced by HPI for a period of ninety (90) days."

This case involves three at-will employees of HPI: Mitch Templeton, Shanda McCalib, and Michelle Thoms (the employees), who were each hired to work as gate clerks/dock hands[1] for Arnold Transportation Company (Arnold) at the Campbell's Soup plant in Paris, Texas, in 2010,[2] pursuant to Arnold's contract with Campbell's Soup to supply employees for these positions. The employees signed contracts with HPI wherein both the employer and employee acknowledged that the employees were in an employment at-will status and wherein the [**3] employees each agreed to be bound by the ninety-day noncompetition clause mentioned above.

Unbeknownst to HPI, Lazer Spot received a request from Campbell's Soup in approximately July 2010 to submit a proposal to provide truck spotting services at its Paris facility. While Lazer Spot was aware that Arnold had been providing these services up to that point, Lazer Spot was unaware that Arnold was utilizing temporary employees supplied by HPI to perform yard work (or truck spotting services). On October 7, 2010, Campbell's Soup awarded the contract for those services to Lazer Spot.[3] In mid-October, Lazer Spot received employment [**4] applications [*44] from the employees.[4] On October 19, Lazer Spot interviewed and offered employment to the employees to work as gate clerks/dock hands at the Campbell's Soup plant. At the time the employees were offered employment, Lazer Spot was unaware of the employees' written contracts for employment with HPI, contracts which included the noncompetition agreements.[5]

On October 19, after the employees interviewed with Lazer Spot and were offered employment by it, Dana Hill, the operations manager for HPI, telephoned Jerry Edwards, the vice president of operations for Lazer Spot. Hill advised Edwards that the employees were subject to employment contracts with HPI. Although Edwards indicated that he then requested that Hill send him a copy of the contracts, Hill did not do so. According

---

[1]   Employees are periodically referred to in the record as gate clerks, dock clerks, or dock hands. As gate clerks/dock hands, the employees were responsible for checking in trucks when they arrived at the plant, checking in with truck drivers, gathering information, and entering certain data into a computer system. HPI's job description for the gate clerks/dock hands indicates the position is akin to that of a warehouse worker.

[2]   The employees were hired to perform yard management services required by Arnold pursuant to a contract between Arnold and Campbell's Soup.

[3]   HPI does not contend that Lazer Spot took any improper action in connection with bidding for and obtaining the services contract.

[4]   The applications were dated October 14 and October 19. Each application indicated that the applicant was currently employed by HPI.

[5]   HPI was unaware that Arnold's contract with Campbell's Soup was about to expire and that Lazer Spot was awarded the successor services contract.

[**5] to Hill, Edwards did not ask to see a copy of the contracts, even after she indicated her belief that the employees would breach their contracts and that Lazer Spot would be assisting in that breach if it hired the employees.

On October 23, Lazer Spot received a letter (dated October 21) from HPI's counsel, Larry Lesh, demanding that Lazer Spot cease its interference with the employment contracts between HPI and its employees. The letter neither described the contractual obligations owed HPI by the employees, nor included a copy of the referenced contracts. Because counsel for Lazer Spot was hospitalized shortly after the letter was received, no immediate response was made.

On November 2, Lazer Spot commenced its operations at the Campbell's Soup plant and the employees began work for Lazer Spot "around this time."[6] Having received no reply to its October 21 letter, HPI filed suit against Lazer Spot on November 3, alleging that Lazer Spot tortiously interfered with HPI's employment contracts with the employees, seeking actual and exemplary damages.

On November 18 (after having been served [**6] with the lawsuit) Rhonda McCurtain, vice president of human resources and general counsel for Lazer Spot, called Lesh. According to McCurtain, she unconditionally offered to terminate the employment relationships of the employees so that HPI could rehire them.[7] McCurtain states that Lesh rejected this offer, indicating that HPI did not want to rehire the employees. Lesh claims that during the telephone conversation with McCurtain, he inquired whether

Lazer Spot would pay a reasonable amount to settle the lawsuit. According to Lesh, McCurtain indicated that Lazer Spot would not pay any substantial amount to settle, but inquired whether Lazer Spot's termination of the employees would be an acceptable alternative to HPI. HPI did not find this alternative acceptable.[8]

On January 23, Lazer Spot filed a motion for summary judgment wherein it alleged [*45] that it had engaged in no tortious interference with HPI's contracts because the post-employment restrictive covenants [**7] are unenforceable as a matter of law, and the unenforceability of those covenants is a valid and absolute defense to HPI's tortious interference claim. Lazer Spot alleged in its motion (and re-urges on appeal), that the covenants not to compete are unenforceable because there was no legally enforceable consideration promised or provided to the employees that would support those promises. In addition, Lazer Spot alleged that HPI has no protectable interest because the employees are dock hands who engage in a common calling. Finally, Lazer Spot claimed the covenants are unenforceable because they are overly broad.[9]

HPI filed a competing motion for summary judgment, contending Lazer Spot tortiously interfered with the employment contracts between HPI and its employees, entitling HPI to damages and declaratory relief, citing authority it maintains supports the proposition that a contract for at-will employment is subject to interference. It contended that Lazer Spot interfered with the employment contracts with full knowledge of their existence and [**8] that such interference was willful and intentional, causing HPI damages in the aggregate

---

[6] The affidavit of Hill indicates that the employees terminated their employment with HPI on October 31.

[7] McCurtain also requested copies of the employment contracts. Lesh indicated that he would refer the request to HPI, but did not believe it would be a problem.

[8] McCurtain received copies of the employment contracts on November 24.

[9] Lazer Spot further claimed that it was unaware of the employees' contractual obligations, and hence there could be no tortious interference.

amount of $47,684.83 as of December 31, 2011, with damages continuing to accrue thereafter for so long as employees were employed by Lazer Spot.

On March 12, the trial court entered its final summary judgment denying Lazer Spot's motion for summary judgment and granting HPI's motion for summary judgment. The judgment awarded HPI damages it requested in the amount of $47,684.83, representing damages caused by Lazer Spot through December 31, 2011, and further declared that the liability of Lazer Spot to HPI "shall continue from and after December 31, 2011 for so long as Mitchell Templeton, Shanda McCalib and Michelle Thoms remain employees of Defendant Lazer Spot." This appeal ensued.

## II. Standard of Review

*HN1* "When both sides move for summary judgment, as they did here, and the trial court grants one motion and denies the other, reviewing courts consider both sides' summary-judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London, 327 S.W.3d 118, 124 (Tex. 2010)* (citing *Embrey v. Royal Ins. Co. of Am., 22 S.W.3d 414, 415-16 (Tex. 2000))*.

## III. [**9] Appellate Issues

Lazer Spot's primary appellate point is based on the premise that its motion for summary judgment should have been granted because the noncompetition covenants were not enforceable as a matter of law. In support of this contention, Lazer Spot argues that HPI did not provide consideration to the employees in exchange for their purported agreement to be bound by the covenants not to compete, and the noncompetition

covenants are unlawfully broad with regard to the scope of activity they purport to restrain. Because we find the noncompetition covenants are not supported by consideration, we need not address the argument regarding their scope or breadth.

Lazer Spot further contends (apart from any issue relating to the noncompetition agreements) that the trial court erred in denying its motion for summary judgment [*46] (and in granting HPI's motion) because there was no tortious interference with the employees' contracts, claiming the mere act of hiring an at-will employee who works for another is not tortious as a matter of law. We agree.[10]

## IV. Analysis

### A. The Noncompetition Agreements Are Unenforceable

Lazer Spot initially maintains that the trial court erred in failing to grant its motion for summary judgment—and in granting HPI's motion—because the noncompetition agreements between HPI and its employees are unenforceable as a matter of law. Because "covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference," Lazer Spot contends there is no tortious interference. *Juliette Fowler Homes, Inc. v. Welch Assocs., 793 S.W.2d 660, 665 (Tex. 1990)*.

*HN2* The Covenants Not to Compete Act governs the enforceability of noncompetition agreements. *TEX. BUS. & COM. CODE ANN. §§ 15.50-.52* (West 2011). The enforceability of a covenant not to compete is a question of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009)*. We review the trial

---

[10]   Lazer Spot raises additional appellate issues, including claims of justification in hiring the employees and of estoppel, the trial court's [**10] failure to strike HPI's first amended petition and certain summary judgment evidence, together with various complaints regarding the damage award included in the judgment. Our reversal of the trial court's judgment in favor of HPI renders these issues moot.

[**11] court's determinations of questions of law on a de novo basis. *Barber v. CO Indep. Sch. Dist., 901 S.W.2d 447, 450 (Tex. 1995)*.

*Section 15.50* provides in relevant part:

> *HN3* Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise.

*TEX. BUS. & COM. CODE ANN. § 15.50(a)*.

Lazer Spot contends the noncompetition agreements are unenforceable because they are not "ancillary to or part of' an otherwise enforceable agreement as required under *Section 15.50*. *HN4* The requirement of an "otherwise enforceable agreement" is satisfied when the covenant is part of an agreement which contains mutual, nonillusory promises. *Marsh USA, Inc. v. Cook, 354 S.W.3d 764, 773 (Tex. 2011)*. An "otherwise enforceable" agreement "can emanate from at-will employment so long as the consideration [**12] for any promise is not illusory." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson, 209 S.W.3d 644, 648 (Tex. 2006)*. A noncompetition agreement must be supported by consideration to be enforceable. *Id. at 651*; *DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 681 n.6 (Tex. 1990)*. "Consideration for a noncompet[ition] that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus." *Marsh, 354 S.W.3d at 775*. Here, Lazer Spot contends there was no consideration given to enforce the noncompetition agreements.

The covenant in question provides:

> [*47] I [**13] agree not to seek employment on a temporary, contract or permanent basis at any company where introduced by Hiring Partners, Inc. for a period of ninety (90) days. I will not seek to induce any client to call other temporary or contract agencies for their temporary, permanent or project assignments. This means that I will not knowingly inform other services of Hiring Partners, Inc. clients and/or rates charged at these client companies. Nor will I discuss my hourly rate with other individuals working for Hiring Partners, Inc. nor other temporary or employment agencies.
>
> Hiring Partners, Inc. realizes that clients may seek help from other temporary or employment agencies and, that I may also be called upon by another agency to fill other positions; however, I may not accept an assignment through another agency for a period of ninety (90) days at a firm/ company that applicant has been introduced to by Hiring Partners, Inc.
>
> Hiring [**14] Partners, Inc. reserves the right to replace a candidate working on assignment at its own discretion, without this signed agreement being altered in any way and considers such to remain in effect for a period of ninety (90) days from the date last worked by applicant.

All contracts specify that employment is "employment at will," meaning that either HPI or the employee "can terminate the employment relationship at any time, with or without cause, with or without notice."

There is no recitation of consideration in the contracts. The contracts identify neither confidential, proprietary, or trade secret information to be divulged, nor any goodwill or specialized training to be provided the employees

in consideration for signing the contracts. The only implied consideration[11] is illusory—the consideration of at-will employment. This is insufficient. *See, e.g., Martin v. Credit Protection Ass'n, 793 S.W.2d 667, 669 (Tex. 1990)* (holding **HN5** employment agreement consisting entirely of covenant not to compete unenforceable because covenant "must be supported by valuable consideration"); *Sheshunoff, 209 S.W.3d at 651*.[12]

Likewise, the record fails to disclose the existence of any such consideration. Hill was asked whether there is "any confidential information [**16] that you can identify for the judge or jury that Hiring Partners provided to these employees as a part of their employment with Hiring Partners?" Her response was "No." In addition, Hill testified that because she could not identify any confidential or proprietary information given to the employees, she could not [*48] identify any steps HPI took to ensure that such information remained confidential.[13]

HPI responds that "[c]onsideration for a noncompetition that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus" because "the purpose of the Act . . . was to expand rather than restrict the enforceability of such covenants" and "[t]he Act provides that 'goodwill' is a protectable interest." *Marsh, 354 S.W.3d at 775-77*.

HPI relies on Hill's testimony that the noncompetition agreements [**17] were designed to protect HPI's goodwill:

> Q. Can you identify for the judge or the jury what was the interest that Hiring Partners was seeking to protect through this 90-day clause?
>
> A. It's the nature of our business. If we don't have some rules to follow, then we could present employees, to clients all day long every day and they could just hire them on their own. We would be out of business if we did not have guidelines to go by.

While *Marsh* does find that **HN7** goodwill is a protectable interest, goodwill does not encompass guidelines that prevent the business from ceasing to exist (although some goodwill is generally necessary for that aim).[14] *Marsh* further requires consideration to support a noncompetition agreement.

---

[11] **HN6** Where the nature of the employment requires the employer to furnish the employee [**15] with confidential information, the employer impliedly promises to provide that information and that implied promise is sufficient consideration to support a covenant not to compete. *Fielding, 289 S.W.3d at 852*.

[12] Where an employer in an at-will employment agreement agrees to provide confidential information or other consideration to an employee, a reciprocal promise by the employee not to use the confidential information in competition with the employer may not be immediately enforceable because the employer's promise is illusory because he could terminate the employee before any confidential information is shared. But, once the employer fulfills the promise to divulge the confidential information, the contract becomes enforceable and may support a covenant not to compete. *See Sheshunoff, 209 S.W.3d at 648-49*. Thus, a covenant not to compete is not unenforceable under the Act solely because the employer's promise is executory when made. *Id.* at 655. Here, there is no allegation or claim that employees were, at any time, provided confidential information.

[13] Hill generally described the training provided to HPI employees as "vibes in the workplace training; harassment training; safety in the workplace; back protection; hearing protection; fire safety; lock out, tag out instructions; forklift safety." She could not recall the specific training given to any of the employees.

[14] "Goodwill" is defined as:

> the advantage or benefits which is acquired by an establishment beyond the mere value of the capital stock, funds or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant and habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities [**18] or

In *Marsh*, the employer's managing director, Cook, was granted the option to purchase shares of stock in the Marsh entity pursuant to an incentive plan. When the option was nearing expiration, Cook exercised his right to purchase company stock. In conjunction with the purchase, Cook agreed that in the circumstance he left Marsh within three years, he would neither compete with Marsh nor solicit its employees. Cook also agreed that he would maintain the confidentiality of Marsh's confidential information and trade secrets. *Id. at 767*. After leaving Marsh, Cook was sued for violating the covenant not to compete.

The Texas Supreme Court concluded that the noncompetition provision satisfied the requirements of the Act. *Id. at 780*. In doing so, it recognized that the award of stock options "linked the interests of a key employee with the company's long-term business interests." *Id. at 777*. In addition, "[o]wners' interests are furthered by fostering the goodwill between the employer and its clients" and "stock options are reasonably related to the protection of this business goodwill." *Id.*

*Marsh* does not support HPI's claim that the

covenants against [**19] employment by others in controversy here were necessary to protect its goodwill; *Marsh* involved a managing director who was successful in achieving and attracting business for the company, these long-term relationships being vitally important in the insurance brokerage [*49] industry. *Id. at 776-77*. The consideration for the protection of business goodwill was reasonably related to that protection. In contrast with *Marsh*, the employees here were blue collar workers[15] who signed noncompetition agreements in the absence of consideration.[16]

Because the [**21] restrictive covenants here were not supported by consideration independent of the simple act of hiring under an at-will agreement, they are not "ancillary to or part of" an otherwise enforceable agreement under *Section 15.50*. *TEX. BUS. & COM. CODE ANN. § 15.50(a)*. **HN9** Those "covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference." *Juliette Fowler Homes, 793 S.W.2d at 665*. Thus, unenforceability of a noncompetition covenant is a valid defense to a claim of tortious interference. *Id.*;[17] *see also Travel Masters,* [*50] *Inc. v. Star Tours, Inc., 827 S.W.2d 830, 833 (Tex. 1991)*,

prejudices.

*Marsh, 354 S.W.3d at 777-78*.

[15] The employees were responsible for checking in trucks, gathering information, and entering data into a computer system. HPI's job description for the gate clerks/dock hands says the job is akin to that of a warehouse worker. Lazer Spot thus contends that because the employees' positions only entailed generic work skills, this basic knowledge does not implicate a protectable interest under Texas law. *See Evan's World Travel, Inc. v. Adams, 978 S.W.2d 225, 231 (Tex. App.—Texarkana 1998, no pet.)* (**HN8** general skills and knowledge developed through course of employment not type of interest which justifies protection under restrictive covenant). There is no evidence [**20] the employees received specialized training. When asked if HPI provided employees any training for the specific tasks they were to perform at Campbell's Soup, Jones stated that she had no idea.

[16] In addition to *Marsh*, HPI cites a number of cases from other jurisdictions finding disintermediation—a diversion of a company's business by eliminating the middleman—to be an interest worthy of protection. *See, e.g., Volt Servs. Grp. v. Adecco Emp't Servs., 178 Ore. App. 121, 35 P.3d 329, 334 (Ore. App. 2001)* (contacts between employer's employees and its customers can create protectable interest when nature of contact is such that there is substantial risk employee may be able to divert all or part of customer's business); *see also Aerotek, Inc. v. Burton, 835 So.2d 197 (Ala. Civ. App. 2001)* (employer had interest in protecting itself from disintermediation); *Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc., 946 F.Supp. 495 (E.D. Ky. 1996)* ("disintermediation" worthy of protection where considerable time, effort, and money spent in training employees). In light of Texas' statutory restrictions governing the enforceability of noncompetition agreements, we do not find this authority persuasive.

[17] In *Juliette Fowler Homes*, Fowler, a nonprofit organization, entered into a fund-raising contract with Welch, whereby Welch agreed

*superseded by statute on other grounds as stated in Sheshunoff, 209 S.W.3d at 653 n.5*. Therefore, to the extent HPI's tortious interference claim is premised on breach of the noncompetition agreements, such claim cannot stand. HPI contends, however, that tortious interference exists here, independent of any issue relating to the noncompetition agreements.

## B. The Mere Hiring of an at-Will Employee [**24] Cannot, Without More, Give Riseto a Tortious Interference Claim

HPI relies on *Sterner v. Marathon Oil Co., 767 S.W.2d 686, 689 (Tex. 1989)*, to claim that even though the employment contracts were terminable-at-will, they are nevertheless subject to a cause of action for tortious interference. *See also Crouch v. Trinque, 262 S.W.3d 417, 425-26 (Tex. App.—Eastland 2008, no pet.)* (cause of action exists "for tortious interference with a contract of employment terminable at will").

Lazer Spot's response to this argument is two-fold. The first part of Lazer Spot's argument zeroes in on the fact that Jones (HPI's president) testified that the only portions of the contracts HPI alleges were violated are the noncompetition covenants. When asked what part of the agreement the employees violated, Jones pointed to the following language, "I may not accept an assignment through another agency for a period of 90 days, at a firm/company that applicant has been introduced to by Hiring Partners." Jones further explained, "[T]he contractual obligation is . . . that the employee cannot go to a company where we have introduced them. So that is what is in violation. They are certainly at-will employee[s] [**25] and can go to anybody else but some place where we've introduced them to, because that's our business." Lazer Spot seeks to hold HPI to this testimony and restrict the tortious interference issue to the noncompetition clause.[18] In doing so, Lazer Spot prevails, because the noncompetiton clause is unenforceable and thus will not support a tortious interference claim.

In its second point, Lazer Spot contends that when stripped of any protection the subject noncompetition agreements might otherwise provide, the remaining contract is nothing more

---

to conduct a fund-raising [**22] campaign for the benefit of Fowler. Welch contracted with Butler to help execute the Fowler fund-raising campaign. The contract between Welch and Butler contained a covenant not to compete which bound Butler not to "enter into any form of contract for services" with any of Welch's clients for a period of two years after the conclusion of the Butler-Welch contract. *Juliette Fowler Homes*, 793 S.W.2d at 661. Thereafter, Fowler terminated its contract with Welch. Butler also terminated its contract with Welch. Butler was then hired by NBA, one of whose agencies is Fowler. Butler was assigned to work with Fowler, and to supervise its fund-raising campaign. As a result, Welch sued Fowler, alleging breach of the Welch-Fowler contract and further alleging breach of the noncompetition clause. Welch also sued Butler for breach of the noncompetition clause of the Butler-Welch contract and for tortious interference with Welch's contractual relations with Fowler.

The jury found that Butler breached the noncompetition clause of the Butler-Welch contract by accepting the position with NBA. The court found that the noncompetition clause was unenforceable and that Welch could therefore not recover for [**23] Butler's breach of the Butler-Welch contract (the clause contained no limitations concerning geographical area or scope of activity).

The jury found that Fowler tortiously interfered with Welch's contractual relationship with Butler. Fowler argued that the noncompetition clause in the Butler-Welch contract was an unreasonable restraint of trade and unenforceable on the grounds of public policy. Fowler therefore claimed that its actions "inducing" Butler to accept the position with NBA cannot support a judgment for tortious interference. The Texas Supreme Court indicated that "this argument presents the narrow issue of whether the unenforceability of the noncompetition clause in the Butler-Welch contract is a defense to Welch's action against Fowler for tortious interference with contractual relations." *Id. at 664*. After determining that the unenforceability of the noncompetition clause was a defense to Welch's tortious interference claim, the court held "that covenants not to compete which are unreasonable restraints of trade and unenforceable on grounds of public policy cannot form the basis of an action for tortious interference." *Id. at 665*.

[18] HPI's original petition alleges, "[T]he willful and malicious acts and conduct of Lazer Spot described above constitute tortious and unlawful interference with the contracts of employment between HPI and employees of HPI." While the petition never mentions the noncompetition clauses, it does describe the recruiting and testing of employees and their placement with Arnold.

than the written memorialization of a common law at-will employment relationship. Proceeding from that premise, Lazer Spot says that the mere hiring of an at-will worker who is currently employed by another, does not constitute actionable interference.

[*51] HPI does not concede the [**26] noncompetition agreements are unenforceable; even so, they place great reliance on *Sterner* and its progeny. However, the holding in *Sterner* is limited: at-will contracts are protected from tortious interference.[19] Lazer Spot contends it is not tortious interference to induce a contract obligor to do what it has a right to do. In *ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997)*, the high court recognized that "[o]rdinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference." After this quote, the Texas Supreme Court signaled, "but cf. *Sterner v. Marathon Oil Co., 767 S.W.2d 686 (Tex. 1989).*" *Id*. HPI contends that by preceding the citation of *Sterner* with the "but cf." signal, the high court signified that the quoted statement in *ACS Investors* was inapplicable to *Sterner* which, unlike *ACS Investors*, involved tortious interference with an employment relationship.

In *Sterner*, an employee of Marathon (Sterner) prevailed in a suit against Marathon following an accident. *Sterner, 767 S.W.2d at 688*. Sterner then took a job with a different company at a drilling site. Sterner's new employer was under contract with Marathon. When a Marathon supervisor noticed Sterner on the job site, he instructed Sterner's new employer to fire Sterner. *Id*. The high court held that it was tortious interference for Marathon to induce Sterner's employer to

terminate its at-will contract with Sterner. *Id. at 691*.

While *Sterner* appears to be at odds with *ACS Investors*, it has been postulated [**28] that an explanation for this apparent inconsistency is the fact that

Marathon's contract with Sterner's employer specifically yielded all managerial decisions to the employer. Marathon induced the employer to do what it had a right to do (i.e., terminate at will). In this case, however, Marathon breached its contract with Sterner's employer by making a demand that violated the terms of the Marathon-employer agreement. Marathon's acts violated its agreement with Sterner's employer and thus exceeded its right to interfere with the contract between Sterner and his employer.

Sean Farrell, *Applying Tortious Interference Claims to at-Will Contracts*, 39 Tex. J. Bus. L. 527, 532 (Winter 2004) (footnotes omitted) (citations omitted). If one accepts this distinction, it does not follow that *ACS Investors* is necessarily at odds with *Sterner*.

Additional authority cited by HPI does not support its position that an at-will employee cannot be induced to do what he otherwise has a right to do (i.e., terminate employment at any time). For example, in *Crouch*, the tortious interference claim was based on allegedly defamatory comments that led to termination of the plaintiff's at-will employment. Summary [**29] judgment on the tortious interference claim was upheld

---

[19] HPI suggests that *Juliette Fowler Homes* did not modify *Sterner* because it did not involve an employment contract. We disagree. *Sterner* held that the terminable-at-will status of a contract is no defense to an action for tortious interference with its performance. [**27] *Sterner*, 767 S.W.2d at 689. *Fowler* recognized that **HN10** "even an unenforceable contract may serve as the basis for a tortious interference claim if the contract is not void," and emphasized that "mere unenforceability of a contract is not a defense to an action for tortious interference with its performance." *Juliette Fowler Homes, Inc.*, 793 S.W.2d at 664. The court then created an exception to the general rule and held that a tortious interference claim may not be grounded on a contract that was "void or illegal," or where there is "any public policy opposing its performance." *Id*. at 664-65.

because the affirmative [*52] defense of justification was not pled. *Crouch, 262 S.W.3d at 426*. The remaining authority[20] cited by HPI in support of its contention that at-will employment is subject to tortious interference likewise involved claims based on allegedly defamatory comments regarding the plaintiff, which resulted in the plaintiff's termination of employment.[21] In each of these cases, a third party allegedly interfered, and the plaintiff was fired. In this case, however, the employees quit their jobs, as they had every right to do. There is no evidence of wrongful conduct by Lazer Spot, such as defamation or breach of an obligatory contractual provision.[22]

*Graham v. Mary Kay Inc., 25 S.W.3d 749 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)*, highlights the distinction between inducing someone to terminate at-will employment and interfering with at-will employment contracts. In that case, Graham appealed an injunction preventing her from selling Mary Kay cosmetics at her retail location. The Mary Kay consultants were required to sign an agreement with Mary Kay to only sell directly to the [*53] consumer. Graham maintained that because the consultants were at-will employees, it was not tortious interference to induce them to transact business with her. Graham did not induce the consultants to leave their employment. "The [**33] object of the interference was . . . not in inducing a switch in contractual relations, but in exploiting contractual relations to Graham's benefit (and Mary Kay's detriment)." *Id. at 754*. Because Graham induced the consultants to do something they had no right to do under their contracts with Mary Kay, she tortiously interfered with those contracts. *Id*.

**HN13** Outside of the realm of allegedly defamatory statements made by third parties that result in termination of at-will employment (where inducement is apparently tortious because it is accomplished via defamation), other actionable interference appears to hinge on violation of a

---

[20] *De Mino v. Chu*, No. 01-03-01127-CV, 2005 Tex. App. LEXIS 7323, 2005 WL 2123537 (Tex. App.—Houston [1st Dist.] Aug. 31, 2005, pet. denied) (mem. op.); *Armijo v. Mazda Int'l*, No. 14-03-00365-CV, 2004 Tex. App. LEXIS 4765, 2004 WL 1175335 (Tex. App.—Houston [14th Dist.] May 27, 2004, pet. denied) (mem. op.); *Albertsons. Inc. v. Hufnagle*, No. 05-01-00573-CV, 2002 Tex. App. LEXIS 6200, 2002 WL 1964236 (Tex. App.—Dallas Aug. 26, 2002, no pet.) (not designated for publication).

[21] Based on this authority, Lazer Spot takes the position that there must be some [**30] independent misconduct (other than the mere loss of at-will employment) before tortious interference may be considered. The Texas Supreme Court has held that **HN11** to establish liability for interference with a prospective contractual or business relation, the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001).

[22] **HN12** A party seeking to establish tortious interference with a contract must prove four elements: (1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred. A defendant may defeat a tortious interference claim on summary judgment by disproving one element of the claim as a matter of law. *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455 (Tex. 1998); *Archives of Am., Inc. v. Archive Litig. Servs., Inc.*, 992 S.W.2d 665, 666-67 (Tex. App.—Texarkana 1999, pet. denied). The disputed element here is that of "willful and intentional" interference. To establish a willful and intentional act of [**31] interference, there must be evidence that the defendant was more than a willing participant—the defendant must have knowingly induced one of the contracting parties to breach its obligations under a contract. *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

To support its claim of "willful and intentional" interference, HPI contends that despite Lazer Spot's claimed lack of knowledge of the ninety-day clause (there is no evidence Lazer Spot knew about the ninety-day clause when it hired the employees on October 19), Lazer Spot was fully aware that employees were employed by HPI at the time it hired them because: (1) the employment applications listed HPI as the current employer, giving Lazer Spot actual notice of the status of those applicants as employees of HPI; and (2) on October 19, the date the employees were interviewed and offered employment, Hill advised Edwards that the employees were "under contract" with HPI and that Lazer Spot "would be assisting them in breaching the contract if" Lazer Spot hired them. Hill admits the telephone conversation with Edwards took place after Lazer Spot interviewed the employees and offered them employment. [**32] Further, Lazer Spot contends there is no evidence it was aware of any of the employees' contractual obligations when it hired them, and HPI provided no evidence to prove otherwise. We agree. Even if Lazer Spot was aware of the contractual provisions between HPI and its employees, nothing in those contracts prevented Lazer Spot from hiring the employees.

contractual provision, other than the at-will provision. *See Sterner, 767 S.W.2d at 691* (Marathon not justified to interfere because directive to fire Sterner exceeded terms of Marathon-employer agreement); *Graham, 25 S.W.3d at 754* (breach of direct sales clause in employees' agreements with Mary Kay).

Because *HN14* a claim of tortious interference cannot be premised merely on the hiring of an at-will employee, without more, summary judgment was improperly granted on the claim of tortious interference with contractual relations; the employees were within their rights [**34] to terminate employment with HPI at any time.[23]

## V. Conclusion

Because the noncompetition covenants in this circumstance are unenforceable, and because there is otherwise no tortious interference with the contracts between HPI and the employees, we reverse the judgment of the trial court. Further, because Lazer Spot was entitled to summary judgment as a matter of law, we render judgment in favor of Lazer Spot. Lazer Spot is not, however, entitled to recover attorney's fees and court costs.[24]

/s/ Bailey C. Moseley

Bailey C. Moseley

Justice

Date Submitted: September 26, 2012

Date Decided: October 18, 2012

---

[23] If the mere hiring of an at-will employee, without more, were sufficient to support a claim of tortious interference, the economy in the State of Texas would soon grind to a halt.

[24] Lazer Spot claims that it should have been awarded attorney's fees as a part of its summary judgment, pursuant to Section 15.51(c) of the Texas Business and Commerce Code:

> *HN15* If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, the promisor establishes that the promise knew at the time of the execution of the agreement that the covenant did not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable [**35] and the limitations imposed a greater restraint than necessary to protect the goodwill or other business interest of the promise, and the promise sought to enforce the covenant to a greater extent than was necessary to protect the goodwill or other business interest of the promise, the court may award the promisor the costs, including reasonable attorney's fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant.

TEX. BUS. & COM. CODE ANN. § 15.51(c). *HN16* The foregoing provision permits the "promisor" to recover costs and reasonable attorney's fees, in certain circumstances. Because the express language of the statute does not apply here, Lazer Spot is not entitled to attorney's fees under Section 15.51(c). TEX. BUS. & COM. CODE ANN. § 15.51(c); *see Glattly v. Air Starter Components, Inc., 332 S.W.3d 620, 645 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)* (Covenants Not to Compete Act does not permit employers to recover their attorney's fees in suits to enforce their rights under the Act). We find no authority to support the proposition that a third party, such as Lazer, Spot, is entitled to attorney's fees pursuant to this section of the [**36] statute.